## AFFIDAVIT OF STEPHEN T. PATERNITI

I, Stephen T. Paterniti, do hereby depose and state as follows:

1. Along with my colleague, Andrew C. Pickett, I represent Defendant Washington Group International ("WGI") in the matter entitled *EEOC, et.al. v. Washington Group International, et al.* U.S.D.C. Docket Number 04-12097GAO.

2. This affidavit is being filed in support of WGI's motion for a protective order to prevent the deposition of WGI's President and Chief Executive Officer, Stephen G. Hanks.

3. WGI's Corporate Equal Employment Officer, Michael McDaniel, was deposed in this matter on December 1, 2006. Attached hereto as Exhibit A are relevant portions of Mr. McDaniel's deposition transcript.

Signed under the pains and penalties of perjury this ___ day of December 2006.

\s\Stephen T. Paterniti
Stephen T. Paterniti

1

Volume I
Pages 1 to 182
Exhibits 1 - 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
EQUAL EMPLOYMENT OPPORTUNITY      :
COMMISSION,                       :
        Plaintiff,                :
                                  :
JOHN BALDWIN, LEONARD BELL,       :
JOHANNES KAINDOH, WAYNE           :
HENDERSON, GODWIN ENAGBARE and    :
JOE L. WILLIS,                    :
        Intervenor-Plaintiffs,    :
                                  :
        -against-                 :   C.A. No.
                                  :   04-12097-GAO
WASHINGTON GROUP INTERNATIONAL,   :
INC., RON BENNETT, MICHAEL        :
FOGARTY and DENNIS WOODRUFF,      :
        Defendants.               :
                                  :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF D. MICHAEL McDANIEL, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Carol H. Kusinitz, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of the
Equal Employment Opportunity Commission, John F.
Kennedy Federal Building, Room 475, Government
Center, Boston, Massachusetts, on Friday, December
1, 2006, commencing at 12:41 p.m.

(Continued on Page 2)

```
 1      Q.   Anybody else?
 2      A.   Certainly the responsibility would -- for
    that project goes to the project management as well.
 4      Q.   The on-site project management?
 5      A.   Yes.
 6      Q.   Who does Mr. Myers report to you, if you
 7  know?
 8      A.   To the Office of the Chairman.
 9      Q.   Any particular person within that office?
10  The president himself?
11      A.   Probably, yes.
12      Q.   Is the president of WGI still Stephen
13  Hanks?
14      A.   Yes.
15      Q.   And I believe it was Mr. Hanks at the time
16  this case originated in 2002?
17      A.   I believe that's true.
18      Q.   Do you ever, in your work duties, have to
19  interact with Mr. Hanks?
20      A.   No.
21      Q.   Have you ever?
22      A.   Once.
23      Q.   Tell me what it was that you had to
24  interact with him about.
```

1  A.   An OFCCP audit of the Boise corporate
2  office.
3  Q.   Why did you need to speak to him about
4  that?
5  A.   Because that's his home office, and they
6  were also looking at it from certain corporate
7  perspectives, and they were also going to be
8  scheduling a visit by the OFCCP district director
9  during the course of that audit, who had asked for
10 an audience with Mr. Hanks.
11 Q.   I see.
12 A.   And we sat down to discuss the elements of
13 the audit, where it was, et cetera.
14 Q.   Although you may not, with this exception,
15 have to deal with Mr. Hanks directly in the course
16 of your work duties, are you ever presented with
17 questions from the Office of the Chairman or in a
18 position where you need to provide information to
19 the Office of the Chairman about EEO matters?
20 A.   Not directly, no.
21 Q.   When you say "not directly," what do you
22 mean?
23 A.   If I provide information to my supervisor,
24 who in turn provides it to her supervisor, who is

1   Larry Myers, that information may get to the Office
2   of the Chairman.
3       Q.   And your supervisor is Ms. Rupert; is that
4   true?
5       A.   No, Ms. Large, Jennifer Large.  I'm sorry,
6   at the time -- that's true now.  So which time frame
7   are we referring to?
8       Q.   So Jennifer Large is now your supervisor,
9   and at the time that Mystic was happening here in
10  Boston, Cathy Rupert was your supervisor?
11      A.   No.  Mr. Myers was my supervisor.
12      Q.   Okay.  There was no Cathy Rupert at the
13  time?
14      A.   There was, but I reported directly to Mr.
15  Myers.
16      Q.   Got it.  Just again to get a little bit of
17  a context of how the HR function works at WGI, I
18  think you're aware that the EEOC has another case
19  pending against WGI out of a facility in New Jersey.
20  Are you aware of that?
21      A.   Yes.
22      Q.   What division did that case originate in,
23  if you know?
24      A.   Infrastructure.

1   A.   Yes.

2   Q.   Have you seen this document before?

3   A.   Yes.

4   Q.   When did you first see this document?

5   A.   I believe I generated that.

6   Q.   You actually drafted it?

7   A.   No. I put it together.

8   Q.   What do you mean by that?

9   A.   From the report from which it came, I
10  extracted this. I wiped out some of the other stuff
11  and sent it to Warren to alert him, to let Warren
12  know -- this is my recollection of this; I think
13  it's accurate -- to let Warren know that it was
14  being looked after.

15  Q.   Okay. I think I understand what you just
16  said, but let me try to back up. Now, the subject
17  of this document says "Human Resources Report for
18  the week ending September 6th, 2002."

19       Is there a Human Resources report that goes
20  out weekly to Stephen Hanks -- I assume that those
21  are individuals in the Office of the Chairman?

22  A.   That's correct.

23  Q.   Is that true, that --

24  A.   Generally true.

1  Q.  On a weekly basis?

2  A.  Generally true.

3  Q.  And is it fair to say that this particular
4  weekly report was generated by you, I guess, through
5  Larry Myers and then to the Office of the Chairman?
6  Is that how it goes?

7  A.  I would generate a weekly report.

8  Q.  Okay.

9  A.  One of my pieces labeled "EEO/AA" here
10 would have -- this would have been in my report.
11 Larry Myers then takes the reports of all the HR
12 directors, five to eight, you know, whatever other
13 sources for the weekly report, and selects those
14 items from those individuals' reports to put into
15 his report that goes to the Office of the Chairman.

16 Q.  Do you know how the selection process goes
17 with respect to -- I mean, probably not every single
18 thing gets put in; is that true?

19 A.  True.

20 Q.  I mean, to your knowledge, are items
21 selected that could cause liability for the company?
22 I mean, how does -- if you know, how is that
23 generated?

24        MR. PATERNITI:  Objection.  I'm just

1  confused.  Are you talking about the report he
2  writes or the report that Larry Myers writes?
3           MS. PALACIOS-BALDWIN:  I'm talking about
4  just the weekly report that is being submitted to
5  the Office of the Chairman.  If it's going from
6  Larry Myers, that's fine.  He said he generated his,
7  or this one.
8      A.   I wouldn't want to be presumptuous about
9  how Larry Myers makes his selections, but there have
10 been generalizations to those people who submit
11 reports to try and make the contents of your report
12 relevant to business, as opposed to "This week I'm
13 working on something"; if you have an end result or
14 if there is a condition, et cetera, that appears to
15 be reportable and affecting -- whether it's good,
16 bad, what have you, that management needs to know
17 about in order to apply the necessary resources.
18     Q.   Okay.  And did you get a response from the
19 Office of the Chairman about this particular report
20 that you made?
21     A.   No.
22     Q.   Have you ever gotten a response from the
23 Office of the Chairman on any report that you've
24 made?

1  A. No.
2  Q. Do you think they read it?  Just kidding --
3  well, actually, I'm not kidding.  Do you think they
4  read it?
5  A. Yes.
6  Q. They review it themselves?
7  A. The link there is that I, at that time
8  reporting to Larry Myers, submitted my report to
9  Larry Myers.  Larry Myers did with it what he would.
10 That was the end of my connection to the Office of
11 the Chairman.
12 Q. All right.  Now, if you look with me on the
13 actual text, the narrative piece under "EEO," I
14 guess Affirmative Action, "AA," the second-to-last
15 line says, "All supervisors are being reminded of
16 their responsibility and sensitivity training will
17 be done to raise awareness."
18 A. Okay.
19 Q. Do you know whether in fact sensitivity
20 training was actually done at the facility?
21 A. Yes.
22 Q. And how do you know that?
23 A. By records of the meetings that were
24 conducted which the supervisors generally referred

182

COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.                )

   I, Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, hereby certify that there came before me on the 1st day of December, 2006, at 12:41 p.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

   I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

   In witness whereof, I have hereunto set my hand and affixed my notarial seal this 7th day of December, 2006.

                   *Carol H. Kusinitz*
                   Notary Public
                   My commission expires  6/7/13