**EXHIBIT   A**

Case 1:04-cv-12097-MBB   Document 32-2   Filed 01/11/2007   Page 1 of 11



Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
U.S.E.E.O.C. v. Pipe Fitters Ass'n Local Union 597N.D.Ill.,2002.
United States District Court, N.D. Illinois, Eastern Division.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION plaintiff
v.
FOSTER WHEELER CONSTRUCTORS, INC.; Local Union 597 Pipefitters Association; Foster Wheeler Illinois, Inc.; Foster Wheeler USA, Inc.; Foster Wheeler Corporation defendant
James M FERGUSON intervenor
UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
James M. FERGUSON, Plaintiff-Intervenor,
v.
PIPE FITTERS ASSOCIATION LOCAL UNION 597, Defendant.
James M. FERGUSON, Plaintiff
v.
PIPEFITTERS ASSOCIATION LOCAL UNION 597
**Nos. 98 C 1601, 98 C 3217.**

March 28, 2002.

Jean Powers Kamp, John C. Hendrickson, John A. Knight, Gregory M. Gochanour, Diane Ilene Smason, United States Equal Employment, Opportunity Commission, Chicago, IL, for Equal Employment Opportunity Commission, plaintiff.
Angela Frances Milella, Federal Defender Program, Chicago, IL, Roger L. Taylor, Roya Behnia, William Allen Woolley, Katheryn Kim Frierson, Kirkland & Ellis, Chicago, IL, for Foster Wheeler Constructors, Inc., defendant.
Thomas Michael Durkin, Charles Francis Regan, Jr., Mayer, Brown, Rowe & Maw, Chicago, IL, for Local Union 597 Pipefitters Association, defendant.
Russell J. Fee, III, Law Offices of Russell J. Fee, III, Oak Park, IL, Law Offices of Ayesha S. Hakeem, Chicago, IL, Catherine Ward Bremer, Warner & Meihofer LLC, Chicago, IL, for James M Ferguson, intervenor.
James M Ferguson, Markham, IL, intervenor, pro se.
COAR, J.
**\*1** This matter coming before the court after a consolidated bench trial in these cases, the following shall constitute the court's findings of fact and conclusions of law.

*FINDINGS OF FACT*

1. Plaintiff Equal Employment Opportunity Commission ("EEOC") is the agency of the United States Government charged with the administration, and enforcement of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § § 2000e-5(f)(1) and (3).

2. At all relevant times, Defendant Pipe Fitters Association, Local Union 597 ("Local 597") has been a labor organization as that term is defined under Title VII. Local 597 represents approximately 7000 pipe fitters and welders in Northeastern Illinois and Northwestern Indiana.

3. The Robbins Resource Recovery facility, located in Robbins, Illinois, is a 1600 ton per day "waste to energy" facility.

4. Foster Wheeler Constructors is a construction company based in Clinton, New Jersey. It specializes in the construction, throughout the world, of petroleum, chemical, petrochemical and alternative fuel facilities and related infrastructure, including power generation and distribution facilities.

5. Foster Wheeler Constructors was the general contractor for the Robbins Resource Recovery Center (the "Robbins Project"). It also performed one of the subcontracts on the Project, which included mechanical work and piping.

6. Foster Wheeler Constructors began constructing a stack foundation for the Robbins Resource Recovery facility in January 1995. Full-scale construction began in April 1995. During construction, Foster Wheeler Constructors hired workers from several unions (including Local 597) to work on the Robbins project. Over the course of construction, approximately 2300 workers from 36 different contractors and subcontractors worked at the Robbins facility. When union workers were hired by Foster Wheeler Constructors, hiring was in accord with the procedures established by the respective unions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                        Page 2
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

7. Foster Wheeler Constructors completed all construction work at the Robbins site by November 1996.

8. The Robbins Facility was constructed in Robbins, Illinois. The population of Robbins, Illinois is approximately 95% African-American. As a result of an agreement between Foster Wheeler and the City of Robbins, Foster Wheeler Constructors undertook to hire a significant number of local residents to work on the Robbins project.

9. A minority of the workers at the Robbins Project was African American.

10. A minority of the pipe fitters from Local 597 at the Robbins Project was African American.

11. Steven Kokosa was employed by Foster Wheeler Constructors as the site Construction Manager at the Robbins Project from approximately March 28, 1995 to December 1996. Kokosa is Caucasian.

12. Les Jordan was employed by Foster Wheeler Constructors as the Project Superintendent at the Robbins Project. Jordan is Caucasian.

**\*2** 13. Troy Roder was employed by Foster Wheeler Constructors as the Construction Superintendent at the Robbins Project. Roder is Caucasian.

14. Richard LeBarre was employed by Foster Wheeler Constructors as a Field Superintendent at the Robbins Project. LeBarre is Caucasian.

15. Leonard Wallace was employed as the Site Human Resources Manager at the Robbins Project. Wallace is African American.

16. James Roach was employed by Foster Wheeler Constructors as the Site Labor Relations Manager at the Robbins Project from approximately April 1995 to September 10, 1996. Roach is Caucasian.

17. Dennis Hahney was Piping Superintendent for Foster Wheeler Constructors. Hahney is now and was a member of Local 597 at the time of the Robbins Project. Hahney is Caucasian.

18. Hahney started at the Robbins site on October 2, 1995 and remained on the job until on or about October 4, 1996.

19. Hahney was paid by the hour.

20. Brian Speers was employed by Foster Wheeler Constructors as a pipefitting foreman from approximately October 1995 to October 1996. Brian Speers is now and was a member of Local 597 at the time of the Robbins Project. He is Caucasian.

21. Warren Mrowczynski was General Foreman for pipe fitters and reported to Hahney. Mrowczynski is now and was a member of the Local 597 at the time of the Robbins Project. Mroczynski is Caucasian.

22. Hahney was responsible for hiring pipe fitters through the Local 597 hiring hall.

23. Hahney decided who would be foremen for pipe fitters on the Robbins Project.

24. James Ferguson was a member of Local 597 at the time of the Robbins Project and has been a member since that time. Mr. Ferguson was employed by Foster Wheeler Constructors at the Robbins Project from approximately November 27, 1995 to August 2, 1996.

25. James Foster was a member of Local 597 at the time of the Robbins Project and has been a member since that time. Mr. Foster was employed by Foster Wheeler Constructors at the Robbins Project from approximately March 18, 1996 to June 19, 1996.

26. Monconer Higgs was a member of Local 597 at the time of the Robbins Project and has been a member since that time. Higgs was employed by Foster Wheeler Constructor's at the Robbins Project from approximately May 2, 1996 to August 2, 1996 and is African American.

27. Keith Hill was a member of Local 597 at the time of the Robbins Project and has been a member since that time. Hill was employed by Foster Wheeler Constructors at the Robbins Project from approximately December 13, 1995 to June 19, 1996 and is African American.

28. Joseph McGhee was a member of Local 597 at the time of the Robbins Project and has been a member since that time. McGhee was employed by Foster Wheeler Constructors at the Robbins Project from approximately January 16, 1996 to April 26, 1996 and is African American.

29. David Payne was a member of Local 597 at the time of the Robbins Project and has been a member since that time. Payne was employed by Foster

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 3
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

Wheeler Constructors at the Robbins Project from approximately November 27, 1995 to August 2, 1996 and is African American.

**\*3** 30. Robert Smith was a member of Local 597 at the time of the Robbins Project and has been a member since that time. Smith was employed by Foster Wheeler Constructors at the Robbins Project from approximately April 23, 1996 to May 1, 1996 and is African American.

31. Larry Smizer was a member of Local 597 at the time of the Robbins Project and has been a member since that time. Smizer was employed by Phillips Getschow at the Robbins Project from approximately May 17, 1995 to July 3, 1995. Smizer is African American.

32. Lance Williams was employed by Phillips Getschow at the Robbins Project from approximately May 17, 1995 to May 22, 1995. Williams obtained his job with Phillips Getschow at the Robbins Project through Local 597's hiring hall. Williams is African American.

33. Joe Mantagano was a member of Local 597 at the time of the Robbins Project. Mantagano is Caucasian and was employed by Phillips Getschow at the Robbins Project in May, June and July of 1995 and served as lead pipe fitter for Local 597 members performing work on the site for Getschow. Included among these members were Larry Smitzer and Lance Williams.

34. White pipe fitters at the Robbins Project frequently made racial jokes about African Americans.

35. In addition to the swastikas drawn on the interior walls of the port-a-johns, a swastika made of a cardboard box was placed in the tool box used by Keith Hill.

36. A swastika made of paper was placed at Keith Hill's seat in the trailer.

37. Restroom facilities for workers including pipe fitters at the Robbins Facility consisted primarily of portable toilets ("port-a-johns") scattered throughout the Robbins Facility.

38. The port-a-johns were leased by Foster Wheeler Constructors for use by all persons working at the Robbins Facility. The portable toilets were rented from a portable toilet company, which emptied and maintained them.

39. The number and location of the port-o-johns at the Robbins site changed as construction progressed.

40. As of October of 1996, near the end of the project, there were 28 portable toilets at the 13-acre Robbins site.

41. The graffiti in the portable toilets was often racially tinged and contained racially offensive phrases such as "death to all niggers," "your grandmother is such a slut she even fucks niggers," "kkk," and swastikas. Many of the toilets containing racially offensive graffiti were in areas used by members of Local 597.

42. The racial graffiti in the port-a-johns also included racial graffiti that specifically referred to individual African American pipe fitters: "Fergie [James Ferguson], if you don't want to be treated like a nigger, don't act like one," and a drawing of an African American male with the size of his lips exaggerated and drawn around the toilet paper roll and the phrase "pull out Joe's [Joe McGhee] tongue."

43. On a daily basis (and several times each day) African American pipe fitters, including Ferguson, Hill, McGhee, Smith, Foster, Payne, Smizer and Williams were subjected to the racially hostile, offensive, derogatory, humiliating and threatening graffiti written on the interior walls of the port-a-johns at the Robbins Project.

**\*4** 44. A hangman's noose(s) was hung at different locations at the Robbins Project. A hangman's noose was hung over the door way of the trailer used by the African American pipe fitters at the Robbins Project

45. A hangman's noose was tied by Brian Speers, Ferguson's supervisor, and hung on the railing outside the trailer in which Ferguson worked. Speers is Caucasian.

46. Most, if not all, of the portable toilets regularly used by the pipe fitters at the Robbins Project had racially hostile, offensive, derogatory, humiliating and threatening graffiti written on the interior walls.

47. Many of the class members have seen racial and sexual graffiti at other construction sites, both before and after the Robbins project.

48. Many of the class members have seen racial and sexual graffiti at other construction sites, both before

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-12097-MBB    Document 32-2    Filed 01/11/2007    Page 5 of 11

Not Reported in F.Supp.2d                                                                                                   Page 4
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

and after the Robbins project.

49. There was conflicting testimony as to whether the frequency and offensiveness of graffiti at the Robbins site was greater than at other sites.

50. On July 9, 1996, James Ferguson requested a meeting with Local 597 business agent Steve Toth. The next day, July 10, 1996, Mr. Toth went out to the Robbins Project work site, and met with Mr. Ferguson and Dennis Hahney, the piping superintendent at the Robbins Project.

51. Steve Toth was a business agent of Pipe Fitters Association, Local Union 597, whose geographical territory included the Robbins project. Toth is Caucasian. Toth saw sexual graffiti in the port-a-johns at the Robbins Project and reported it to Steve Kokosa, the Foster Wheeler Project Manager, and Dennis Hahney, the Piping Superintendent.

52. On September 9, 1996, EEOC investigator, Michael Thomas ("Thomas") visited the Robbins Facility to investigate complaints of racial harassment against Foster Wheeler Constructors. During his September 9, 1996 visit to the Robbins Facility, Thomas toured the Robbins Facility and inspected the port-a-johns with representatives of Foster Wheeler.

53. On September 19, 1996, Thomas returned to the Robbins Facility.

54. On September 19, 1996, Thomas toured the Robbins Facility with representatives of Foster Wheeler.

55. On September 19, 1996, Thomas again inspected the port-a-johns for graffiti.

56. On August 30, 1996, Lawrence Malone filed a charge of discrimination with the EEOC alleging that Pipe Fitters Local 597 subjected him to a racially hostile work environment.

57. On August 30, 1996, Darryl Nelson filed a charge of discrimination with the EEOC alleging that Pipe Fitters Local 597 subjected him to a racially hostile work environment.

58. On September 3, 1996, James Ferguson filed a charge of discrimination with the EEOC alleging, among other things, that Pipe Fitters Local 597 subjected him to a racially hostile work environment.

59. At all times material to this action, Local 597 has continuously had and does now have at least five hundred (500) members.

60. Dennis Hahney functioned as the lead pipe fitter for Local 597 at the Robbins Project from October 1995 until the completion of construction. As the lead pipe fitter at the Robbins Project, Hahney was responsible for addressing issues affecting pipe fitters and if he could not resolve the problem he would call the business agent, Steve Toth. As Piping Superintendent for Foster Wheeler and lead pipe fitter for Local 597, Hahney believed that he was equally representing management and the union.

*5 61. Hahney would act on complaints from workers under his supervision, but sometimes acted on his own initiative when he saw something that would adversely affect pipe fitters. Among his duties, he was responsible for seeing that the pipe fitters had proper facilities and that no one was "hassled". If he observed a condition that threatened the safety of the pipe fitters and the other people working at the Robbins Project while he was piping superintendent, he would have taken steps to correct the problem, or contacted someone who could, even if no one had complained to him about the condition.

62. Pipe fitters at the Robbins Project reasonably believed that Dennis Hahney was acting as the on-site representative of Local 597 at the Robbins Project.

63. Joe Mantagano functioned as the lead pipe fitter for Local 597 at the Robbins Project over Larry Smizer and Lance Williams.

64. Mr. Smizer and Mr. Williams reasonably believed that Joe Mantagano was acting as the on-site representative of Local 597 at the Robbins Project.

65. Dennis Hahney saw racial graffiti in the port-a-johns at the Robbins Project on, or soon after, the day he started work in approximately October 1995. Hahney knew that there was racial graffiti in nearly all of the port-a-johns at the Robbins Project.

66. Despite his knowledge of the fact of and content of racially offensive graffiti in port-a-johns used by the pipe fitters at the Robbins site, Hahney took no action to report the condition to Toth at the union or his supervisors at Foster Wheeler or to address the problem himself until after July 6, 1996 when Ferguson complained.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                     Page 5
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

67. Despite his knowledge of the racially offensive graffiti directed at Ferguson in the port-a-johns, Hahney took no action report the problem to Toth at the union or to his supervisors at Foster Wheeler until after July 6, 1996 when Ferguson complained.

68. Dennis Hahney saw a hangman's noose hanging at the Robbins Project at least two months prior to July 1996, when James Ferguson complained to Hahney about the noose yet did nothing to remove it until Ferguson complained.

69. Dennis Hahney knew that a swastika made of cardboard was placed in Keith Hill's toolbox.

70. Mantagano used the port-a-johns at the Robbins Project and therefore would have known of the racial graffiti. The racial graffiti continued to exist in the port-a-johns at the Robbins Project throughout all periods that members of Local 597 were on the site.

71. Although he was aware of the racial graffiti in the port-a-johns starting in October 1995, Hahney took no action regarding the racial graffiti until approximately July 1996 when James Ferguson complained to Hahney about the racial graffiti.

72. Through inaction, Local 597, acquiesced in the creation of a hostile work environment at the Robbins site.

73. When James Ferguson complained to Hahney about the racial graffiti in July, 1996, Hahney asked the laborers' foreman to have the racial graffiti referring to Ferguson painted over or removed.

**\*6** 74. Dennis Hahney took no further action to prevent additional racial graffiti from appearing in the port-a-johns until approximately September 1996. At a safety meeting in September 1996 Hahney met with approximately one-half of the pipe fitters at the project. At the safety meeting Hahney told the pipe fitters not to write on port-a-johns and handed out a copy of a Notice prepared by the EEOC and Foster Wheeler regarding racial graffiti

75. Local 597's net worth is approximately $3.1 million.

76. Local 597 does not provide racial harassment training for any of its members, including those who act as lead pipe fitters on any projects.

77. Local 597 does not have a written procedure for making or handling complaints about discrimination at a work site.

78. Ferguson suffered from anxiety and depression that are related to work related stressors experienced as a result of the racist work environment to which he was subjected at the Robbins Project. His level of anger, frustration, anxiety and discomfort, as well as some degree of apprehension about his physical safety and job security, is directly attributable to his experiences at the Robbins work site. Ferguson has been scarred by his exposure to racial graffiti and racial jokes at the Robbins work site. Ferguson's experiences at the Robbins Project have left him with internal conflicts and feelings of uncertainty, if not inadequacy, in his inherent desire to view himself as competent, successful, and accomplished. Ferguson has been left in the psychological position of being predisposed to expect that he will be exploited or harmed again by an employer and therefore, he tends to be much more reserved in his interactions in the work place.

79. Any African American exposed to the racially hostile environment at the Robbins Project was at risk for suffering the same or similar psychological harm as Ferguson.

80. James Ferguson experienced emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life as a consequence of the racially hostile work environment at the Robbins Project.

81. Keith Hill experienced emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life as a consequence of the racially hostile work environment at the Robbins Project.

82. Joseph McGhee experienced emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life (including problems sleeping and socializing with Caucasians) as a consequence of the racially hostile work environment at the Robbins Project.

83. Robert Smith experienced emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life as a consequence of the racially hostile work environment at the Robbins Project.

84. David Payne experienced emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life as a consequence of the racially hostile work environment at the Robbins Project.

85. James Foster experienced emotional pain,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

suffering, inconvenience, mental anguish, and loss of enjoyment of life as a consequence of the racially hostile work environment at the Robbins Project.

**\*7** 86. Larry Smizer experienced emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life as a consequence of the racially hostile work environment at the Robbins Project.

87. Lance Williams experienced emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life as a consequence of the racially hostile work environment at the Robbins Project.

88. The kind of discriminatory conduct that occurred at the Robbins Project-i.e., racial harassment-could also occur at other projects employing members of Local 597.

*ADDITIONAL FINDINGS OF FACT*

There can be no serious contention that the racial environment at the Robbins construction site was not racially hostile. Despite the contentions of Local 597, the graffiti on the walls of the port-a johns was vile, disgusting and insulting. Only a visitor from another planet would fail to understand the ugliness of what was written and drawn on those walls. To credit the testimony that Hahney, Toth, Jordan and others failed to understand that the graffiti was offensive to any African American pipe fitters would require an extraordinary level of naivete or cynicism. Nor was the graffiti merely "shop talk"the crude, but common-place vulgarity that marks some workplaces. The language and tenor of the graffiti exhibited on this site go beyond mere vulgarity and amount to verbal and psychological assault as explained by plaintiff's expert. The same is true as to the swastikas. The plaintiffs have not persuaded the court that the noose tied by Speers was intended nor interpreted to be racial in nature and therefore does not rely on that evidence in reaching a verdict in this case.

In defense of its inaction, Local 597 argued that racial graffiti was common on all construction sites and that there was really nothing that could be done about it. It is unclear how the union knew that because there was very little evidence that it had ever tried to prevent it. If Local 597 is of the view that its members (and other construction workers) are so hopelessly bigoted that neither education nor sanctions will deter racist conduct, then perhaps the actions of Hahney, Toth and others were reasonable.

However, the law, and experience suggest otherwise. It may be true that civil laws may not truly change what is in a person's heart, but experience has shown that the law can change conduct.

Hahney was Local 597's representative on the work site. He was hired to ensure that things ran smoothly. He had the ear of Foster Wheeler and the power to obtain redress for issues that affected the pipe fitters on the site. Mantagano had similar authority as it related to the pipe fitters working for Getschow. Toth was aware of the graffiti. Yet nothing was done by the union until Ferguson complained. Why did Ferguson and the other African American pipe fitters wait so long to speak up? Was it, as Local 597 suggests, because they did not find the graffiti and the swastikas subjectively offensive? The answer was provided by Plaintiffs' expert Dr. Phillips. To complain about the graffiti would be to acknowledge the power of its authors to inflict harm. If this were the first incident of racially offensive conduct on a work site, perhaps the hope of remedial action would have outweighed the sting of acknowledgement: akin to saying uncle if that will result in relief. But the African American's pipe fitters knew (or suspected, based on experience) that complaining would not produce relief, so they said nothing. Dr. Phillips testified that what finally drove Ferguson to raise the issue with Hahney was that the insults became unavoidable when it began to specifically name Ferguson's wife and himself. Ferguson could no longer "deflect" the assault on his self worth and spoke up.

*CONCLUSIONS OF LAW*

**\*8** 1. Plaintiff, EEOC, is the agency of the United States Government charged with the administration and enforcement of Title VII of the Civil Rights Act of 1964, as amended, and is expressly authorized to bring this action by Sections 706(f)(1) and (3) and Section 707(a) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3) and § 2000e-6(a).

2. At all times material to this action, Defendant Pipe Fitters Association, Local Union 597 ("the Union" or "Local 597") has been and is now a labor organization within the meaning of Section 701(e) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(e).

3. Jurisdiction and venue are not disputed by the parties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4. The Court has jurisdiction over the subject matter and the parties to this action.

5. Title VII of the Civil Rights Act of 1964, as amended, provides:

"It shall be an unlawful employment practice for a labor organization-
to limit, segregate ... it's membership ... in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee ... because of such individual's race."

Title VII of the Civil Rights Act of 1964, as amended, also provides:
"Whenever the [EEOC] has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the [EEOC] may bring a civil action ... setting forth facts pertaining to such pattern or practice, and ... requesting such relief ... as [it] deems necessary to insure the full enjoyment of the rights herein described."

Sections 703(a) and 707(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a) and 2000e-6(a).

6. Section 1981 prohibits racial harassment in the workplace when the harassment is sufficiently severe or pervasive to alter the conditions of an employee's employment and create an abusive working environment. Harris v. Forklift Systems, Inc., 114 S.Ct. 367 (1993) and 42 U.S.C. § 1981, as amended by the 1991 Civil Rights Act.

7. In these cases, plaintiffs Ferguson and EEOC allege that defendant Local 597 discriminated against James Ferguson and a class of African American members of Local 597 because of their race by subjecting them to harassment of a racial nature by contributing to or intentionally acquiescing in a racially hostile and offensive work environment. EEOC alleges that Local 597 discriminated against a class of African Americans by engaging in a pattern or practice of racial harassment and that African Americans were damaged by their experience of this harassment.

8. Title VII prohibits racial harassment in the work place when the harassment is sufficiently severe or pervasive to alter the conditions of an employee's employment and create an abusive working environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367 (1993).

*9 9. Hostile work environment claims involve both an objective and a subjective standard. Harris v. Forklift Systems, Inc., 510 U.S. at 21, 114 S.Ct. at 370 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the atmosphere to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.") EEOC v. Foster Wheeler., 1999 WL 528200 *2, 98 C 1601 (N.D.Ill. July 13, 1999), Memorandum Opinion and Order Denying Defendants' Motion to Limit Claims for Damages to Claimants Who Appear at Trial and Prove Their Individual Cases, slip op. p. 3.

10. In determining whether an objectively reasonable African American union member would find that the Robbins work site was a racially hostile environment, the Court considers the nature of the alleged harassment, such as the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Systems, Inc., 510 U.S. at 23 (1993); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-67, 106 S.Ct 2399, 2404-05 (1986). The Court considers the combined effect of all racially harassing incidents at the Robbins work site Racially harassing incidents may include racial graffiti and spoken racial epithets such as the word "nigger." Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 673-675 (7th Cir.1993); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1275 (7th Cir.1991); Brooms v. Regal Tube Co., 881 F.2d 412, 421 (7th Cir.1989).

11. In determining the likely effect of the racial incidents upon a person's ability to perform his or her work, you are not required to find that a reasonable person would have failed to do his or her job properly-only that the abusive or offensive environment unreasonably affected his or her ability to do so. There is no requirement to show that the harassment would have caused a reasonable union member tangible economic consequences, such as the loss of a job, or psychological injury. Harris v.

Not Reported in F.Supp.2d                                                                                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

*Forklift Systems, Inc.,* 510 U.S. at 21-23.

12 The use of the word "nigger" automatically separates the person addressed from every non-black person. Therefore, its use is discriminatory per se. *Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d at 675-77.

13. Plaintiffs have proven by a preponderance of the evidence that a racially hostile environment existed at the Robbins site which was sufficiently sever or pervasive so as to alter the terms and conditions of employment for reasonable African American members of Local 597.

14. EEOC has proven by a preponderance of the evidence that Local 597 engaged in a pattern and practice of racial discrimination by intentionally acquiescing in the racially hostile environment and that such intentional acquiescence was the Union's standard operating procedure, the regular rather than the unusual practice. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1854-55 (1977); *EEOC v. Mitsubishi Motor Manufacturing of America,* 990 F.Supp. 1059, 1071 (C.D.Ill.1998).

**\*10** 15. Plaintiffs have proven by a preponderance of the evidence that James Ferguson, Keith Hill, Joseph McGee, David Payne, Robert Smith, James Foster, Larry Smizer, and Lance Williams each found the hostile racial environment to be unwelcome and each was subjectively offended by the hostile racial environment.

16. A labor union is subject to liability for a hostile work environment if the union contributes to the alleged discriminatory action or intentionally acquiesces in an employer's discriminatory policies and procedures. EEOC *v. Foster Wheeler,* 1999 WL 507191 \*7; 98 C 1601 (N.D.Ill. July 6, 1999), Memorandum Opinion and Order Denying Motion for Summary Judgment of Local 597, Slip op. at p. 16; *Goodman v. Lukens Steel Co.,* 482 U.S. 656, pp. 667-67 (1987).

17. Local 597 has a duty to report or otherwise seek to remedy a racially hostile work environment if its practice is to report or otherwise seek to remedy workplace conditions and/or activities that adversely impact members of the union, even if a union member has not filed a grievance or complaint with Local 597. The Court must consider the normal manner by which Local 597 dealt with problems in the work place in the absence of a grievance.

Problems in the workplace may include issues of safety, relations among employees or questions about the responsibilities and job performance of union members. *EEOC v. Foster Wheeler,* 1999 WL 507191 \*9; 98 C 1601 (N .D. Ill. July 6, 1999), Memorandum Opinion and Order Denying Motion for Summary Judgment of Local 597, Slip op. at pp. 19-21.

18. EEOC has proven by a preponderance of the evidence that it was the practice of Local 597 to deal with members' problems in the work place in the absence of a grievance, and that, therefore it had a duty to take action to report or remedy the racially hostile work environment.

19. Because it had a duty to report or remedy the racially hostile environment, Local 597 is liable for that environment if 1) it knew or should have known of the racially hostile environment and 2) it failed to take effective action. *EEOC v. Mitsubishi,* 990 F.Supp. at 1073; *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir.1988), *cert. denied,* 490 U.S. 1110 (1989); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2267 (1998) (employer is liable if it knew or should have known about harassing conduct and fails to stop it); *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1275 (7th Cir.1991).

20. The repeated and open nature of the harassment and its intensity constitute evidence that the union, through its business agent, Steven Toth, knew or should have known of its existence. *EEOC v. Mitsubishi,* 990 F.Supp. at 1074.

21. In addition, Dennis Hahney's admitted knowledge of the racially hostile environment must be imputed to Local 597 because he was the agent of Local 597. Hahney had actual authority to act for Local 597, because he functioned as the Union's steward at the Robbins site. In the alternative, he had apparent authority to act for the Union, because reasonable union members believed that he had authority to act as steward at the Robbins site. *Cole v. Appalachian Power Co.,* 1995 WL 370400 \*2 (S.D.W.V.1995); *See, Burlington Indus. v. Ellerth,* 118 S.Ct. at 2267-68 (analyzing supervisor liability under Rest. (2d) Agency § 219(2)).

**\*11** 22. Plaintiffs have proven by a preponderance of the evidence that Hahney, Toth and Local 597 failed to take effective action to report or remedy the racially hostile work environment existing at the Robbins site.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 9
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

23. Each individual class member is entitled to damages for any emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life that he experienced as a consequence of defendant's conduct. No evidence of monetary value of such intangible things need be introduced into evidence. No exact standard exists for fixing the compensation to be awarded for these elements of damages. 42 U.S.C. § 1981(A)(b)(3). *Cf. EEOC v. AIC Security Investigations, Inc.,* 55 F.3d 1276, 1285 (7th Cir.1995)(holding compensatory damage award of $50,000 for emotional distress not excessive, despite no evidence of psychological treatment).

24. Keith Hill has suffered damages for emotional distress in the amount of $15,000.

25. Joseph H. McGhee has suffered damages fore emotional distress in the amount of $15,000.

26. David Payne has suffered damages for emotional distress in the amount of $10,000.

27. James M. Foster has suffered damages for emotional distress in the amount of $10,000.

28. Robert L. Smith has suffered damages for emotional distress in the amount of $10,000.

29. Larry Smizer has suffered damages for emotional distress in the among of $10,000.

30. Lance Williams has suffered damages for emotional distress in the amount of $10,000 and James Ferguson has suffered damages for emotional distress in the amount of $25,000.00.

31. The Court may award punitive damages if the EEOC demonstrates that the Union engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of the African American Union members. 42 U.S.C. § 1981(A)(b)(1). *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 2124 (1999). Similarly, Ferguson may be awarded punitive damages on his section 1981 claim if the evidence establishes that the Union engaged in discriminatory practices with malice or reckless indifference to the federally protected rights of the African American union members.

32. The Union's failure to implement any policy against racial harassment, including, but not limited to failure to train members or lead pipe fitters and absence of any grievance procedure for complaints of racial; harassment, warrant an award of punitive damages. *Kolstad v. American Dental Association,* 119 S.Ct. at 2129.

33. Punitive damages are appropriate in this case to punish defendant Local 597 for its misconduct and to serve as an example or warning to others not to engage in such conduct.

34. In determining the amount of punitive damages, the Court has considered the offensiveness of the conduct, the resources of the defendant, and the relationship to the compensatory damages awarded. The Court awards punitive damages on behalf of the claimants in the amount of $50,000; $20,000 of which is to paid to Ferguson and the balance of $30,000 to be equally divided among the other class members.

**\*12** 35. The Court may order injunctive relief once it finds "that the defendant intentionally engaged in an unlawful employment practice" if "the discriminatory conduct could possibly persist in the future." *EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1578-79 (7th Cir.1997); 42 U.S.C. § 2000e-5(g). Injunctive relief is warranted in this case.

36. Local 597 will be permanently enjoined from permitting a hostile work environment based on race to exist for its members at any job site.

37. Local 597 shall mail to each current member, and to each new member for a period of three years, a notice advising members of the findings of the Court in this action and of the relief ordered by the Court, which notice shall be approved and signed by the Court. The Notice shall also be posted in a prominent location in the Local 597 hiring hall for a period of three years.

38. Local 597 will be ordered to develop a written policy against racial harassment, and a mechanism for making complaints of racial harassment to the Union. Such policies shall be submitted to the EEOC for approval within thirty (30) days of the entry of this Order. If the parties are unable to agree to the content of such policies, any disputes shall be submitted to the Court for resolution.

39. Local 597 will be ordered to develop a training program to be required of all union members concerning racial harassment. Such program shall be submitted to EEOC for approval within thirty (30)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d   Page 10
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349
**(Cite as: Not Reported in F.Supp.2d)**

days of the entry of this Order. If the parties are unable to agree to the content of such training, any disputes shall be submitted to the Court for resolution.

40. Local 597 will be ordered to report to the EEOC every six months for a period of three years regarding its compliance with this Order, including

(a) A list of all Projects at which pipe fitters were employed during the six month period;

(b) A description of all training regarding racial harassment, including the names of the persons receiving the training, conducted during the period;

(c) Descriptions of any complaints of racial harassment received during the period;

(d) Description of all actions taken by the Union in response to any complaint;

41. The EEOC is entitled to its costs incurred in this action. Fed.R.Civ.P. 54(d).

42. As a prevailing plaintiff, James Ferguson is entitled to attorney's fees.

*CONCLUSION*

For the reasons stated above, judgment is entered for the plaintiffs EEOC and James Ferguson in the consolidated cases. Compensatory damages are awarded in the following amounts: Keith Hill-$15,000; Joseph H. McGhee-$15,000; David Payne-$10,000; James Foster-$10,000; Robert L. Smith-$10,000; Larry Smizer-$10,000; Lance Williams-$10,000 and James M. Ferguson$25,000. In addition, Punitive damages are assessed against Local 597 in the amount of $50,000, $20,000 of which is to paid to Ferguson and the balance of $30,000 to be equally divided among the other class members. By separate order, a permanent injunction will be entered against Local 597. EEOC is entitled to its costs in this action. Ferguson shall be entitled to reasonable attorney's fees.

N.D.Ill.,2002.
U.S.E.E.O.C. v. Pipe Fitters Ass'n Local Union 597
Not Reported in F.Supp.2d, 2002 WL 976618 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 349

Briefs and Other Related Documents (Back to top)

• 1:98CV01601 (Docket) (Mar. 17, 1998)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.