**EXHIBIT B (Part 1)**

# In the Matter of:

Equal Employment Opportunity Commission, et al.

vs.

Washington Group, International, Inc., et al.

---

Warren Anderson
Vol. 1, April 12, 2006

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street*
*Boston, MA 02110*
*(617) 426-2432*

```
                                    Volume I
                                    Pages 1 to 186
                                    Exhibits 1 to 16
             UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - -x
                                    :
EQUAL EMPLOYMENT OPPORTUNITY        :
COMMISSION,                         :
     Plaintiff,                     :
                                    :
JOHN BALDWIN, LEONARD BELL,         :
JOHANNES KAINDOH, WAYNE             :
HENDERSON, GODWIN ENAGBARE          :
and JOE L. WILLIS,                  :
     Intervenor-Plaintiffs,         :
                                    :
     -against-                      :   C.A. No
                                    :   04-12097-GAO
WASHINGTON GROUP                    :
INTERNATIONAL, INC., RON            :
BENNETT, MICHAEL FOGARTY and        :
DENNIS WOODRUFF,                    :
     Defendants.                    :
                                    :
- - - - - - - - - - - - - - - - - -x
```

DEPOSITION OF WARREN R. ANDERSON, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Ken A. DiFraia, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Equal Employment Opportunity Commission, John F. Kennedy Federal Building, Government Center, Boston, Massachusetts, on Wednesday, April 12, 2006, commencing at 10:07 a.m.

PRESENT:

Equal Employment Opportunity Commission

    (by R. Liliana Palacios, Esq.)

    John F. Kennedy Federal Building,

    Room 475, Government Center, Boston, MA

    02203-0506, for the Plaintiff.

Page 2

PRESENT: (Continued)
   Corrigan, Bennett & Belfort, P.C.
     (by Todd J. Bennett, Esq.,
     and Nicole Taub, Esq.)
     24 Thorndike Street, Suite 300,
     Cambridge, MA 02141, for the
     Intervenor-Plaintiffs John Baldwin,
     Leonard Bell, Johannes Kaindoh and Wayne
     Henderson.
   Dessin & Associates
     (by Jacques A. Dessin, Esq.)
     236 Huntington Avenue, Boston, MA 02115,
     for the Intervenor-Plaintiffs Godwin
     Enagbare and Joe L. Willis.
   Jackson Lewis LLP
     (by Stephen T. Paterniti, Esq.)
     75 Park Plaza, Boston, MA 02116,
     for the Defendant Washington Group
     International, Inc.
          * * * * *

Page 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WARREN R. ANDERSON | | | | |
| BY MS. PALACIOS | 5 | | | |

* * * *

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notes prepared by Warren Anderson dated 9/24/02 | 85 |
| 2 | Job rules | 90 |
| 3 | Warning slip | 93 |
| 4 | Audit form | 103 |
| 5 | Posting relating to EEO policy | 113 |
| 6 | Posting relating to EEO policy | 113 |
| 7 | Posting relating to EEO policy | 113 |
| 8 | Letter to Mystic site employees dated 3/1/02 | 118 |
| 9 | Check stuffer | 120 |
| 10 | Document regarding toolbox meeting | 120 |
| 11 | Policy | 126 |
| 12 | Diagram | 131 |
| 13 | Diagram | 132 |
| 14 | Memo to Office of Chairman from Larry Myers dated 9/11 | 170 |

Page 4

EXHIBITS, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 15 | Memo drafted by Warren Anderson | 170 |
| 16 | Notes from interview prepared by EEOC investigator | 174 |

* * * *

Page 5

```
 1            PROCEEDINGS
 2            WARREN R. ANDERSON
 3   a witness called for examination by counsel for the
 4   Plaintiff, having been satisfactorily identified by
 5   the production of his driver's license and being
 6   first duly sworn by the Notary Public, was examined
 7   and testified as follows:
 8            DIRECT EXAMINATION
 9   BY MS. PALACIOS:
10   Q.   Morning.
11   A.   Good morning.
12   Q.   We met before, but for the record, if you
13   could state your full name and address, please.
14   A.   Warren Reid Anderson, 3879 South Helena
15   Aurora, Colorado.
16   Q.   Thanks.
17            MS. PALACIOS:  Just for the record, we are
18   all agreeing to the usual stipulations in the case?
19   I'm assuming Warren will read and sign?
20            MR. PATERNITI:  Yes.  Why don't we do the
21   turnaround time, since he's out of state, maybe 60
22   days to read and sign.
23            MS. PALACIOS:  Sure.  I would be glad to
24   allow additional time.  That's no problem.
```

Page 26

1  supervisor.
2    A.  Labor relations supervisor at the job in
3  Olympia. I was there until about 1984. The job
4  concluded. Actually, the job was shut down. The
5  client lost all their financing, and the job was
6  shut down.
7       I was transferred to the Browns Ferry
8  Nuclear Plant in the '84, '85 time period. We were
9  going to do a steam generator replacement project
10 there. I still carried the same title, supervisor.
11 This was in Decatur, Alabama. We were there
12 approximately eight months as a team. There was
13 about 50 of us preparing for the project, and the
14 client lost money, and the job got canceled.
15      Then an opportunity came up. We got a
16 contract to be the construction manager for a new
17 automotive assembly plant in Kansas City, Kansas,
18 which that would have been the '85, '86 time period.
19 That job was approximately two and a half years.
20      I'm going to say that I had gotten the
21 title change to manager during that time frame, but
22 I'm not quite sure. I believed I had a grade change
23 in that period.
24   Q.  You recall at some point you became labor

Page 27

1  relations manager?
2    A.  Correct. That job concluded. This would
3  have been approximately 1988. I was transferred to
4  a job in Watertown, New York, which was the
5  construction of the New Fort Drum facilities, the
6  Tenth Mountain Division. I believe I still had the
7  same title.
8    Q.  As manager?
9    A.  Yes. Those titles can be somewhat informal
10 in our company. It's more grade changes that occur.
11 It's not so much the title.
12      I'm currently Grade 18. I believe I
13 started at a 14. I had a four grade progression
14 over the years. I'm not sure when exactly those
15 occurred. That would be in my personnel file.
16   Q.  That's helpful.
17   A.  Fort Drum, we were concluding that job from
18 Watertown. We got a contract, the company did, with
19 the Department of Energy in Oak Ridge, Tennessee to
20 be their construction manager. There was about four
21 months preparation for that job. I had to negotiate
22 a project agreement with the building trades there.
23 All of these were union projects, by the way.
24      Towards the end of 1990, I'm going to say

Page 28

1  August, we staffed the project at Oak Ridge. I
2  transferred there, my wife and I, from Watertown. I
3  was there for approximately seven years, first as
4  the labor relations manager only, and then in about
5  '93, '94, we consolidated a number of departments,
6  industrial relations, security and training into
7  one. I was appointed as the team leader for that.
8  I carried that team leader title for a couple of
9  years.
10   Q.  I assume at some point you became director
11 of labor relations?
12   A.  That's correct.
13   Q.  Was that the next position you held after
14 industrial relations and security training director?
15   A.  That's correct.
16   Q.  Do you recall approximately when you became
17 director of labor relations?
18   A.  It would have been in the 1998 time period.
19 The director of labor relations for Morrison-Knudsen
20 then, who, of course, was based in Boise, he had
21 recommended me to the company. He was retiring, so
22 to take his place. He was a director. He carried
23 the director title.
24   Q.  Have you held director of labor relations

Page 29

1  as a position since 1998 to the present?
2    A.  That's correct.
3    Q.  I just want to go back to your experience
4  as a police officer. I wonder if you could give me
5  some understanding of the type of training that you
6  had at that time to become a police officer at the
7  academy.
8       I can help you with more specifics, unless
9  you are able to give me a general response?
10   A.  I recall the academy was about 12 weeks in
11 length. I might add that for approximately six
12 weeks before, the academy because I was hired before
13 the next academy cycle occurred, I was assigned to
14 crimes against persons at the headquarters in
15 Downtown Dallas. I hate to say gopher, but that's
16 what I did for the detectives.
17   Q.  Assistant?
18   A.  Assistant. I mostly did clerical
19 activities. The academy began. The training at the
20 academy was in criminal law; firearms; defensive and
21 aggressive driving, had a fairly extensive course on
22 that; handling domestic disputes, and that
23 specifically because they were considered the most
24 dangerous calls you would go on.

Page 34

1  to have occurred because of an individual's race?
2      A. I don't recall.
3      Q. Mr. Anderson, are you familiar with
4  something called "the broken windows theory"?
5      A. No.
6      Q. That was not something you studied when you
7  were in the police academy?
8      A. Not that I recall, no.
9      Q. What about when you were an MP, did you
10 have any occasion to investigate any anonymous
11 crimes?
12     A. No, I did not.
13     Q. Have you ever whether as an MP or as a
14 police officer in Texas investigated any crimes of
15 vandalism?
16     A. Yes, certainly in Texas.
17     Q. Any particular investigation that you can
18 recall that you can tell me about?
19     A. I can recall tire slashings of cars being
20 reported, windows of cars being broken, crimes like
21 that.
22     Q. What steps would you take to investigate
23 those types of crimes?
24     A. Gather any information I could as a

Page 35

1  patrolman at the time. If there was any possibility
2  of physical evidence, I would contact in the case of
3  vandalism the crimes against persons unit to come
4  out to the property to see if they could gather any
5  prints or any physical evidence at the scene.
6      Q. Is it fair to say that when you were
7  working as a police officer, you worked as a sort of
8  onsite responder, and then if there was information,
9  you sent it to someone else that continued the
10 investigation?
11     A. That's correct. I headed a defined beat.
12     Q. I have some understanding of how WGI's
13 corporate structure works, but I wonder if you could
14 help me understand. As director of labor relations,
15 going back to your work at WGI, is that part of a
16 larger department or organization within WGI, like
17 human resources or anything like that?
18     A. No, it's not. It's a stand-alone
19 department.
20     Q. The department is labor relations?
21     A. That's correct.
22     Q. Is there anyone that you report to at WGI?
23     A. Yes.
24     Q. Can you tell me who.

Page 36

1      A. Ismet Cakrane.
2      Q. Who is he or she?
3      A. He is the vice president of labor
4  relations, and he's based in Princeton, New Jersey.
5      Q. Do you report to anybody else?
6      A. No.
7      Q. Does Mr. Cakrane report to anyone, that you
8  know of?
9      A. No, he does not. Let me step back on that.
10     Q. Certainly.
11     A. We have a group of executives at the high
12 level of the company called the Chairmen Board I
13 believe. If there were any issues that require a
14 corporate approval or involvement that Is may have,
15 he may contact them. But that's a fairly rare
16 occurrence.
17         I just had to clarify that. He does have a
18 reporting, but it's not in the sense of he's
19 constantly dealing with this group.
20     Q. Who is the present president of the
21 company, WGI?
22     A. Steve Hanks. It's Office of the Chairman,
23 by the way. I'm sorry.
24     Q. You are referring to the group of

Page 37

1  executives you referred to earlier?
2      A. Yes.
3      Q. Is Mr. Hanks president and CEO?
4      A. Yes.
5      Q. How long has he been the president and CEO?
6      A. Nine or ten years.
7      Q. Do you have any regular contact with
8  Mr. Cakrane?
9      A. Yes.
10     Q. How often do you speak with him?
11     A. We talk usually around once a week.
12     Q. Where's he located?
13     A. Princeton, New Jersey. We have a corporate
14 office there.
15     Q. Do you have any regular face-to-face
16 meetings with him?
17     A. No.
18     Q. What percentage of the time that you
19 communicate with Mr. Cakrane is it over the phone,
20 would you say?
21     A. 95, 98 percent of the time.
22     Q. I assume that also includes E-mails or
23 writings?
24     A. Yes.

10 (Pages 34 to 37)