**EXHIBIT C (Part 1)**

# In the Matter of:

Equal Employment Opportunity Commission, et al.

vs.

Washington Group International, Inc., et al.

D. Michael McDaniel
Vol. 1, December 1, 2006

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street*
*Boston, MA 02110*
*(617) 426-2432*

```
                                                    Page 1
                                     Volume I
                                     Pages 1 to 182
                                     Exhibits 1 - 5
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
  - - - - - - - - - - - - - - - - - -x
                                     :
  EQUAL EMPLOYMENT OPPORTUNITY       :
  COMMISSION,                        :
         Plaintiff,                  :
                                     :
  JOHN BALDWIN, LEONARD BELL,        :
  JOHANNES KAINDOH, WAYNE            :
  HENDERSON, GODWIN ENAGBARE and     :
  JOE L. WILLIS,                     :
         Intervenor-Plaintiffs,      :
                                     :
         -against-                   : C.A. No.
                                     : 04-12097-GAO
  WASHINGTON GROUP INTERNATIONAL,    :
  INC., RON BENNETT, MICHAEL         :
  FOGARTY and DENNIS WOODRUFF,       :
         Defendants.                 :
                                     :
  - - - - - - - - - - - - - - - - - -x
```

DEPOSITION OF D. MICHAEL McDANIEL, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of the Equal Employment Opportunity Commission, John F. Kennedy Federal Building, Room 475, Government Center, Boston, Massachusetts, on Friday, December 1, 2006, commencing at 12:41 p.m.

(Continued on Page 2)

Page 2

PRESENT:

Equal Employment Opportunity Commission
  (by R. Liliana Palacios-Baldwin, Esq.,
  and Markus Penzel, Esq.)
  John F. Kennedy Federal Building, Room 475,
  Government Center, Boston, MA 02203-0506,
  for the Plaintiff.
Corrigan, Bennett & Belfort, P.C.
  (by Todd J. Bennett, Esq.)
  24 Thorndike Street, Cambridge, MA 02141,
  for the Intervenor-Plaintiffs John Baldwin,
  Leonard Bell, Johannes Kaindoh and Wayne
  Henderson.
Dessin Law Office (by Jacques A. Dessin, Esq.)
  236 Huntington Avenue, Suite 302-304,
  Boston, MA 02115, for the Intervenor-
  Plaintiffs Godwin Enagbare and Joe L.
  Willis.
Jackson Lewis LLP (by Stephen T. Paterniti Esq.)
  75 Park Plaza, Boston, MA 02116,
  for the Defendant Washington Group
  International, Inc.
* * * *

Page 3

INDEX
WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
D. MICHAEL MCDANIEL
BY MS. PALACIOS-    4            176
BALDWIN
BY MR. BENNETT     113            177
BY MR. DESSIN      150
BY MR. PATERNITI                  179
* * * *
EXHIBITS
NO.    DESCRIPTION                    PAGE
1   Resume of D. Michael McDaniel, Bates   16
    Nos. DEF01774-1775
2   Position statement of Washington       113
    Group International, Inc., dated
    January 28, 2003, relating to
    complaint of John Baldwin, Bates
    Nos. DEF00009-15
3   Position statement of Washington       113
    Group International, Inc., dated
    January 28, 2003, relating to
    complaint of Wayne Henderson, Bates
    Nos. DEF00097-102
4   Position statement of Washington       113
    Group International, Inc., dated
    January 28, 2003, relating to
    complaint of Johannes Kaindoh, Bates
    Nos. DEF00151-158
5   Position statement of Washington       113
    Group International, Inc., dated
    January 28, 2003, relating to
    complaint of Leonard W. Bell, Bates
    Nos. 2275-2279
* * * *

Page 4

1                PROCEEDINGS
2       MS. PALACIOS-BALDWIN: Steve, we're going
3  to go with our usual stips?
4       MR. PATERNITI: Yes.
5           D. MICHAEL McDANIEL
6  a witness called for examination by counsel for the
7  Plaintiff, having been satisfactorily identified by
8  the production of his driver's license and being
9  first duly sworn by the Notary Public, was examined
10 and testified as follows:
11           DIRECT EXAMINATION
12 BY MS. PALACIOS-BALDWIN:
13   Q.  Good morning, Mr. McDaniel.  I know we've
14 met before, so I'm not going to introduce myself,
15 but I will introduce my colleague Markus Penzel who
16 is here today from the EEOC.
17      I am certain that you're aware what this
18 case is about and why you're here today.  And I also
19 suspect, given my review of your biography or your
20 resume, that because you've done EEO work and looks
21 like HR-related work for quite a long time that you
22 may be familiar with the deposition process.  Is
23 that true?
24   A.  That's true.

Page 5

1    Q.  I think that probably the most important
2  rule for me is just that if you don't understand one
3  of my questions, I just want you to let me know, and
4  I will do my best to rephrase it and make sure that
5  you understand it.  But if you answer my question,
6  I'm going to assume that you have understood it.  Is
7  that fair to say?
8    A.  Yes.
9    Q.  So have you ever had your deposition taken
10 before today?
11   A.  Yes.
12   Q.  How many times have you had your deposition
13 taken?
14   A.  Probably no more than two or three.
15   Q.  And were those depositions in the course of
16 your position at WGI or other jobs or other
17 circumstances?
18   A.  There was one personal, but most of them,
19 they were -- all of these have been with WGI.
20   Q.  Can you tell me, starting with the personal
21 one, just give me a brief synopsis of what the
22 deposition was about.
23   A.  I had participated in the sale of mail
24 order products, and a person left without delivering

Page 30

1  The case that we're involved in right now, which
2  deals with -- dealt with the project that was being
3  handled out of Everett, Massachusetts, at the Mystic
4  Power Plant, that project fell within the Power
5  Division; is that accurate?
6     A.  Yes.
7     Q.  Did that project fall under any other
8  division?
9     A.  None known to me.
10    Q.  With respect to that project, based on what
11 we just discussed was the hierarchy of HR, what I
12 want to know is who in HR, starting with Mr. Larry
13 Myers, would have responsibility over or would have
14 had responsibility over that project, if you know?
15 Do you know the answer to that?
16    A.  I believe I do.
17    Q.  Okay.  Why don't you tell me.
18    A.  Mr. Myers had overarching responsibility
19 for that.  The next step would have been down to the
20 vice-president of HR operations, Cathy Rupert.  The
21 next step down might be an equal step to myself for
22 EEO issues, to Inez Davis as HR director of the
23 Power Unit, and to Warren Anderson as the site
24 representative for EEO issues and labor relations.

Page 31

1     Q.  Anybody else?
2     A.  Certainly the responsibility would -- for
3  that project goes to the project management as well.
4     Q.  The on-site project management?
5     A.  Yes.
6     Q.  Who does Mr. Myers report to you, if you
7  know?
8     A.  To the Office of the Chairman.
9     Q.  Any particular person within that office?
10 The president himself?
11    A.  Probably, yes.
12    Q.  Is the president of WGI still Stephen
13 Hanks?
14    A.  Yes.
15    Q.  And I believe it was Mr. Hanks at the time
16 this case originated in 2002?
17    A.  I believe that's true.
18    Q.  Do you ever, in your work duties, have to
19 interact with Mr. Hanks?
20    A.  No.
21    Q.  Have you ever?
22    A.  Once.
23    Q.  Tell me what it was that you had to
24 interact with him about.

Page 32

1     A.  An OFCCP audit of the Boise corporate
2  office.
3     Q.  Why did you need to speak to him about
4  that?
5     A.  Because that's his home office, and they
6  were also looking at it from certain corporate
7  perspectives, and they were also going to be
8  scheduling a visit by the OFCCP district director
9  during the course of that audit, who had asked for
10 an audience with Mr. Hanks.
11    Q.  I see.
12    A.  And we sat down to discuss the elements of
13 the audit, where it was, et cetera.
14    Q.  Although you may not, with this exception,
15 have to deal with Mr. Hanks directly in the course
16 of your work duties, are you ever presented with
17 questions from the Office of the Chairman or in a
18 position where you need to provide information to
19 the Office of the Chairman about EEO matters?
20    A.  Not directly, no.
21    Q.  When you say "not directly," what do you
22 mean?
23    A.  If I provide information to my supervisor,
24 who in turn provides it to her supervisor, who is

Page 33

1  Larry Myers, that information may get to the Office
2  of the Chairman.
3     Q.  And your supervisor is Ms. Rupert; is that
4  true?
5     A.  No, Ms. Large, Jennifer Large.  I'm sorry,
6  at the time -- that's true now.  So which time frame
7  are we referring to?
8     Q.  So Jennifer Large is now your supervisor,
9  and at the time that Mystic was happening here in
10 Boston, Cathy Rupert was your supervisor?
11    A.  No.  Mr. Myers was my supervisor.
12    Q.  Okay.  There was no Cathy Rupert at the
13 time?
14    A.  There was, but I reported directly to Mr.
15 Myers.
16    Q.  Got it.  Just again to get a little bit of
17 a context of how the HR function works at WGI, I
18 think you're aware that the EEOC has another case
19 pending against WGI out of a facility in New Jersey.
20 Are you aware of that?
21    A.  Yes.
22    Q.  What division did that case originate in,
23 if you know?
24    A.  Infrastructure.

Page 58

1  conversation with Warren about Willis forward, were
2  there any other conversations either with Warren or
3  with anybody else where you were informed of
4  complaints made by someone other than Willis during
5  the time that that project was being built, which I
6  believe was about, you know, 2000 to 2002, end of
7  2002 -- or 2003, I'm sorry.
8      A.  '03 or '04, yes.
9      Q.  Can you recall chronologically the next
10 communication that you got regarding somebody else's
11 complaint at Sithe Mystic?
12     A.  I believe Mr. Enagbare was the next
13 sequence of claim.
14     Q.  And how did you learn about Mr. Enagbare?
15     A.  I'm trying to recall if I received that
16 information first by a fax from the mailing of the
17 charge, which usually went to the Boise office and
18 then was forwarded to me, and then I would
19 communicate that communication to Warren, or whether
20 Warren called me and said he had a copy.  I don't
21 recall that.
22     Q.  And, again, same question.  Omitting Mr.
23 Willis and Mr. Enagbare, I'll go back to them later,
24 but anybody else that you recall hearing complaints

Page 59

1  about from the Sithe Mystic facility, other than Mr.
2  Willis and Mr. Enagbare?
3      A.  Yes.  Perhaps to generalize, I eventually
4  found out about all six of the Plaintiffs associated
5  with this case and some others.
6      Q.  Who are the some others, if you can recall?
7      A.  If I can recall them.  Is it that you're
8  asking their names or the situation or --
9      Q.  Let's start with their names.  I suspect
10 you may at some point remember situations and not
11 names, but let's start with what you remember as far
12 as names.
13     A.  Jamie Elder.  Leanne Scopa.
14     Q.  Leanne?
15     A.  Scopa, S-c-o-p-a.  Sandra Williams.  Those
16 are the only other names that I can think of right
17 now.
18     Q.  I'm going to ask you if you know about some
19 other names to see if it refreshes your
20 recollection, on other individuals that you may have
21 heard about with respect to complaints on EEO.
22         Did you ever hear about an individual,
23 Melvin Dixon, who had a complaint of discrimination
24 at that site?

Page 60

1      A.  I don't recall it.  I may have, but I don't
2  recall it.
3      Q.  Do you remember a complaint made by an
4  individual named Ozzie Weeks, who was a
5  subcontractor employee who was working on that
6  facility, who made a complaint about another
7  employee named Dick O'Hare?  Does that sound
8  familiar?
9      A.  Yes.
10     Q.  So you remember hearing about Mr. Weeks --
11     A.  Those are a memory -- it sparks a memory of
12 something, yes.
13     Q.  Do you have any memory of how you learned
14 about those facts?
15     A.  Yes.
16     Q.  Can you tell me what your memory is.
17     A.  That in the preparation of position
18 statements for one or more of these Plaintiffs, it
19 was, I believe, enumerated in one of those position
20 statements that individuals had been terminated for
21 use of discriminatory language, et cetera.
22         I believe Mr. O'Hare, was he not one of
23 those who was terminated, one of our employees?
24 That seems to be the memory that's stirring for me

Page 61

1  on that.
2      Q.  Is it fair to say that you learned about it
3  in the context of writing the position statement, or
4  is it more fair to say that you learned about it at
5  the time that it occurred, that Mr. O'Hare was
6  terminated for using discriminatory language?
7      A.  I would say more in line with the time
8  associated with the writing of the position
9  statement.
10     Q.  Do you think you got that information from
11 Warren?
12     A.  I do.
13     Q.  Do you have any memory of an individual
14 named John Day who was a civil superintendent who
15 was terminated for using discriminatory language?
16     A.  Yes.  The same scenario.
17     Q.  You've named about ten or so instances of
18 complaints, and I'll get into the details of them in
19 a second.  I understand that the Sithe Mystic
20 project was large, on the larger end of the power
21 projects.  But was it unique for you to receive this
22 many complaints in a period of two to three years in
23 this type of facility?
24         And what I'm really trying to find out is,

16 (Pages 58 to 61)