**<u>EXHIBIT C (Part 2)</u>**

Page 62

1  I would imagine that you don't always have an EEO
2  problem at every facility, I would hope.  But was
3  this a unique number for you as far as this facility
4  went?
5      A.  It was on the high side, but not unique.
6      Q.  I'm aware of Jamie Elder's complaint.  I
7  understand it was a sexual harassment complaint; is
8  that correct?
9      A.  Yes.
10     Q.  What about Leanne Scopa; just briefly, what
11 was her complaint was about?
12     A.  Sexual harassment.
13     Q.  And Sandra Williams as well?
14     A.  Yes.
15     Q.  Were the three women related or different
16 context, different cases?
17     A.  As far as I could tell, they were totally
18 different conditions and circumstances.
19     Q.  And I understand Ms. Elder filed a charge
20 with the MCAD, and Mr. Anderson, last time I spoke
21 to him during his deposition, said that the case was
22 still being litigated.  Do you know whether or not
23 that case has been resolved?
24     A.  So far as I know, it was never litigated.

Page 63

1  It was with MCAD, and we settled.
2      Q.  And Ms. Scopa, can you tell me the type of
3  complaint that she made?  Was it internal?  Was it
4  through an administrative agency?
5      A.  It was an MCAD filing.
6      Q.  And what happened with that case?
7      A.  We had a hearing with MCAD relative to the
8  facts, and met with Ms. Scopa at MCAD, and
9  eventually came to a cash settlement.
10     Q.  And Ms. Williams?
11     A.  I don't believe we met with MCAD.  She
12 filed suit.  She did file suit.  And that was a cash
13 settlement as well.
14     Q.  Now, with respect to the time period, I
15 know Ms. Elder's charge originated within the 2000
16 to 2003 time frame.  Is that the same for Ms. Scopa
17 and Ms. Williams, to your recollection?
18     A.  My memory of the sequence would have been
19 Elder, Scopa, Williams.
20     Q.  With respect to Mr. Willis's complaints of
21 discrimination, you mentioned you got a first call
22 from Warren about complaints about graffiti.  Did
23 you ever get any complaints or any information from
24 Warren or anybody else about any other complaints

Page 64

1  Mr. Willis made at the site?
2      A.  I believe there were several things
3  enumerated in Mr. Willis's visit to Warren's office
4  and that Warren and I discussed all of those
5  elements at one time or another.
6      Q.  Mr. Willis worked for a subcontractor on
7  that site, Encompass.  Do you recall that?
8      A.  I recall that fact.
9      Q.  Did you think to yourself at the time that
10 you learned that, and I assume -- let me back up.
11 Did you learn that Mr. Willis was in fact a
12 subcontractor's employee right from the beginning
13 when you heard about the complaint?
14     A.  My initial conversations with Warren would
15 have revealed that, yes.
16     Q.  Did you have any concern, or if you can
17 explain to me what your position was as far as
18 dealing with Mr. Willis's complaints, given that he
19 wasn't directly a WGI employee.
20     A.  I did not see us getting separated from
21 that, because it was our setup, and inasmuch as we
22 can influence the environment, we need to do
23 whatever we can.
24     Q.  Did you ever speak to Mr. Willis directly

Page 65

1  about his complaints?
2      A.  I did not.
3      Q.  Did you ever speak to any of the six
4  charging parties in this case, Mr. Enagbare, Mr.
5  Kaindoh, Mr. Bell, Mr. Baldwin or Mr. Henderson?
6      A.  Not to my recollection.
7      Q.  I have spoken to Mr. Anderson in detail
8  about his communication with each of these
9  individuals.
10         As far as the graffiti allegations on the
11 work site, did you get any other reports from Mr.
12 Anderson or anyone else at Sithe Mystic about
13 discriminatory graffiti erupting at the work site?
14     A.  I'm not sure erupting, but the occurrence,
15 and someone's concern about graffiti apparently was,
16 to my recollection, was a common theme to each of
17 the six Plaintiffs.  And those came in at various
18 times.
19     Q.  Did you ever go to the Sithe Mystic
20 facility?
21     A.  I did not.
22     Q.  Mr. Anderson testified at length about the
23 discriminatory graffiti that occurred on the site of
24 Sithe Mystic.  Did you have communications with Mr.

Page 70

1  it. It could have been him, in which he said, "We
2  have cleaned it. Someone has on occasion written
3  over that, the cleaning, and we've gone to
4  painting," and then they shifted to black paint,
5  because lesser depths of shade were not covering it.
6     Q.  Any other discussions about how to handle
7  the graffiti on the site, other than cleaning and
8  painting?
9     A.  No, because I felt that, if it was applied
10  sufficiently, that we would be successful in that
11  fashion.
12     Q.  Did you ever suggest anything else to
13  Warren that you discussed, other than cleaning and
14  painting?  Any other ideas sort of batted around
15  about how to handle the situation?
16     A.  Well, there were certainly discussions and
17  a follow-through of talking to the site, talking
18  to -- particularly those areas that we had somehow
19  isolated for activity, what have you, or complaints,
20  I guess, and to instruct the group as to our
21  expectations and the punitive actions that would
22  ensue for failure to comply.
23     Q.  Did you have any conversations with Warren
24  at all about what -- well, let me back up.  Did you

Page 71

1  ever learn that any of the graffiti or that the
2  graffiti that was reported was threatening in
3  nature?
4     A.  At some point I had information regarding
5  "The kids aren't safe" or something like that.  I
6  found that out at some point, yes.
7     Q.  And I think what you're referring to is
8  actually a piece of graffiti that we have
9  photographed that says, "Godwin, your kids aren't
10  safe."  Does that jog your memory?
11     A.  Yes.
12     Q.  Do you consider that to be threatening?
13     A.  Yes.
14     Q.  Once you learned about the threatening --
15  this particular threatening piece of graffiti, was
16  there any discussion about doing something else with
17  the graffiti problem, other than painting and
18  cleaning?
19     A.  Advising those individuals to please keep
20  us informed of any changing circumstances in their
21  work environment.
22     Q.  Did you ever give any consideration to
23  advising law enforcement about threatening graffiti?
24     A.  I don't recall having that conversation,

Page 72

1  no.
2     Q.  Was there ever any discussion about keeping
3  a log, photographs, video, or any memorialization of
4  the graffiti that was actually found in the
5  workplace one way or the other, "Let's keep it," or
6  "Let's not keep it"?  Do you have any recollection
7  about that discussion?
8     A.  No.
9     Q.  Did you ever have any understanding of the
10  frequency and severity of the graffiti that existed
11  at Mystic?
12     A.  The most significant level of awareness
13  that I achieved regarding that was when our attorney
14  at the time submitted to us the EEOC findings I
15  believe after the suit had been filed.  There was
16  some sort of discovery, release of information, et
17  cetera, and I received the copies, the Xeroxed
18  copies, photos of that.
19     Q.  But independent of those photos, and
20  specifically during the time that you learned about
21  the complaints that were at that point fresher, for
22  lack of a better word, at Mystic, did you have an
23  understanding of the frequency and severity of the
24  graffiti?

Page 73

1     A.  No.
2     Q.  Was there any discussion between you and
3  Mr. Anderson or anybody else at Sithe Mystic about,
4  you know, finding out if anybody recognized or could
5  identify the handwriting on some of this graffiti
6  that was problematic?
7     A.  My discussions with Warren would have been,
8  if there is any way to find out the cause of it, and
9  that was part of those meetings with employees, if
10  we find out, punitive action and termination would
11  occur.  As to any formal process for assessing
12  handwriting, I don't believe we used anything like
13  that.
14     Q.  I do want to show you some documents
15  that -- I don't think I'm going to mark these again.
16  Many of them have actually been marked in Warren's
17  deposition.  Absent any opposition from anybody
18  here, I'm going to go ahead and do that.
19        The first document I'm going to show you is
20  a document that's marked as Exhibit 14 in Mr.
21  Anderson's deposition, and I'll show you that.
22     A.  (Reviewing document)
23     Q.  Have you had an opportunity to review the
24  document?

Page 74

1    A.  Yes.
2    Q.  Have you seen this document before?
3    A.  Yes.
4    Q.  When did you first see this document?
5    A.  I believe I generated that.
6    Q.  You actually drafted it?
7    A.  No.  I put it together.
8    Q.  What do you mean by that?
9    A.  From the report from which it came, I
10   extracted this.  I wiped out some of the other stuff
11   and sent it to Warren to alert him, to let Warren
12   know -- this is my recollection of this; I think
13   it's accurate -- to let Warren know that it was
14   being looked after.
15   Q.  Okay.  I think I understand what you just
16   said, but let me try to back up.  Now, the subject
17   of this document says "Human Resources Report for
18   the week ending September 6th, 2002."
19        Is there a Human Resources report that goes
20   out weekly to Stephen Hanks -- I assume that those
21   are individuals in the Office of the Chairman?
22   A.  That's correct.
23   Q.  Is that true, that --
24   A.  Generally true.

Page 75

1    Q.  On a weekly basis?
2    A.  Generally true.
3    Q.  And is it fair to say that this particular
4    weekly report was generated by you, I guess, through
5    Larry Myers and then to the Office of the Chairman?
6    Is that how it goes?
7    A.  I would generate a weekly report.
8    Q.  Okay.
9    A.  One of my pieces labeled "EEO/AA" here
10   would have -- this would have been in my report.
11   Larry Myers then takes the reports of all the HR
12   directors, five to eight, you know, whatever other
13   sources for the weekly report, and selects those
14   items from those individuals' reports to put into
15   his report that goes to the Office of the Chairman.
16   Q.  Do you know how the selection process goes
17   with respect to -- I mean, probably not every single
18   thing gets put in; is that true?
19   A.  True.
20   Q.  I mean, to your knowledge, are items
21   selected that could cause liability for the company?
22   I mean, how does -- if you know, how is that
23   generated?
24        MR. PATERNITI:  Objection.  I'm just

Page 76

1    confused.  Are you talking about the report he
2    writes or the report that Larry Myers writes?
3        MS. PALACIOS-BALDWIN:  I'm talking about
4    just the weekly report that is being submitted to
5    the Office of the Chairman.  If it's going from
6    Larry Myers, that's fine.  He said he generated his,
7    or this one.
8    A.  I wouldn't want to be presumptuous about
9    how Larry Myers makes his selections, but there have
10   been generalizations to those people who submit
11   reports to try and make the contents of your report
12   relevant to business, as opposed to "This week I'm
13   working on something"; if you have an end result or
14   if there is a condition, et cetera, that appears to
15   be reportable and affecting -- whether it's good,
16   bad, what have you, that management needs to know
17   about in order to apply the necessary resources.
18   Q.  Okay.  And did you get a response from the
19   Office of the Chairman about this particular report
20   that you made?
21   A.  No.
22   Q.  Have you ever gotten a response from the
23   Office of the Chairman on any report that you've
24   made?

Page 77

1    A.  No.
2    Q.  Do you think they read it?  Just kidding --
3    well, actually, I'm not kidding.  Do you think they
4    read it?
5    A.  Yes.
6    Q.  They review it themselves?
7    A.  The link there is that I, at that time
8    reporting to Larry Myers, submitted my report to
9    Larry Myers.  Larry Myers did with it what he would.
10   That was the end of my connection to the Office of
11   the Chairman.
12   Q.  All right.  Now, if you look with me on the
13   actual text, the narrative piece under "EEO," I
14   guess Affirmative Action, "AA," the second-to-last
15   line says, "All supervisors are being reminded of
16   their responsibility and sensitivity training will
17   be done to raise awareness."
18   A.  Okay.
19   Q.  Do you know whether in fact sensitivity
20   training was actually done at the facility?
21   A.  Yes.
22   Q.  And how do you know that?
23   A.  By records of the meetings that were
24   conducted which the supervisors generally referred