**EXHIBIT C (Part 3)**

Page 86

1  Anderson's deposition.
2      A.  (Reviewing documents)
3      Q.  Now, while you're looking at those
4  documents, I will represent to you that these
5  documents, Mr. Anderson testified in his deposition,
6  were the documents that I mentioned earlier that he
7  himself put together.  I think his testimony was
8  that he reviewed different policies that he knew of
9  to create these, and then ran them by you, and then
10  actually put them up at the facility.
11      Does looking at these documents refresh
12  your recollection at all about any conversations you
13  may have had or any review of these documents based
14  on your conversations with Mr. Anderson?
15      A.  I do not recall a review.
16      Q.  Do you ever recall Mr. Anderson contacting
17  you to find out whether there were policies, EEO
18  policies, that existed that he could use at this
19  facility?
20      A.  I don't recall it, but my assistant may
21  have taken a call of that type.  That's a fairly
22  common transaction for her, for someone to call and
23  say, "Could you send me copies of posters."  And
24  either she would reference them to the Website, if

Page 87

1  that's available to them, or actually mail them hard
2  copies.
3      Q.  Now, would you characterize, from your
4  understanding, WGI's EEO policies to be zero
5  tolerance policies?
6      A.  Yes.
7      Q.  And when you hear the words "zero
8  tolerance," can you tell me what, in the context of
9  what you understand, what that means to you.
10      A.  That any instance that is a violation of
11  the policies would be subject to corrective action.
12      Q.  So it doesn't in your mind necessarily mean
13  subject to termination?
14      A.  No.
15      Q.  I also am going to show you a document that
16  was marked -- you can put those aside -- as Exhibit
17  8 in Mr. Anderson's deposition.
18      A.  (Reviewing document)
19      Q.  Now, are you familiar with the document
20  that I just put in front of you as Exhibit 8?
21      A.  Yes.
22      Q.  Can you tell me what it is.
23      A.  It is the annual reaffirmation of our Equal
24  Employment Opportunity Policy, usually done in

Page 88

1  January and February of each year.
2      Q.  Do you have any information about the
3  protocol of how this document is supposed to be
4  reissued, in the sense of is it in a check-stuffer
5  type situation or is it given out at a safety
6  meeting?  How is it normally distributed to
7  employees?
8      A.  Typically a check stuffer.
9      Q.  And is this document the same document
10  every year, or is it revised every year?
11      A.  Ordinarily it's the same document, except
12  as rules or laws might adjust it.
13      Q.  Are you responsible for making any
14  revisions to this particular document?
15      A.  Generally, yes.
16      Q.  And do you have or have you had any
17  conversations with Stephen Hanks about this
18  particular document prior to his signature of the
19  document?
20      A.  No.
21      Q.  Does he sign it every year?
22      A.  The person in charge of his electronic
23  signature has authority to apply it.  That is
24  probably -- exactly what happens, whether there is

Page 89

1  ink on paper, I'm not sure, but eventually it
2  becomes electronic, because it's posted on our
3  Website.
4      Q.  Do you have any personal knowledge of what
5  Mr. Hanks' feeling is about the importance of EEO
6  issues at WGI?
7      A.  I think he's intense about it.
8      Q.  How do you know that?
9      A.  Various meetings I've attended.
10      Q.  What are some of the things that he has
11  said or done that make you believe that he's intense
12  about it?
13      A.  All right.  People are our most important
14  resource.  We have, I think, a vast network of
15  support for employees in our workplace, and intend
16  to respect every individual in the workplace,
17  spending 50-plus million dollars a year on employee
18  training, for example, to advance their capacities
19  and abilities and value to the company, et cetera.
20      And of course those kinds of budgetary
21  concerns definitely have to go to the top.  I have
22  found him to, if you will, walk the talk of
23  endorsing an expected fairness throughout the
24  company for anyone.

Page 90

1    Q. Are you aware of whether or not Mr. Hanks
2  is aware of this lawsuit? Do you know?
3    A. The previous document that you showed me
4  indicated that at least on September 11th of 2002 it
5  went into Larry Myers' report to him regarding --
6    Q. Charges?
7    A. -- an immediate status of it, yes.
8    Q. Well, I think the date puts it in the
9  context of charges of discrimination, and I'm
10 actually talking about the lawsuit that the EEOC has
11 brought against the company. Does that change your
12 answer?
13   A. No. Probably through the same vehicle,
14 that he would be apprised of it.
15   Q. And has he ever communicated with you about
16 his interest in this lawsuit at all?
17   A. No.
18   Q. I'm going to show you Exhibit 10 in
19 Warren's deposition. You can put that aside.
20       Exhibit 10, the subject reads "Tool Box
21 Meeting on Harassment, Intimidation and Coercion."
22 Have you seen this document before? Not necessarily
23 this one with the signatures, but the actual text of
24 the document that looks like it was generated by

Page 91

1  WGI?
2    A. I believe I have.
3    Q. Did you have any input into the actual
4  drafting of this particular document?
5    A. I do not recall having done that, no.
6    Q. Now, what I showed you previously, the
7  weekly report that Larry Myers sent to the Office of
8  the Chairman, you described the sensitivity training
9  as being the tool box training. Fair to say that
10 this was the actual tool box training that you were
11 referring to that was mentioned in that weekly
12 update?
13   A. I believe this represents part of that
14 intent, yes.
15   Q. And was the -- my understanding from the
16 document that was sent by Mr. Myers to the Office of
17 the Chairman was that the issue -- the main issue,
18 as he described it, was racial graffiti.
19       Is there any reason why you think that
20 racial graffiti specifically was not mentioned as a
21 situation that was occurring at the time at the
22 facility for which reason this tool box meeting was
23 held?
24       MR. PATERNITI: Objection. Go ahead.

Page 92

1    Q. I can restate that for you.
2    A. Please.
3    Q. Given the fact that racial graffiti was, as
4  Mr. Myers described it in his weekly report to the
5  Office of the Chairman, the main issue regarding the
6  charges that were raised against the company at the
7  time, can you -- do you have any response as to why
8  this particular tool box meeting narrative that's
9  here did not actually specifically state that racial
10 graffiti was found on the facility or at the
11 facility? In other words, why wasn't it
12 specifically discussed in this tool box meeting, if
13 you know?
14       MR. PATERNITI: Objection. Go ahead.
15   A. I do not know what the content of the
16 discussion was. I can only obviously speak from
17 this, where graffiti appears in the list. I have
18 some information that indicates that the topic was
19 covered more thoroughly during those meetings to the
20 purpose -- in the discussion than is represented
21 simply in this text.
22   Q. What information is that that you have?
23   A. I thought I saw a description of that
24 somewhere.

Page 93

1    Q. Of the conversation?
2    A. Of some of the content --
3    Q. Okay.
4    A. -- that was expounded upon.
5    Q. Like a script or something you're thinking
6  about?
7    A. More like recounting what was said, notes.
8    Q. By who? Someone to you?
9    A. No. A document -- I was not involved in
10 the event nor in the creation of the document. But
11 aftermath information indicated that the matter had
12 been covered with more emphasis and detail in these
13 discussion than would be represented by the text
14 into these documents.
15   Q. I see. But you don't recall what that
16 document was?
17   A. No.
18   Q. If it comes to you, please let me know.
19       MS. PALACIOS-BALDWIN: Can we take five
20 minutes.
21       (Discussion off the record)
22       (Recess)
23 BY MS. PALACIOS-BALDWIN:
24   Q. Mr. McDaniel, we're back on the record, and

24 (Pages 90 to 93)

Page 178

1  example -- what, if any, type of corrective action,
2  in light of your opinion that it would be a
3  violation of the zero tolerance policy, in your
4  opinion should have been taken relative to that
5  display of the Confederate flag?
6      A.  To request the individual to cease and
7  desist in such acts, and failure to do so would
8  result in punitive action up to and including
9  termination.
10     Q.  Would you counsel the person on why the
11 Confederate flag would be inappropriate to display
12 at the work site?
13     A.  Yes.
14     Q.  What would you say?
15     A.  That it has a history associated with it
16 that is indicative of discriminatory practices, and
17 that it is inciteful at times for certain
18 individuals and accentuates a racial connotation to
19 it, and I would ask them to stop displaying it.
20     Q.  I assume you would -- is it fair to say you
21 would also tell the person that it is inappropriate
22 for display at the work site?
23     A.  Yes.
24         MR. BENNETT:  I don't have anything

Page 179

1  further.
2          MR. PATERNITI:  I just have some questions
3  about the photos.  I don't need to see them.
4              CROSS EXAMINATION
5  BY MR. PATERNITI:
6      Q.  The photographs that you reviewed here,
7  just a couple of minutes ago, do you have any
8  knowledge, Mr. McDaniel, of when the photographs
9  were taken?
10     A.  Not exactly, no.
11     Q.  Do you have any general knowledge of when
12 they were taken?
13     A.  I believe, in my conversations with Warren
14 following the visits, one or more visits of EEOC to
15 the site, that he said they took pictures.
16     Q.  The EEOC took pictures?
17     A.  Yes.
18     Q.  Do you know -- of the pictures you just
19 reviewed, do you have any idea whether those are the
20 pictures the EEOC took or not?
21     A.  I do not know.
22     Q.  And were you ever -- did you ever do any
23 investigation in 2000 -- well, strike that.
24         The graffiti in the photographs that you

Page 180

1  just reviewed, do you have any knowledge of how long
2  that graffiti was up on the walls at the work site?
3      A.  No.
4          MR. PATERNITI:  Okay.  That's all I have.
5          MS. PALACIOS-BALDWIN:  Thanks.
6          MR. BENNETT:  Do you want to put on the
7  record, since we talked about it off the record --
8          MR. PATERNITI:  If you don't trust me, I'm
9  an honest guy.  I'll produce him.  If I'm wrong, he
10 is coming back.
11         MS. PALACIOS-BALDWIN:  His objection was
12 pretty much stated as we summarized previously, that
13 you're taking your position, and you will bring him
14 back if it's necessary.
15         MR. PATERNITI:  I will agree to bring him
16 back if necessary, or somehow produce him, if we can
17 do it by video.
18             (Whereupon the deposition was
19             adjourned at 5:55 p.m.)

Page 181

1              CERTIFICATE
2      I, D. MICHAEL McDANIEL, do hereby certify that I
3  have read the foregoing transcript of my testimony,
4  and further certify under the pains and penalties of
5  perjury that said transcript (with/without)
6  suggested corrections is a true and accurate record
7  of said testimony.
8      Dated at _____, this ___ day of _____,
9  2006.
10
11                    _____

Page 182

```
 1  COMMONWEALTH OF MASSACHUSETTS)
 2  SUFFOLK, SS.            )
 3     I, Carol H. Kusinitz, Registered Professional
 4  Reporter and Notary Public in and for the
 5  Commonwealth of Massachusetts, hereby certify that
 6  there came before me on the 1st day of December,
 7  2006, at 12:41 p.m., the person hereinbefore named,
 8  who was by me duly sworn to testify to the truth and
 9  nothing but the truth of his knowledge touching and
10  concerning the matters in controversy in this cause;
11  that he was thereupon examined upon his oath, and
12  his examination reduced to typewriting under my
13  direction; and that the deposition is a true record
14  of the testimony given by the witness.
15     I further certify that I am neither attorney or
16  counsel for, nor related to or employed by, any
17  attorney or counsel employed by the parties hereto
18  or financially interested in the action.
19     In witness whereof, I have hereunto set my hand
20  and affixed my notarial seal this ____ day of
21  December, 2006.
22
23            _____
              Notary Public
24         My commission expires  6/7/13
```