# EXHIBIT A(PART 1)

1

Volume I
Pages 1 to 182
Exhibits 1 - 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
EQUAL EMPLOYMENT OPPORTUNITY        :
COMMISSION,                         :
        Plaintiff,                  :
                                    :
JOHN BALDWIN, LEONARD BELL,         :
JOHANNES KAINDOH, WAYNE             :
HENDERSON, GODWIN ENAGBARE and      :
JOE L. WILLIS,                      :
        Intervenor-Plaintiffs,      :
                                    :
        -against-                   :  C.A. No.
                                    :  04-12097-GAO
WASHINGTON GROUP INTERNATIONAL,     :
INC., RON BENNETT, MICHAEL          :
FOGARTY and DENNIS WOODRUFF,        :
        Defendants.                 :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF D. MICHAEL McDANIEL, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Carol H. Kusinitz, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of the
Equal Employment Opportunity Commission, John F.
Kennedy Federal Building, Room 475, Government
Center, Boston, Massachusetts, on Friday, December
1, 2006, commencing at 12:41 p.m.

(Continued on Page 2)

14

1      A.   Clerical, factory, computers.

2      Q.   But no Human Resources or EEO jobs during

3 that time in particular?

4      A.   That's correct.

5      Q.   Now, as I said earlier, I did get -- I

6 believe it's your resume that was produced to us by

7 WGI that has a summary of your experience, and it

8 looks like the experience, as compiled on this

9 document that I have in front of me, has your

10 experience since 1980 going forward and summarizes

11 your experience as 18 years of management experience

12 in EEO and Affirmative Action and then has a

13 description of what that is.

14        When did you first start working in the

15 area of what may be described as EEO or Affirmative

16 Action or even Human Resources?

17      A.   I started to work with Rust in early 1980,

18 and over a period of about two years, I probably

19 began to drift into that activity.  I would say it's

20 probably '82 or '83 that I began to deal with --

21 well, first of all, Affirmative Action Plans and

22 then moved into case responses or EEOC-type charges.

23      Q.   Prior to working at Rust, had you done any

24 EEO, Affirmative Action or Human Resources work?

40

1        But we do try to keep tab on all that's

2    happening.  It is a very dynamic environment.

3        Q.    Now, Mr. Anderson explained to me that from

4    time to time he may actually be placed at a

5    particular facility in his job as labor relations

6    director.  Are you as EEO director ever actually

7    stationed at a site of a particular project?  Have

8    you ever been sent to a particular site?

9        A.    No.

10       Q.    Do you ever -- have you ever had to visit a

11   site because of a particular issue or problem?

12       A.    Yes.

13       Q.    How many times would you say you have done

14   that since you have been with WGI?

15       A.    A rough estimate for 20-plus years in that

16   role, four or five a year.

17       Q.    Now, I imagine that different things would

18   bring you out to a particular site.  Can you give me

19   a couple examples or at least an example of the type

20   of situation that would require your personal

21   involvement on a site, as opposed to anybody else's.

22       A.    Oftentimes that's by invitation.

23       Q.    And when you say -- I'm sorry.  Go ahead.

24       A.    I'm trying to think of a dynamic that

43

1          I'm just trying to think the last time I

2     made a trip specifically for the purpose of doing an

3     investigation.  I went to Boise probably a year and

4     a half, two years ago.  There were claims of

5     discrimination made by individuals within a

6     department about their manager, and I went to

7     investigate, interview, to move to a solution for

8     that.

9          Q.    And what division was that in, if you

10    recall?

11         A.    Infrastructure.

12         Q.    And did you have anyone else assisting you

13    in doing the interviews?

14         A.    No.

15         Q.    How many interviews did you have to do,

16    approximately?

17         A.    Five.

18         Q.    Did you do anything else other than conduct

19    interviews at the time?  Did you do any training or

20    a site visit where you had to look at the facility,

21    anything like that?

22         A.    Training is usually done in the course of

23    an investigation in the form of counseling

24    individuals regarding corrective behaviors or better

44

1    behaviors, less inciteful behaviors, et cetera,

2    counseling individuals.

3           And any one interview with an individual

4    might result in, typically for me, at the conclusion

5    of that interview, unless it is totally preliminary

6    to the development of the information I need, to

7    counsel that individual regarding our expectations

8    for any changes that we might expect from them.

9           So I think training is inherently a part of

10   an investigation, because at my order of

11   responsibility, I see the need to move that issue to

12   resolution, as opposed to collect information per

13   se.

14       Q.    And how do you normally come to a

15   resolution?  You can tell me generally, or if you

16   want to use the example that you started to talk

17   about in Boise, whichever you prefer.  You told me

18   you interview folks.

19       A.    Yes.  We gather the information and assess

20   the fact base and determine a plan of action for any

21   corrective measures as might be needed.

22          I would typically involve the HR director

23   associated with that location or other directly

24   related top management.  I believe -- I know in the

45

1    case of the Boise visit, that particular manager

2    reported to a vice-president, and we incorporated

3    them into the information and told them what we

4    recommended for resolution of it.

5            Quite often the resolution itself might be

6    fairly simple, but getting people to adjust behavior

7    patterns and whatever can occasionally be

8    problematic and lead to punitive action and

9    termination.

10    Q.    Is there any part of what you do after you

11    reach resolution that involves actually checking

12    back in once you've left the site to make sure that

13    things either continue to be resolved or that

14    additional problems haven't arisen?

15    A.    Yes.

16    Q.    What do you do to ensure that?

17    A.    Any investigation I would have with

18    someone, particularly if they were the complainant,

19    would be to invite them to open communication with

20    me and/or others in their reporting chain.

21            And I would look to follow-up phone calls,

22    et cetera, with probably the level of the HR

23    director, how is this issue going, have things

24    smoothed out, et cetera, just follow-up calls on

46

1    that.   I might call the individual, depending on

2    what the issue was, to say, "How are things?   Did

3    they improve?   Has it changed for you for the

4    better?", et cetera.

5        Q.   How many hours a day do you work on a

6    regular week?

7        A.   50.

8        Q.   50 hours a week?

9        A.   Yes.

10       Q.   Sometimes more?

11       A.   Yes.

12       Q.   And are you -- do you receive a performance

13   evaluation on a yearly or bi-yearly basis?

14       A.   Usually annually.

15       Q.   And your supervisor does that?

16       A.   Yes.

17       Q.   Is it a documented performance evaluation?

18       A.   Yes.

19       Q.   Have you ever had an unacceptable

20   performance evaluation while you've been with WGI?

21       A.   No.

22       Q.   And what is your current salary with WGI?

23       A.   104 annually.

24       Q.   And are you eligible for bonuses or raises

47

1    on a yearly basis?

2        A.    Raises, yes.  I think I'm out of the bonus

3    program now.  I'm not sure about that.

4            MS. PALACIOS-BALDWIN:  Can we take five

5    minutes.

6            (Recess taken)

7            MS. PALACIOS-BALDWIN:  Back on the record.

8        BY MS. PALACIOS-BALDWIN:

9        Q.    Mr. McDaniel, in your opinion, is the EEO

10   function properly staffed at WGI, or do you think it

11   requires additional personnel?

12       A.    I think it's ample for the scope of duties.

13       Q.    Have you ever been in a position to request

14   additional staff?

15       A.    I have not.

16       Q.    You have never requested to have additional

17   staff added to the EEO department?

18       A.    I haven't.

19       Q.    Did you review any documents for today's

20   deposition?

21       A.    Yes.

22       Q.    Which documents did you review?

23            MR. PATERNITI:  Objection.  I'm going to

24   ask him to not answer that with regard to the

1   essentially another layer between you and Myers.

2   What has happened?

3       A.    Okay.  Mr. Myers felt that the organization

4   of that particular task would better be looked at

5   under staffing and diversity, and that is the

6   vice-president name of that position, vice-president

7   of staffing and diversity.  And so I report to

8   Jennifer in that fashion.  I can talk to Larry, et

9   cetera, about any issues, but the reporting

10  relationship is to Jennifer.

11      Q.    With having Jennifer in between you and

12  Myers, do you get the sense that the EEO function in

13  any way was less prioritized within the

14  organization?

15      A.    No.

16      Q.    You explained that on average you might go

17  on site four to five times a year to deal with a

18  particular EEO issue.  Have you ever, in the 20

19  years that you've been at WGI, had to go on site to

20  deal with a discriminatory graffiti problem?

21      A.    Yes.

22      Q.    How many times?

23      A.    Once.

24      Q.    Can you tell me what that was and

52

1    approximately when it occurred.

2         A.    Where would be our Umatilla, Oregon, office

3    in Hermiston -- in the Hermiston, Oregon, area, a

4    chemical demilitarization plant.  There had been

5    some complaints of graffiti, and I interfaced with

6    the HR rep or the EEO response/labor relations

7    person, much as I did with Warren Anderson at Sithe

8    Mystic, and eventually went on site to do some

9    training.

10        Q.    Did you have to go on site, though,

11   specifically to -- or did you go on site in that

12   instance specifically to view the graffiti or make a

13   determination as to whether the graffiti was

14   discriminatory?

15        A.    I did not.

16        Q.    So your visit was really just to do some

17   training?

18        A.    Yes.

19        Q.    That was all?

20        A.    Yes, post-event.

21        Q.    I want to focus your attention now

22   specifically on the Mystic facility and the period

23   of time during which WGI had responsibility over the

24   site, essentially starting when Mr. Anderson also

53

1    began on the site, which I believe was December of

2    2000.  So if you can put yourself there, my

3    questions are really going to be focused on that

4    time period and on that site.

5            When did you first become aware that WGI

6    was the general contractor for the Sithe Mystic

7    facility in Everett?

8        A.    I would guess 1998.

9        Q.    And I know that WGI went through a

10   bankruptcy in that particular -- on that project, so

11   you learned about it prior to the bankruptcy; is

12   that true?

13       A.    Yes.

14       Q.    And did you keep up with the project to the

15   extent that you recognize that it came back after

16   the bankruptcy to manage --

17       A.    I was very much aware of that, yes.

18       Q.    And were you aware, at the time that Mr.

19   Anderson was assigned to that site, that he was in

20   fact going to be going to the site, or did you learn

21   about it after the fact?

22       A.    I learned about it afterwards.

23       Q.    When was the first time that you had to

24   specifically deal with the Mystic facility in the

54

1    context of your job duties?

2        A.    I think, except for potentially interacting

3    with people at the site that is not memorable to me

4    prior to that, because that's a possibility, the

5    most remarkable time was in August of 2002 when

6    Warren Anderson called to talk about someone's

7    complaint about graffiti.

8        Q.    Do you remember whose complaint that was?

9        A.    I believe it was Mr. Willis's.

10       Q.    So your memory is that prior to August '02,

11   when Warren called to talk to you about Mr. Willis's

12   complaint, you did not handle any EEO-related matter

13   at the Mystic site?  That's your memory?

14       A.    That's my memory.

15       Q.    Did you -- you mentioned previously that

16   you, from your department in EEO, try to make sure

17   what projects are going on when to make sure that

18   those projects have the policies that they need in

19   order to have an EEO information system on the site.

20   I'm paraphrasing a little bit what you said.

21           But did you do that with this Mystic

22   facility as well, prior to Mr. Anderson calling you,

23   to your recollection?

24       A.    I don't recall being specifically involved

1   in that.  I would have anticipated that the HR

2   directors and others in the hierarchy of that

3   start-up of the project would have been involved in

4   putting up posters, example.

5       Q.    In Mr. Anderson's deposition, he testified

6   that when he came to the site, and after he started

7   getting some complaints of discrimination, he

8   realized that the safety department was doing an

9   orientation for new employees, and that orientation

10  did not include any documents that would reflect

11  policies or procedures relating to EEO, that he

12  became concerned about that, and that he himself

13  drafted some policies, which I'll show you later on.

14       He then told me during the deposition that

15  he drafted these policies in coordination with

16  discussions with you on whether the policies were

17  appropriate or not.

18       Do you have a memory of those types of

19  discussions with Mr. Anderson?

20       A.    No.

21       Q.    And just to be clear, are you denying that

22  that happened, or you just do not recall?

23       A.    Do not recall.

24       Q.    Is it strange for Mr. Anderson to have had

56

1    to draft his own policies, given what I assume is

2    the fact, that probably there are policies already

3    drafted at WGI that would handle these issues?

4        A.    Taken in its apparent intent of the way it

5    was stated, it's extraordinarily unusual.  I would

6    have expected Mr. Anderson to be fully aware of

7    well-published policies that were available to post

8    at any site.

9        Q.    And incidentally, Mr. Anderson, in his

10   deposition, also testified that there was -- just as

11   there's a labor relations manual that's distributed

12   at a corporate level to labor relations folks, there

13   is also an EEO corporate manual.  Are you familiar

14   with that?

15       A.    My definition of an EEO manual, I don't

16   know it as that, no.

17       Q.    Is there any sort of collection of policies

18   and procedures related to EEO that exist in some

19   form for corporate use that you're aware of?

20       A.    Yes.

21       Q.    What is that document or set of documents,

22   or are there several?  Can you explain?

23       A.    It is -- they are contained in the employee

24   handbook, which is posted on our Website.  And they

1    are available from our EEO Website -- we have an EEO

2    section of our corporate Website, internal Website,

3    that copies are maintained for people to go in and

4    print, print and post -- print, customize as

5    necessary, and post.

6         MS. PALACIOS-BALDWIN:  Steve, I think this

7    document was not produced to us, and it's very much

8    responsive to some requests.  So I'll put a request

9    in writing to you, but I would like to get a copy of

10   those policies.

11        MR. PATERNITI:  Yes.

12        MS. PALACIOS-BALDWIN:  That would be great.

13        Q.   So going back, you said, in August '02,

14   Warren called you to talk about a complaint made by

15   Mr. Willis about graffiti?

16        A.   Yes.

17        Q.   Other than that conversation with Mr.

18   Anderson about Mr. Willis, did you have any

19   conversations with Mr. Anderson or anyone else

20   reporting to you from Mystic regarding any other EEO

21   matters that arose during the project at Sithe

22   Mystic?

23        A.   Are you putting a time frame on that?

24        Q.   Not really.  I mean, any time after your

66

Anderson about how to handle the graffiti situation

on that work site?

A.    And that is that memorable first

conversation with him when he said -- called to say

that someone, and it turned out to be Mr. Willis,

had complained about the occurrence of graffiti.

I said, "We'll need to get rid of it, and

it has worked for us before to assign a cleaning

crew to it."  And so I believe he did that within a

week of that conversation.

Q.    Now, let me back up.  The Umatilla

facility, I know that that situation, from your

interrogatory responses, occurred prior to the

Mystic facility situation with graffiti.  Is that

true, to your recollection?

A.    Yes.

Q.    And from what I understand, there was --

the graffiti situation at Umatilla was actually of a

sexual nature.  Is that true, from your

recollection?

A.    I believe -- I don't recall exactly its

content.  I would estimate that it was a variety,

but -- yes, go on.

Q.    But nonetheless discriminatory?

67

1       A.    Offensive.

2       Q.    And what -- did you have any role in

3   actually thinking of strategies to deal with that

4   type of graffiti at Umatilla?

5       A.    I tend to think it was my idea to assign

6   someone to clean it up, and my idea very roughly

7   spoken, in the sense that I had either heard of

8   that, observed it in case history as a necessary

9   element, that it should be at least our

10  responsibility to attempt to remove it, and that a

11  cleaning crew was one of the better solutions to

12  accomplish that.

13      Q.    At that facility, were there any

14  photographs taken by the company of the graffiti?

15      A.    I do not recall any.

16      Q.    Do you recall whether the company took --

17  documented any of the actual graffiti, whether in

18  writing or in any other form, video, et cetera?

19      A.    Other than describing it, I don't think so.

20      Q.    And the complaints of the graffiti at that

21  facility were brought to the company's attention by

22  employees; is that accurate?

23      A.    Yes.

24      Q.    And was that project equal in size to the

68

1    Mystic facility project, or was it smaller?

2         A.    I would estimate it, at that time, because

3    it was going to the construction phase, probably

4    half the size of Sithe Mystic.

5         Q.    And is it your memory that the only thing

6    that was done in that -- in the Umatilla facility

7    was to establish a cleaning crew, and that the

8    cleaning crew resolved the graffiti?  Is that your

9    recollection?

10        A.    No.

11        Q.    What is your recollection about that?

12        A.    That individuals were counseled regarding

13   expectations for it not to occur.

14        Q.    Okay.

15        A.    I believe in that case there were may have

16   been -- this is a foggy memory -- that there may

17   have been someone actually accused of it and

18   confronted about that.

19        Q.    Do you know who handled that situation at

20   Umatilla?

21        A.    Yes.

22        Q.    Who was the person's name or what was the

23   person's name?

24        A.    Just remembering it, Paul Schweitzer.

69

1    Q.    And Paul was -- what was his title?

2    A.    Labor relations manager.

3    Q.    Is he still with the company?

4    A.    No.

5    Q.    Now, with respect to the graffiti situation

6    at Sithe Mystic, I understood that you explained to

7    Warren that -- to go out and set up a cleaning crew;

8    is that accurate?

9    A.    Yes.

10    Q.    Do you know whether or not that was

11    effective, or did you learn at some point that it

12    wasn't effective?

13    A.    I learned at some point that it was not as

14    effective as we had intended.

15    Q.    And at that point did you have any other

16    conversations with Warren or anybody else at Sithe

17    Mystic about alternatives to the cleaning crew that

18    would increase the effectiveness of getting rid of

19    graffiti on the site?

20        MR. PATERNITI:    Objection.    Go ahead and

21    answer.

22    A.    Conversations that went to -- I have

23    forgotten whether it was he who said he had

24    initiated additional steps or whether I talked about

1   it.  It could have been him, in which he said, "We

2   have cleaned it.  Someone has on occasion written

3   over that, the cleaning, and we've gone to

4   painting," and then they shifted to black paint,

5   because lesser depths of shade were not covering it.

6       Q.   Any other discussions about how to handle

7   the graffiti on the site, other than cleaning and

8   painting?

9       A.   No, because I felt that, if it was applied

10  sufficiently, that we would be successful in that

11  fashion.

12      Q.   Did you ever suggest anything else to

13  Warren that you discussed, other than cleaning and

14  painting?  Any other ideas sort of batted around

15  about how to handle the situation?

16      A.   Well, there were certainly discussions and

17  a follow-through of talking to the site, talking

18  to -- particularly those areas that we had somehow

19  isolated for activity, what have you, or complaints,

20  I guess, and to instruct the group as to our

21  expectations and the punitive actions that would

22  ensue for failure to comply.

23      Q.   Did you have any conversations with Warren

24  at all about what -- well, let me back up.  Did you

84

1      A.    It is an audit of EEO and Affirmative

2   Action form intended to be used for individuals to

3   assess the EEO health of their site.

4      Q.    And is this something that is supposed to

5   be done on every WGI site?

6      A.    It is available for them to do that, yes.

7      Q.    It's not required?

8      A.    It's not, no.

9      Q.    Is this required under -- on federal jobs,

10   to your knowledge?

11      A.    This particular sequence is not required.

12   It is an available tool to help make assessments.

13   It's been available for -- I produced this document

14   and made it available on our intranet for anyone to

15   go and select it to use it as a gauge of compliance.

16      Q.    It seems like it's helpful in the context

17   of providing a checklist to make sure that you have

18   policies and procedures entering a job.  Is that

19   part of the function of the document?

20      A.    Yes.

21      Q.    And I'm not going to show you this

22   document, but the Mystic project had a project rules

23   document that was a two-page document that had

24   project rules on it, and I assume that project rules

85

1    are developed for every project that WGI has.  Do

2    you have any knowledge of that?

3        A.    My impression is that every job has a list

4    of rules, often driven by safety.

5        Q.    Do you ever have any input into these

6    project-specific rules from the EEO standpoint?

7        A.    Yes.  The expectation that these rules

8    would include prohibitions or references to company

9    policies is an expectation.  Do I help author each

10   set of these?  No.

11       Q.    Do you know generally who has the

12   responsibility for generating project-specific

13   rules, as far as a title is concerned?

14       A.    I would say most typically it is a dual

15   effort by the project management and safety and

16   labor relations.

17       Q.    Did you ever get the opportunity to review

18   those project rules?

19       A.    I have on occasion, yes.

20       Q.    But it's not a requirement that you

21   personally review each of them?

22       A.    It has not been.

23       Q.    Now I'm going to show you three documents

24   together that were marked Exhibits 5, 6 and 7 in Mr.

1  Anderson's deposition.

2      A.    (Reviewing documents)

3      Q.    Now, while you're looking at those

4  documents, I will represent to you that these

5  documents, Mr. Anderson testified in his deposition,

6  were the documents that I mentioned earlier that he

7  himself put together.  I think his testimony was

8  that he reviewed different policies that he knew of

9  to create these, and then ran them by you, and then

10  actually put them up at the facility.

11         Does looking at these documents refresh

12  your recollection at all about any conversations you

13  may have had or any review of these documents based

14  on your conversations with Mr. Anderson?

15     A.    I do not recall a review.

16     Q.    Do you ever recall Mr. Anderson contacting

17  you to find out whether there were policies, EEO

18  policies, that existed that he could use at this

19  facility?

20     A.    I don't recall it, but my assistant may

21  have taken a call of that type.  That's a fairly

22  common transaction for her, for someone to call and

23  say, "Could you send me copies of posters."  And

24  either she would reference them to the Website, if

87

1    that's available to them, or actually mail them hard

2    copies.

3         Q.    Now, would you characterize, from your

4    understanding, WGI's EEO policies to be zero

5    tolerance policies?

6         A.    Yes.

7         Q.    And when you hear the words "zero

8    tolerance," can you tell me what, in the context of

9    what you understand, what that means to you.

10        A.    That any instance that is a violation of

11   the policies would be subject to corrective action.

12        Q.    So it doesn't in your mind necessarily mean

13   subject to termination?

14        A.    No.

15        Q.    I also am going to show you a document that

16   was marked -- you can put those aside -- as Exhibit

17   8 in Mr. Anderson's deposition.

18        A.    (Reviewing document)

19        Q.    Now, are you familiar with the document

20   that I just put in front of you as Exhibit 8?

21        A.    Yes.

22        Q.    Can you tell me what it is.

23        A.    It is the annual reaffirmation of our Equal

24   Employment Opportunity Policy, usually done in

1    January and February of each year.

2        Q.    Do you have any information about the

3    protocol of how this document is supposed to be

4    reissued, in the sense of is it in a check-stuffer

5    type situation or is it given out at a safety

6    meeting?  How is it normally distributed to

7    employees?

8        A.    Typically a check stuffer.

9        Q.    And is this document the same document

10   every year, or is it revised every year?

11       A.    Ordinarily it's the same document, except

12   as rules or laws might adjust it.

13       Q.    Are you responsible for making any

14   revisions to this particular document?

15       A.    Generally, yes.

16       Q.    And do you have or have you had any

17   conversations with Stephen Hanks about this

18   particular document prior to his signature of the

19   document?

20       A.    No.

21       Q.    Does he sign it every year?

22       A.    The person in charge of his electronic

23   signature has authority to apply it.  That is

24   probably -- exactly what happens, whether there is

89

1    ink on paper, I'm not sure, but eventually it

2    becomes electronic, because it's posted on our

3    Website.

4        Q.    Do you have any personal knowledge of what

5    Mr. Hanks' feeling is about the importance of EEO

6    issues at WGI?

7        A.    I think he's intense about it.

8        Q.    How do you know that?

9        A.    Various meetings I've attended.

10       Q.    What are some of the things that he has

11   said or done that make you believe that he's intense

12   about it?

13       A.    All right.  People are our most important

14   resource.  We have, I think, a vast network of

15   support for employees in our workplace, and intend

16   to respect every individual in the workplace,

17   spending 50-plus million dollars a year on employee

18   training, for example, to advance their capacities

19   and abilities and value to the company, et cetera.

20            And of course those kinds of budgetary

21   concerns definitely have to go to the top.  I have

22   found him to, if you will, walk the talk of

23   endorsing an expected fairness throughout the

24   company for anyone.

90

1      Q.    Are you aware of whether or not Mr. Hanks

2   is aware of this lawsuit?  Do you know?

3      A.    The previous document that you showed me

4   indicated that at least on September 11th of 2002 it

5   went into Larry Myers' report to him regarding --

6      Q.    Charges?

7      A.    -- an immediate status of it, yes.

8      Q.    Well, I think the date puts it in the

9   context of charges of discrimination, and I'm

10   actually talking about the lawsuit that the EEOC has

11   brought against the company.  Does that change your

12   answer?

13      A.    No.  Probably through the same vehicle,

14   that he would be apprised of it.

15      Q.    And has he ever communicated with you about

16   his interest in this lawsuit at all?

17      A.    No.

18      Q.    I'm going to show you Exhibit 10 in

19   Warren's deposition.  You can put that aside.

20          Exhibit 10, the subject reads "Tool Box

21   Meeting on Harassment, Intimidation and Coercion."

22   Have you seen this document before?  Not necessarily

23   this one with the signatures, but the actual text of

24   the document that looks like it was generated by

91

1  WGI?

2      A.    I believe I have.

3      Q.    Did you have any input into the actual

4  drafting of this particular document?

5      A.    I do not recall having done that, no.

6      Q.    Now, what I showed you previously, the

7  weekly report that Larry Myers sent to the Office of

8  the Chairman, you described the sensitivity training

9  as being the tool box training.  Fair to say that

10 this was the actual tool box training that you were

11 referring to that was mentioned in that weekly

12 update?

13     A.    I believe this represents part of that

14 intent, yes.

15     Q.    And was the -- my understanding from the

16 document that was sent by Mr. Myers to the Office of

17 the Chairman was that the issue -- the main issue,

18 as he described it, was racial graffiti.

19          Is there any reason why you think that

20 racial graffiti specifically was not mentioned as a

21 situation that was occurring at the time at the

22 facility for which reason this tool box meeting was

23 held?

24          MR. PATERNITI:  Objection.  Go ahead.

92

1    Q.   I can restate that for you.

2    A.   Please.

3    Q.   Given the fact that racial graffiti was, as

4  Mr. Myers described it in his weekly report to the

5  Office of the Chairman, the main issue regarding the

6  charges that were raised against the company at the

7  time, can you -- do you have any response as to why

8  this particular tool box meeting narrative that's

9  here did not actually specifically state that racial

10 graffiti was found on the facility or at the

11 facility?  In other words, why wasn't it

12 specifically discussed in this tool box meeting, if

13 you know?

14        MR. PATERNITI:  Objection.  Go ahead.

15   A.   I do not know what the content of the

16 discussion was.  I can only obviously speak from

17 this, where graffiti appears in the list.  I have

18 some information that indicates that the topic was

19 covered more thoroughly during those meetings to the

20 purpose -- in the discussion than is represented

21 simply in this text.

22   Q.   What information is that that you have?

23   A.   I thought I saw a description of that

24 somewhere.

94

1    can I have you pull back the documents that were

2    marked Exhibit 5, 6 and 7 in Mr. Anderson's

3    deposition, which are the Complaint Procedure, the

4    Equal Employment Policy, and the Anti-Harassment

5    Policy.  If you could put those in front of

6    yourself.

7        A.    Okay.

8        Q.    Now, I just want to clarify, are you

9    responsible for creating EEO-related policies and

10   procedures for WGI?

11       A.    In part, yes.

12       Q.    What do you mean by "in part"?

13       A.    That's usually coordinated with our

14   in-house counsel for confirmation.

15       Q.    And, again, to clarify, both in document

16   requests and interrogatories that I received from

17   the company in response to my request and what I

18   appeared to get from you earlier today, is there,

19   like, a package of EEO policies and procedures that,

20   if someone were to be starting a project, they could

21   call you or your office and receive, like, some sort

22   of orientation-type packet, or starter packet, for

23   lack of a better word?

24       A.    Yes.

95

1    Q.    Is there a name for such a packet?

2    A.    I don't know that the packet itself is

3    advertised with a name. It is just EEO information,

4    primarily posters for sites to use, whether they

5    access the intranet or call our office and get a

6    mailed package.

7    Q.    When we had a conversation in October about

8    just general EEO and HR issues, I know that Steve

9    gave me a copy of a poster, like a laminated poster,

10   part of which I think included some sort of

11   boilerplate federal and state requirements, but also

12   had some policies from WGI.

13         Other than that poster, which I believe was

14   just one poster that I got, is there anything else

15   that is included in some of these EEO policies and

16   procedures that you would give to someone starting

17   on a project?

18   A.    Nothing specific I can think of.

19   Q.    Now, with respect to the documents that Mr.

20   Anderson said that he drafted that are in front of

21   you as Exhibits 5, 6 and 7, do they -- if you want,

22   why don't we look at each document individually.

23         Looking at Exhibit No. 5, the Complaint

24   Procedure, if you could read it and tell me if this

1    particular complaint procedure is consistent with

2    the complaint procedure under the EEO policies and

3    procedures that you would normally provide.  Is it

4    consistent with that?

5        A.    (Reviewing document)  I would not disagree

6    with its content.

7        Q.    Do you see any language that is cut and

8    pasted or lifted from any of the policies that you

9    have addressing the complaint procedure under the

10   EEO policy?

11       A.    It appears so.

12       Q.    It does.  Any particular language that you

13   can point to in the policy?

14       A.    Paragraph 2, 3, 4.

15       Q.    Paragraphs 2, 3 and 4?

16       A.    Yes.

17       Q.    Is there anything, as you look at this

18   right now, and with what you normally provide in

19   your mind as well, that you would have added to this

20   particular complaint procedure, in other words, that

21   you think is missing from this?

22       A.    (Reviewing document)  I think it's thorough

23   enough.  It connects them to me.  It connects them

24   to Warren.  I'm very much aware that some people,

97

1    particularly in small sites, are put off by

2    reporting to local management, because it makes it

3    such a recognizable event for them, which is why we

4    always want my number, and I now have a 1-800 number

5    that's added to that poster as well.

6              In terms of the fact that you mentioned

7    that he said that he did that in 2000, when he

8    showed up there --

9         Q.    In 2002.

10        A.    2002 is when he arrived?

11        Q.    No, no.  He said in his deposition that

12   once he learned of the charges of discrimination in

13   2002 was when he felt that -- when he looked at the

14   orientation situation and noticed that there were no

15   policies included.

16        A.    All right.

17        Q.    It's in his deposition.

18        A.    Okay.

19        Q.    And I have the same question for the other

20   two -- the same questions for the other two

21   documents.  I'll just remind you what they were.  As

22   you look at the Equal Employment Opportunity Policy

23   as Exhibit 6, I'm interested in knowing whether you

24   recognize any of the content from your policies

98

1   included in here.  And also my next question will

2   be, just to keep it in mind, whether you think

3   there's anything missing from this policy.

4        A.    (Reviewing document)   This particular one

5   brings back memories of the Raytheon policy that

6   Warren may -- that may have been some of the source.

7   The numbering format, which we don't use now, was a

8   part of the Raytheon version of these policies for

9   four years.  So he may have gathered them from

10   there.

11        As to anything missing --

12        Q.    Or anything that you would add.

13        A.    (Reviewing document)   I don't observe a

14   glaring error or loss of intent in this policy.

15        Q.    Compared to yours?

16        A.    Yes.

17        Q.    And again, my same two questions with

18   respect to the Anti-Harassment Policy, No. 7.  Do

19   you see anything that's consistent with something

20   that maybe Warren borrowed from your policies, and

21   is there anything that you would add?

22        A.    (Reviewing document)   I observe the phone

23   numbers to be missing from the Anti-Harassment

24   Policy, specific contact points, which I believe I

1    would have added.  Had I reviewed it, it was

2    certainly an oversight.

3        Q.    Anything else?

4        A.    I don't see anything that glares, no.

5        Q.    And do you find any language in here that

6    you think may have been borrowed from your policies

7    or any policies that you're aware of?

8        A.    It looks like language from the Raytheon

9    era.

10       Q.    Is there any policy that you're aware of

11   that actually -- that you've generated that goes to

12   sites that describes the company's investigative

13   procedure, specifically that triggers once the

14   company receives a complaint?

15       A.    I believe our policies do describe the fact

16   that investigation should be done promptly, et

17   cetera, and the contact points for initiating an

18   investigation or registering a complaint.

19       Q.    And internally, is there any manual or

20   guidance that is provided for you or for people like

21   you in the HR department who might be doing

22   investigations as to steps that need to be followed?

23       A.    Other than the description of the

24   expectations found in our policies and the complaint

100

1   procedure itself, I can't think of any formalized

2   documents that would get any necessary distribution

3   to teach someone how to investigate.

4           Along with that is that individuals -- we

5   expect individuals to report those situations that

6   need investigation, other than casual information

7   gathering, to upper management, including the HR

8   director or my office.  I especially want to hear

9   about investigations that might be going on.

10      Q.    Do you know how many employees,

11  approximately, are in the HR department currently?

12      A.    A very generalized number, 40 to 50.

13      Q.    Has that number remained consistent since

14  approximately 2000, or has it fluctuated

15  significantly?

16      A.    I would say there's been some fluctuation,

17  based upon layoff patterns that we've had, closure

18  of offices.  But it might be close to 40 to 50.

19  There's not been a dramatic change, I don't believe.

20      Q.    There has not been a dramatic change?

21      A.    Not that I can recall.

22      Q.    Mr. Anderson testified that at least as far

23  as the labor relations department went, after 9/11,

24  there was some impact to staffing.  Was that your

101

1    experience in the HR department as well?

2        A.    There may have been some reductions

3    associated with a decline in business that followed

4    9/11.  The more dramatic event was the

5    reorganization of Washington purchasing Raytheon

6    Engineers and Constructors.

7        Q.    Which I believe was in '99, you said?

8        A.    2000.

9        Q.    So there were less, potentially, HR

10   personnel at that time or more?

11       A.    Less happened.  The numbers are not

12   familiar to me right now.  But the reorganization

13   resulted in some 1100 exits from the company.

14       Q.    From every department?

15       A.    All of the company, yes.

16       Q.    Are you able to tell me, as to any -- as to

17   all sites that WGI has for any projects going, who

18   is ultimately responsible for EEO matters at the

19   site, at the specific site?

20       A.    We certainly hold a statement of policy

21   that the top management at the site is responsible

22   for keeping those policies active.  From that point

23   and from an EEO/HR perspective, the site designee

24   for HR and EEO functions, and labor relations as it

102

1    may be, then to the HR directors of that, to the

2    business unit presidents, and to my office, and then

3    on up to people that I report to.

4        Q.    Does every site -- is it supposed to --

5    strike that.  To your knowledge, is it policy at WGI

6    that every site have an EEO designee?

7        A.    Yes.

8        Q.    And to your knowledge, does every site have

9    an EEO designee?

10       A.    I believe there are some smaller sites that

11   that responsibility is probably conducted from

12   another office.  If there were three to 12 to 15

13   people at a particular site, I doubt that typical

14   budgets would find someone with that expertise at

15   that location.  Larger sites, we do expect -- I do

16   believe that you would find someone designated with

17   that responsibility.

18       Q.    Do you have any involvement in the drafting

19   of evaluations for employees on any particular site?

20   And what I mean is not actually doing those

21   individuals' evaluations yourself, but actually

22   drafting of documents that would be used to evaluate

23   employees.

24       A.    I think the answer to that is no.

103

1    Q.   Do you know who at WGI has that

2  responsibility, if anyone, or any department?

3    A.   It would be upper management and HR, in

4  design of forms.  My involvement would be more

5  indirect, such as getting the principles expected by

6  adherence to those issues that I attend to

7  incorporated into that as a measure of performance

8  and expectation.  And there is a section on the

9  typical evaluation form -- I can't speak to that in

10 the form of craft -- but there is a section that can

11 collect that kind of performance data.

12   Q.   Okay.  And I just want to make sure you're

13 not talking hypothetically.  You have actually had

14 the opportunity to include EEO data that can be

15 measured in the context in evaluation -- in certain

16 evaluation forms used at WGI; is that what you're

17 saying?

18   A.   It does exist.

19   Q.   And you have done that yourself; in other

20 words, you have crafted that language?

21   A.   I did not.

22   Q.   You just know that it exists?

23   A.   Yes.

24   Q.   Now, with respect to Mr. Enagbare, Godwin

107

1    investigation of Mr. Baldwin's allegations?

2        A.    No.

3        Q.    And with respect to Mr. Kaindoh, did you

4    conduct any of your own personal and independent

5    investigation of Mr. Kaindoh's claims?

6        A.    No.

7        Q.    Same question with respect to Mr. Bell.

8        A.    No.

9        Q.    And Mr. Henderson.

10       A.    Again, no.

11            MS. PALACIOS-BALDWIN:  And I just ask that

12   if there is any nonprivileged notes or information

13   that Mr. McDaniel has kept on each of those charges,

14   that they be produced if they haven't been already.

15       Q.    Did you have any involvement at all in any

16   of the grievance procedures that took place related

17   to any of the six charging parties -- Mr. Kaindoh,

18   Mr. Bell, Mr. Willis and Mr. Enagbare resorted to

19   grievance procedures in this case prior to or after

20   they filed charges with the EEOC.  Did you

21   personally participate in any of those grievances?

22       A.    No.

23       Q.    Have you ever received any anonymous

24   complaints of discrimination on your 1-800 line or

108

1   to your line directly?

2       A.    Yes.

3       Q.    Is that a frequent occurrence?

4       A.    I don't call it frequent.

5       Q.    How do you handle those situations?

6       A.    We try to find out enough information to be

7   able to act on it.  Sometimes individuals won't

8   identify themselves or their location.  I have not

9   used caller ID to try and trace them, but invite

10  them to provide us enough information.

11          And I caution them that I'm here to listen

12  to all that they have to say about their concern,

13  but if they don't give us enough information to act

14  on, that we can't effect any change or solution for

15  them, and that we indeed want to be able to do that.

16  "If there is something wrong, please tell us, and

17  give us the avenues to help us correct it."

18          MS. PALACIOS-BALDWIN:  Give me a break.

19  You don't have to leave.  Just give me a moment.

20          (Pause)

21      BY MS. PALACIOS-BALDWIN:

22      Q.    Do you know who Mr. Bob Blount is?

23      A.    Spell the last name, please.

24      Q.    B-l-o-u-n-t.

109

1      A.    It's a familiar name.   The circumstances

2  are vague right now.

3      Q.    If I told you he was identified by WGI as

4  the labor superintendent at Sithe Mystic who was

5  primarily responsible for organizing the cleaning

6  crew, does that refresh your recollection at all?

7      A.    Possibly.

8      Q.    You don't recall ever speaking to Mr.

9  Blount?

10     A.    No.

11     Q.    Do you know that the EEOC out of this

12  office did four visits to the Sithe Mystic facility

13  as part of an administrative investigation?   Did you

14  know about that at the time that it was happening?

15     A.    I knew about the visits.   The number would

16  escape me right now.

17     Q.    And you knew about them when they were

18  happening?

19     A.    I believe I did.

20     Q.    Is there any reason why you decided not to

21  attend those visits?

22     A.    My understanding was that Ms. Higgins was

23  present --

24         MR. PATERNITI:   Hold on.   I'm going to

110

1    object if this information was learned only through

2    Ms. Higgins.  I don't want you to testify to

3    anything you learned through conversations with an

4    attorney.  If you can answer the question aside from

5    that, please do.

6        A.    I believe I had letters from Ms. Jimenez

7    that scheduled some of those visits.  I had copies

8    of those.  They continued to go to Dennis Washington

9    and some other office, but it got routed back to me.

10           I believe it was timely information for

11   that, but it was my observation, I think at the time

12   the visits were occurring, that we had engaged the

13   law firm to look after that and to provide us with

14   necessary information related to those visits, in

15   addition to, of course, summaries received from the

16   EEOC of their findings.

17       Q.    Is it fair to say that you felt it was

18   being handled by the attorneys and that was why?

19       A.    Yes.

20       Q.    I'm looking at a document that was

21   generated by you with some carbon copies of a

22   document that I guess you sent, one was to Warren

23   Anderson, and one was to an M. Cullen, who I think

24   it probably your assistant; is that true?