# EXHIBIT A(PART 2)

114

1      A.    It can be.  I do not consider it usual as a
2   safety issue.
3      Q.    In what respects do you mean that it can
4   be?
5      A.    If the discrimination rose to the level of
6   threats, then it could be a safety issue.
7      Q.    Earlier Lily was talking to you about the
8   term "zero tolerance," and you agreed -- I believe
9   you said you agreed that WGI had a zero tolerance
10  policy relative to racial discrimination; is that
11  correct?
12     A.    Yes.
13     Q.    And can you tell me -- I apologize if you
14  said this before -- can you tell me, in your own
15  words, what that means.
16     A.    Zero tolerance would mean that any
17  violation of the policy would require corrective
18  action.
19     Q.    Does that mean that in the instance of a
20  racial discriminatory type conduct, someone might
21  not be terminated for such conduct?
22     A.    There's a possibility for that.
23     Q.    Was anyone at the Mystic site, meaning any
24  employees of WGI, taught by the company or by an

1    outside vendor how to investigate a complaint of

2    racial discrimination?

3         A.    I'm not aware of anyone who was

4    specifically trained.  I'm not aware of anyone's

5    specific training to that effect.

6         Q.    Are you aware if any employees at the

7    Mystic site were taught whom to report a complaint

8    of racial discrimination to?

9         A.    Does your word "taught" mean informed?

10        Q.    Sure.

11        A.    It was my expectation and my belief that

12   policies were posted at the site that described the

13   manner of reporting any kind of untoward activity,

14   including discrimination.

15        Q.    Why do you -- what do you base that belief

16   on that you just testified about?

17        A.    I base that on copies of those policies

18   that were provided during the course of some of the

19   responses to the position statements.

20        Q.    And you said earlier that, still to this

21   date, you have never been to the Mystic site in

22   Everett, Massachusetts; is that correct?

23        A.    That is correct.

24        Q.    Were you aware if any employees of WGI from

1    foremen up were ever informed or taught in any type

2    of educational setting, such as a course or a

3    seminar, how to respond to a complaint of racial

4    discrimination at the work site?

5         A.    The one instance of informing individuals

6    about that were those series of tool box meetings

7    that I believe were documented in position

8    statements, et cetera.  As to whether or not they

9    had formal courses other than that, I'm unaware of

10   those.

11        Q.    Would you agree with me that the tool box

12   meetings that you were referring to occurred only

13   after complaints of racial graffiti were brought to

14   the attention of WGI?

15             MR. PATERNITI:  Objection.  Go ahead.

16        Q.    The tool box meetings that we've talked

17   about earlier that are set forth in I believe it was

18   one of the documents you looked at, but they were

19   the subject of racial graffiti, would you agree that

20   the tool box meeting you just referred to occurred

21   only after WGI was made aware of some type of racial

22   discriminatory conduct or action?

23        A.    My observation of those facts leads me to

24   believe that that was the chronology of that, but I

117

1   expected that the appearance of the policies that

2   would otherwise describe those avenues and

3   expectations were already at the site.

4        Q.    What would be your understanding if a

5   foreman or a general foreman -- let's start with a

6   foreman.  What would be your understanding and

7   expectation if a foreman was made aware that there

8   was an incident of racial discrimination at the

9   Mystic work site?

10       A.    To fix it or report it.

11       Q.    Okay.  So let's start with the first of

12  those two things, which is fix it.  What would you

13  expect a foreman to do to fix that type of

14  situation?

15       A.    To require stopping the offending behavior.

16       Q.    By doing what?

17       A.    Directing the individual, counseling them,

18  cautioning them relative to expectations.

19       Q.    When you say "counseling them," what would

20  be your expectation as far as what a foreman should

21  do specifically to counsel a person who was reported

22  to have committed some type of racially

23  discriminatory conduct at the Mystic work site?

24       A.    Could you repeat that.

118

1      Q.    Sure.   I'm basically asking you,

2   specifically what do you mean, break down the word

3   "counseling," when you said you would expect a

4   foreman in part, at least, to counsel the offender

5   as to, I guess, potentially what would be prohibited

6   conduct and what would be expected for them in the

7   future?   Is that correct?

8      A.    I believe that's correct.   I believe I

9   understand your question that counsel would be, if

10  you will, the entry level approach to an issue,

11  presuming it was not gross misconduct, that an

12  individual, by informing them of the expectations,

13  would be willing to comply and move quickly to the

14  solution.

15         Obviously, counseling is not ample for some

16  situations, when the individual is not compliant to

17  the policy, and stepping up that to up to and

18  including punitive action and termination for a

19  individual who was unresponsive.

20     Q.    If the WGI foreman at the Mystic work site

21  never underwent any type of courses, training or

22  seminar as far as how to deal with a complaint of

23  racial discrimination, how would you expect them to

24  know specifically what to say to an offender or how

119

1    to counsel an offender?

2        A.    And that's why I said "report it."

3    Individuals who don't understand exactly the quick

4    solution set, such as an acknowledged case of

5    misbehavior that the supervisor would know was -- we

6    would presume to know and have a value system that

7    would say this is not an acceptable behavior, that

8    they would describe correct behaviors to the

9    individual -- absent that, we would expect them to

10   report it, to those individuals who indeed, if you

11   will, had investigation training or insight, and

12   those other individuals, relative to the topic.

13       Q.    To whom would you expect a foreman who had

14   been made aware of a racially discriminatory

15   conduct -- should that foreman report the conduct

16   to?

17       A.    General expectation as is described in our

18   complaint procedure, that that individual report it

19   up through the hierarchy of their reporting

20   structure.

21       Q.    So a foreman should report -- you would

22   expect -- strike that.  You would expect that a

23   foreman who had been made aware of racially

24   discriminatory conduct by an employee, or maybe the

120

1  foreman witnessed it, you would expect that foreman

2  to report it to whom, specifically?

3      A.    The complaint procedure and our expectation

4  for that individual would include reporting it to

5  any of the avenues above that individual, which

6  might be their immediate supervisor all the way up

7  to vice-presidents in the company.

8      Q.    Okay.  So it would be your expectation that

9  a foreman could report an incident of racial

10  discrimination to his or her general foreman,

11  correct?

12      A.    That would be an acceptable practice, yes.

13      Q.    Okay.  And then the general foreman who got

14  the complaint from the foreman should report it to

15  whom?

16      A.    If they -- is the general foreman a

17  Washington Group employee?

18      Q.    Yes.

19      A.    Then I would prefer -- the most effective

20  channel is to report it to the EEO site

21  representative.

22      Q.    And the Mystic EEO site representative for

23  2000 to 2002 was whom?

24      A.    Warren Anderson.

121

1    Q.   And what about if a superintendent was made

2 aware of or witnessed some type of racially

3 discriminatory conduct; to whom should he or she

4 report that?

5    A.   All of the above -- all of the options are

6 available to that individual in their reporting

7 hierarchy, and we believe one of the more efficient

8 methods is to report it to the site EEO manager.

9    Q.   Now, let me ask you this:  What if a

10 superintendent -- strike that.  Are you aware that

11 at a site such as the size of Mystic, there are

12 different superintendents for different sides and

13 different areas of the project?

14    A.   I am generally familiar with that concept,

15 yes.

16    Q.   So, for example, like the boilermakers,

17 they had a day shift and a night shift, and then on

18 each particular shift they had different

19 superintendents, because the project was so large,

20 covering different areas of the project.  Are you

21 familiar with that concept?

22    A.   Yes.

23    Q.   So what would be your expectation if a

24 superintendent -- superintendent, WGI employee -- on

122

1    one side of the project somehow became aware of a

2    racially discriminatory action or conduct that

3    occurred on the other side of the project where

4    there's another superintendent on that side of the

5    project, but for some reason the superintendent who

6    was not in charge of that side of the project

7    happened to have heard about it?

8           What would you expect the superintendent

9    that found out about the racially discriminatory

10   conduct to do about it?

11        A.    I would expect any supervisor to accept the

12   responsibility for affecting those conditions and

13   reporting them as necessary.

14        Q.    Reporting them to whom, if you're a

15   superintendent?

16        A.    Through the reporting process described in

17   our complaint procedure, which opens up all those

18   avenues of the hierarchy of their reporting

19   relationship, as well as to 1-800 numbers, et

20   cetera.

21        Q.    Now, are you aware of any specific training

22   or courses that related to superintendents that made

23   them aware of the reporting hierarchy at the Mystic

24   site?

123

1    A.    I was not aware of any training sessions,

2    other than informationals available on the posted

3    policies.

4    Q.    And would the posted policies have

5    addressed a situation such as the one that we just

6    talked about, whereby a superintendent on one side

7    of the project, even though it was not his side of

8    the project, if he was aware of a racially

9    discriminatory action or conduct, that he should

10    still report it to either Warren Anderson or to

11    perhaps his immediate supervisor or perhaps even to

12    the superintendent on whose side of the project it

13    was?

14    A.    I believe the language is clear in the

15    expectation that that responsibility is to be

16    accepted by that individual.

17    Q.    Would you agree with me that it would be a

18    better practice for WGI to have had a meeting with

19    the employees, especially the supervisory employees,

20    to inform them about how to investigate and/or how

21    to report a discriminatory action?

22    A.    I believe in your question you're implying

23    that it didn't happen.    I feel -- it was my

24    impression that certain instructions along those

1    lines did occur.  But, yes, that someone should be

2    informed, particularly if there is an incident, and

3    those concerned parties to be -- their level of

4    awareness heightened regarding expectations if in

5    fact they had missed the mark on that issue.

6        Q.    I appreciate what you said.  I guess I'll

7    ask it a different way.

8            Would you agree with me that it would have

9    been a better practice for WGI, instead of just

10   posting the policy that dealt with EEO issues and

11   reporting an action of discriminatory conduct, would

12   you agree that it would have been a better policy to

13   have a training seminar or some type of training

14   course to inform the supervisory personnel how to

15   deal with a report of racial discrimination?

16       A.    I believe training can be effective in

17   delivering that message, yes.

18       Q.    So would you agree with me that that would

19   have been a better policy, the training avenue of

20   policy, meaning the actual -- strike that.

21           So would you agree with me that training

22   with a live person or maybe with a video would have

23   been a better policy as far as how to deal with a

24   complaint of racially discriminatory conduct than

125

1   the policy that was in place, which is a posting of

2   the information at the Mystic site?

3          MR. PATERNITI:  Objection.  Go ahead.

4      A.    In theory, yes.

5      Q.    Okay.  Thanks.  Prior to, I believe you

6   said it was August of 2002, is it fair to say that

7   you never heard of any complaints of racial

8   discriminatory conduct or any type of racial

9   graffiti whatsoever at the Mystic site?

10     A.    That is my memory of events at this time,

11  yes.

12     Q.    Have you ever heard of a gentleman named

13  Claude Barker?

14     A.    His name was a part of some of the events

15  described in the issues brought forth by some of the

16  complainants, yes.

17     Q.    Do you recall ever having spoken with him?

18     A.    I did not.

19     Q.    If an employee at the Mystic site, for

20  example, told a racially discriminatory joke, what

21  would be the appropriate discipline against that

22  employee, if anything?

23     A.    To prohibit the practice.  Each instance

24  would be measured for what it was, the content,

126

1    context, what happened, and to determine if it rose

2    to the level of gross misconduct -- and some of that

3    very easily could -- which could result in

4    termination of the individual.

5        Q.    Have you ever heard of a gentleman named

6    Roy Finch?

7        A.    It's not a name that seems familiar right

8    now.

9        Q.    Would you agree that if a person told a

10   racially discriminatory joke at the Mystic site, at

11   the very least some type of corrective action should

12   have been taken?

13       A.    Yes.

14       Q.    Let me give you an example of a joke

15   that -- and I'll get your opinion as to what, if

16   anything, in your opinion, should have been done

17   about it.

18            So what if two white employees were talking

19   in front of a black employee at the Mystic site, and

20   one of them said, "Is your wife a nagger?", and then

21   the other white employee said, "No, she's white"?

22            First of all, would you, in your opinion,

23   would you take that to be a racially discriminatory

24   joke?

127

1      A.    Yes.

2      Q.    If that incident had been reported to you,

3  or if you were on the site and heard it, in your

4  opinion, using that scenario, what would be

5  appropriate corrective action?

6      A.    With only those facts to assess, probably

7  severe counseling and three to five days off.

8      Q.    What do you mean by "severe counseling"?

9      A.    Description of expectations, and with the

10  mention of impending termination for any failure --

11  for any such infraction or any kind of related

12  infraction in the future.

13      Q.    When you say "three to five days off,"

14  would that be without pay?

15      A.    Yes.

16      Q.    In your opinion, would that joke that I

17  just stated to you, would that also warrant some

18  type of documentation in that person's personnel

19  file?

20      A.    Certainly an investigative file, yes.

21      Q.    What type of information would have gone in

22  an investigative file, in that situation?

23      A.    A description of the incident.

24      Q.    Where would investigative files have been

128

1  kept for employees at the Mystic site?

2      A.    The expectation is that the EEO person

3  would conduct some sort of investigation, if they

4  knew about it, and would prepare a file that would

5  not be part of the personnel file, but would be an

6  investigative internal EEO file.

7      Q.    Are you aware of any investigative files

8  that exist relative to any of the names of any of

9  the employees that you've seen in any of the

10  position statements?

11      A.    There are some records associated with

12  discussions and conversations.  For example, the

13  Kenny Carpenter interrogation by Warren Anderson, et

14  cetera, is an example.  And there may be others.

15      Q.    Now, let me ask you this:  What about a

16  scenario whereby a white employee came into a

17  trailer, and there were other employees, including

18  black employees, and the white employee used the

19  word "nigger" in front of the other employees?

20          First of all, it may be an obvious

21  question, but would you agree that that is conduct

22  that would be constituted as racially discriminatory

23  in nature?

24      A.    Yes.

1    Q.   So, in your opinion, what, if any,

2    corrective action should have been taken towards the

3    white employee that used the word "nigger,"

4    particularly in front of black employees?

5    A.   In your example, I impose what I believe to

6    be another fact, and that is that this was also a

7    supervisor, he had some supervisory role?

8    Q.   I appreciate what you're saying.  For the

9    time being, let's assume it was a craft worker, a

10   white craft worker who used the word "nigger."

11   Let's assume they weren't a supervisory person for

12   now, but they used it in the presence of black

13   workers.

14   A.   And in reference to people specifically?

15   Q.   Well, let's just say specifically the

16   person said, "I'm tired of all this nigger shit."

17        So obviously we've determined or

18   established that that is racially discriminatory in

19   nature.  My question to you, as an EEO professional,

20   what type of correction -- corrective action or

21   punitive action should have been taken towards this

22   white employee who said this?

23   A.   Theoretically --

24   Q.   Well, I'm asking your opinion.

1    A.    My opinion would be that that sounds like

2   an offense that ordinarily I would have voted for an

3   exit of the employee.  Under perhaps more

4   extenuating circumstances and so forth, a true

5   repentant attitude on the part of a person and a

6   large amounts of apologies, et cetera, we might have

7   considered retaining him.

8    Q.    Let's assume they apologized and -- well,

9   strike that.  Let's assume they apologized.  In your

10  opinion, should that person still have been

11  counseled or suspended or any other type of

12  sanctions taken against the person that used the

13  word "nigger" in the context that we've just talked

14  about?

15   A.    My normal practice would be to do that,

16  yes.

17   Q.    What specifically in this situation would

18  you have done?

19   A.    This is hindsight.  Had they presented

20  those facts on the day of, you know, consistent with

21  a specific investigation, I would have voted for an

22  exit of the employee, because of the very egregious

23  nature.  But if the person wasn't, then severe

24  counseling, and again, I would -- I believe

134

1    Q.    Is it from the paperwork and from this
2  lawsuit, or do you have independent knowledge of who
3  Ron Bennett is?
4    A.    From the paperwork.
5    Q.    So to your knowledge you have not knowingly
6  ever talked to Ron Bennett?
7    A.    That's correct.
8    Q.    Did you read his deposition transcript that
9  you recall?
10    A.    I can't recall any content.
11    Q.    Do you know a gentleman by the name of
12  Charles Belangia?
13    A.    Only from seeing the name in the paperwork.
14    Q.    Do you knowingly -- do you have a
15  recollection of knowingly talking to Charlie
16  Belangia about any of the circumstances involved in
17  this lawsuit?
18    A.    No.
19    Q.    Do you recall reading Mr. Belangia's
20  deposition transcript?
21    A.    I do not.
22    Q.    At the Mystic site was there a handbook
23  containing EEO policies that were distributed to all
24  employees at the site?

135

1    A.    I'm not aware of a handbook, but the

2    possibility -- I'm not aware of a specific practice

3    of the distribution, but it is commonly accepted

4    that individuals would receive information relating

5    to our policies upon arriving at the site.

6    Q.    That's actually what I meant to ask you.

7    Are you aware of any EEO policies on the part of WGI

8    that were distributed to all employees at the Mystic

9    site?  Do you have a specific recollection of that

10   or specific knowledge of that?

11   A.    Not specific knowledge.

12   Q.    When you say that it's your belief that

13   those policies would have been distributed to

14   employees, what do you base that belief on?

15   A.    That the policies are to be distributed and

16   made known to individuals, and if the policies are

17   not handed out, that instructions regarding

18   accessing those policies in their appropriately

19   posted locations should be given to them.

20   Q.    Would it be fair to say that it is the WGI

21   policy to hand out its EEO policies, but you have no

22   independent knowledge of whether that was actually

23   done at the Mystic site?

24   A.    I think that might be an overstatement as

136

1    regards the policy.  I don't believe you will find a

2    written policy that it will be handed out.  It is an

3    expectation, a practice that we believe should be

4    used in the company and know that it does happen in

5    many cases, but I do not know that it happened

6    specifically at Sithe Mystic.

7        Q.   Is there any type of confirmation or

8    documentation sent in by the EEO person on site,

9    such as the one at Mystic, that is communicated to

10   you to inform you or anyone else in HR to let them

11   or you know that the EEO policies were distributed

12   to the WGI employees at the Mystic site?

13       A.   There is not a repetitive practice to do

14   that.

15       Q.   Are you aware of anything in this case

16   whereby the EEO person on site at Mystic

17   communicated to you in any respect that EEO policies

18   were distributed to WGI employees at the Mystic

19   site?

20       A.   There is information in some of the

21   documentation relative to meetings that included but

22   not exclusive of the tool box meetings that

23   additional discussions were had about those

24   policies.

137

1    Q.   Would you agree that it would be your

2    expectation that EEO policies would have been

3    distributed, which in part would have outlined the

4    zero tolerance policy of WGI -- would it be your

5    expectation that those policies would have been

6    distributed to all WGI employees at the Mystic site

7    upon their arrival at that site?

8    A.   That is a preferred practice.

9    Q.   Is there any -- strike that.  Do you have

10   any information that can confirm that, at the Mystic

11   site, WGI employees were given EEO policies upon

12   their arrival at that site?

13   A.   I don't have specific information to

14   confirm that.

15   Q.   If that were done by WGI, who in the

16   company would have that information that would

17   confirm whether the policies were distributed to the

18   WGI employees upon the employees' arrival at the

19   site?

20   A.   Individuals who were the receivers of

21   employees and who would have organized that

22   information transaction with newly arriving

23   employees would be the ones to inquire of that

24   and/or estimate whether or not they had files to

138

1  support it.

2      Q.   So specifically in this case, talking about

3  the Mystic site, give me the name or names of all

4  persons who would have knowledge of whether the EEO

5  policies were distributed to WGI employees upon the

6  employees' arrival at the site.

7      A.   I don't know.

8      Q.   Are you aware of -- well, strike that.  Is

9  WGI a publicly traded company, if you're aware?

10     A.   Yes, it is.

11     Q.   Is it on one of the exchanges?

12     A.   Yes.

13     Q.   Which exchange?

14     A.   I'm not sure.

15     Q.   Do you own stock in the company?

16     A.   I do not.

17     Q.   As part of your employment, are you offered

18 stock options?

19     A.   No.

20     Q.   I believe earlier when you were talking to

21 Lily, you referred to the term "on-site management."

22 Do you recall talking to her about that at the

23 Mystic site?  I wrote it down in my notes, and I

24 have a question to ask you:  Who did you mean by

139

1    "on-site management" for HR purposes at the Mystic

2    site?

3        A.    For HR purposes --

4            MR. PATERNITI:  Objection.  Go ahead.

5        A.    -- it's vague, I believe, in the way I'm

6    understanding this, but that would include anyone in

7    upper management in particular, such as the lead for

8    EEO and HR or the project manager or the project

9    manager's direct reports.

10       Q.    Who were the persons at the Mystic site who

11   were ultimately responsible for making certain that

12   graffiti of a racial nature was either eliminated or

13   otherwise controlled at the Mystic site?

14       A.    I would consider every employee at the site

15   responsible for that, but especially, of course,

16   anyone in management.  And as it goes up the chain

17   to higher management, the responsibility, if you

18   will, increases for our expectation of that.

19       Q.    So is it fair to say that you would expect,

20   at least from the management perspective, everyone

21   from a foreman up to be responsible to participate

22   in the eradication of racially discriminatory

23   graffiti?

24           MR. PATERNITI:  Objection.

140

1    A.    Yes.

2    Q.    Are you aware of any specific person or

3    persons that allegedly participated in drawing any

4    of the racist graffiti at the Mystic site?

5    A.    No.

6    Q.    So at the Mystic site, was there a

7    permanent EEO officer there?

8    A.    That would have been the role of Mr.

9    Anderson.

10    Q.    So he was on site -- is it your

11    understanding he was on site the entire time the

12    project was going on at Mystic and his job was the

13    EEO officer?

14    A.    The job was interrupted at one time, and

15    I've forgotten how much time occurred between the

16    leaving of the site and the return to the site.  But

17    my involvement with the site pictured Mr. Anderson

18    as consistently the person with that responsibility.

19    Q.    Your office is in Birmingham, Alabama,

20    right?

21    A.    Yes.

22    Q.    Is that a permanent office?

23    A.    Yes.

24    Q.    Meaning you don't travel around -- I mean,

1    you travel around, but you don't go for like a month

2    or two at a time at a different office.  You

3    basically stay in Birmingham.  That's your main

4    office.  You may travel to different sites for

5    different reasons; is that right?

6        A.    That's an accurate description, yes.

7        Q.    Now, Mr. Anderson, does he have a permanent

8    office, sort of like what you have?

9        A.    I believe -- I know that Mr. Anderson is

10   now housed in Denver, if he's not on a site.  Of

11   course, site assignments in the case of his job

12   description could be very lengthy, and whether or

13   not someone would necessarily maintain that office

14   at that, if you will, home base condition, I don't

15   know.  It's possible they did, it's possible they

16   didn't, depending on space constraints they might

17   have had.

18       Q.    Would you say Mystic, the Mystic site, was

19   a fairly big site in relative terms?

20       A.    In relative terms I think it's one of our

21   largest, yes.

22       Q.    Would the size of the Mystic site have --

23   would it have been the policy of the company to have

24   a permanent EEO officer at the Mystic site due to

142

1    the size of the site or due to any other factors?

2    In other words, I don't think every site -- you said

3    every site doesn't have an EEO officer; is that

4    correct?

5        A.    I did.

6        Q.    Are you -- strike that.  Did the Mystic

7    site have -- is it your understanding that Mr.

8    Anderson was sort of a permanent EEO officer at the

9    Mystic site, or was there --

10       A.    Yes.  For the duration of that project.

11       Q.    That's what I was trying to find out.

12   Thanks.

13             Do you recall talking about the Complaint

14   Procedure at the Sithe Mystic Station project?  It

15   was Exhibit 5 in Mr. Anderson's deposition.  Do you

16   still have a copy of that?

17       A.    Yes.

18       Q.    Pick that up and look at it, please.

19       A.    I remember it.

20       Q.    Can you tell me who was this given to,

21   distributed to, or where was this posted?  If you

22   testified to that already, I apologize.  I don't

23   recall that.

24       A.    I'm not familiar with the transaction of

143

1    giving it to someone, how it arrived at the site

2    exactly, how it was generated.  I don't have a

3    specific fact about that.

4        Q.    Do you recall when, if at all, it was

5    either published at the Mystic site or -- well,

6    strike that.  Do you recall -- are you saying you

7    don't know if it was distributed at the site at all?

8    Is that what you're saying?

9        A.    No.  I believe later records indicated that

10   it existed at the site.  Exactly when it appeared

11   there and was posted, notwithstanding our presence

12   there prior to 2000 and in the bankruptcy and our

13   exit, the prior-to-2000 conditions of doing the job

14   would have been under Raytheon and Raytheon's

15   policies posted.

16        When that exit -- when that changed,

17   perhaps those -- perhaps, perhaps not -- the

18   Raytheon policies came down.  There's a possibility

19   that Raytheon policies stayed up during that entire

20   transition and that these policies with the

21   Washington logo may have appeared sometime later.

22   And I don't know what that is.

23        Q.    Would you agree with me that there is no

24   way to confirm whether these policies were actually

posted at the Mystic site?

    A.   I don't know that, and I wouldn't have that

fact, since I didn't visit the site to observe them

myself.

    Q.   Would it be accurate to say that these

policies may have been posted and they may not have

been posted?

    A.   My opinion is the evidence indicates that

they were posted as opposed to not posted.

    Q.   Tell me what you mean by that, "the

evidence indicates." What do you mean by that?

    A.   When we asked Warren for copies of the

posters, et cetera, for purposes, if for nothing

else, as exhibits in the presentation of our

position statement, they appeared. Now, did he have

them on a bulletin board in the proper places? I

didn't see them. It is certainly the expectation of

the company that they be there.

    Q.   All right. I just -- Mr. McDaniel,

referring back to I think it was Exhibits 2 through

5, which are the position statements, if you can

just take all the time you need, and just get all

the paperwork away from there other than those four

documents -- there you go. Now, you signed each of

1    A.    I can't recall the exact date, but it is
2 very possible that it was after some of the events
3 that were the beginnings of the issues at Sithe
4 Mystic.
5    Q.    Was that in 2002, 2003, 2004, to the best
6 of your ability?  Was that in the -- you said you
7 first became aware in August of 2002 after first
8 hearing about Mr. Willis's complaints to Mr.
9 Anderson.  Was it in 2002 or was it in 2003 or
10 later?
11    A.    I don't recall.  I can retrieve that
12 information, but perhaps 2003.
13    Q.    And if you do retrieve that information, we
14 would appreciate it if you could actually produce
15 it.
16         How is the 800 number advertised to
17 employees?
18    A.    Through our Website and our postings of
19 policies.
20    Q.    You've spoken about at least what we're
21 calling perhaps a starter EEO kit.  Would that be
22 part of that since its implementation?
23    A.    I'm sorry, would you ask that question
24 again.

1    documents that he reviewed were all helpful to a

2    certain extent refreshing his recollection.  That's

3    the...

4         MR. DESSIN:  All right.  I'm going to go

5    on.  Why don't you think about it.

6         MR. PATERNITI:  Let me think about it.  We

7    can come back before the end of the day.

8         MR. DESSIN:  We'll come back to it.

9    BY MR. DESSIN:

10    Q.  All right.  You've said, Mr. McDaniel, that

11    you actually do visit some sites when there are EEO

12    matters, correct?

13    A.  I do on occasion.

14    Q.  Now, how do you decide when, where and how

15    to visit those sites?  What criteria do you take

16    into consideration in visiting those sites?

17    A.  I believe I answered that relative to Ms.

18    Palacios-Baldwin's questions on that, but it had to

19    do with occasionally top management is implied in

20    it, and in order to keep the matter clean of tainted

21    facts, we try to do an independent investigation.

22         Managers who are accused, whether they are

23    sometimes mid- or upper management, et cetera, more

24    to upper management, sites that do not normally have

163

1   the level of expertise to attend to those issues, I
2   would do that.
3            If someone is at the site with a level of
4   expertise that I am reasonably comfortable with
5   their engaging that, with or without -- well, in
6   almost all cases, with my observation or oversight
7   or direction, et cetera, then I would ask those
8   individuals to be the on-site people to gather the
9   information.
10            And in some cases, I don't see an added
11   value of me sitting in front of the person to ask
12   them the same questions that someone like Warren
13   Anderson could ask just as effectively, if indeed
14   he's perhaps in some cases been coached by me as to
15   the nature of the questions that should happen.
16       Q.    You have stated previously that at some
17   point you did learn that the cleaning was not as
18   effective as you would like it to be.
19       A.    I did.
20       Q.    And now, when -- how and when did you learn
21   that, did you discover that?
22       A.    It's difficult to put a time on that.
23   These cases develop fairly slowly, fact-based or
24   kind of intermittent, hit a little bit here and

164

1   there.

2          And over the next, you know, three to six

3   months, I guess, and until the pictures that came

4   from the EEOC discovery, I had not seen exactly the

5   context, other than Warren's description of it to me

6   or someone's write-up and their describing

7   conditions, et cetera, some of the written

8   testimony, if you will, from investigations, and so

9   forth.

10      Q.    Do you recall when you actually received

11  those pictures from the EEOC, from the discovery

12  provided by the EEOC?

13      A.    I think it was fall of 2004.

14      Q.    And prior to that, you had not received any

15  pictures?

16      A.    Correct.

17      Q.    You've stated that there is a weekly report

18  that is actually generated from your office,

19  particularly by you, upward to -- that even gets to

20  the VP, to Mr. Myers, correct?

21      A.    There is typically a weekly report.  I

22  occasionally miss a weekly report because I'm out

23  traveling or what have you.  But it's a typical item

24  that goes to my supervision, and/or to Mr. Myers'

1  secretary, who compiles them into his report.

2      Q.    Your supervision, you mean specifically Ms.

3  or Mrs. Large?

4      A.    Yes.

5      Q.    And then it goes up.  Now, is there a

6  weekly report or anything of that nature that goes

7  from the guys on -- the troops on the ground, the

8  general foreman, the foreman, up to you, for example

9  or anybody else?

10     A.    Not to me.

11     Q.    Do you know if there's a weekly report that

12 goes to anybody else underneath you?

13     A.    I'm not aware of a formal approach to that

14 relative to EEO issues necessarily.  We expect those

15 to be dealt with one on one when they happen.

16     Q.    I'm going to ask you now to take a

17 moment -- I have some pictures, and these are

18 pictures that were actually taken at Sithe Mystic of

19 various graffiti.  I would like for you to take a

20 moment and look at them.  They are labeled Exhibit

21 No. 9 of the Bennett deposition.  I think we'll

22 probably also label them for you.

23          If you can take a quick look and go over --

24 look at each one of them, and then I'm going to ask

1    you questions specifically about some specific

2    numbers.  They're also numbered in terms of Bates

3    numbers from discovery which your counsel received

4    from the EEOC.

5        A.    (Reviewing photographs)

6            (Discussion off the record)

7            (Recess)

8        BY MR. DESSIN:

9        Q.    Mr. McDaniel, have you had an opportunity

10   to review the pictures that I've shown to you which

11   are labeled Exhibit No. 9 of the Bennett deposition?

12       A.    I've looked at each of the pages that were

13   handed to me.

14       Q.    What I'll do, sir, is rather than go

15   through all of them, what I wanted to do is actually

16   go through some of them, which are -- they are

17   numbered, and specifically, if you could look at

18   Bates No. 2.  At the bottom on the right-hand corner

19   it has the number.

20           That was a picture of graffiti taken at the

21   Mystic site, and specifically this one reads,

22   "Encompass Joe Louis, a true nigger."  And there are

23   some other things there, correct?

24       A.    I see that.

167

1    Q.    Sir, does this violate the EEO policy of

2    WGI?

3    A.    Yes.

4    Q.    Does it violate any safety policy of WGI?

5    A.    I don't see a safety issue.

6    Q.    Okay.

7    A.    It would have to be taken in context of

8    other facts surrounding it, perhaps, but looking at

9    that one picture, I don't see a safety issue.

10    Q.    But without any qualification, you do see

11    that it violates the EEO policy with respect to --

12    which policy with respect to WGI does it violate?

13    A.    Primarily anti-harassment.

14    Q.    Any specific in terms of what -- is it fair

15    to say racial harassment or racial discrimination?

16    A.    Yes.

17    Q.    And you have never -- have you seen this

18    picture before, other than today?

19    A.    If I did, it would have been in the package

20    that was delivered from the EEOC discovery after

21    suit was filed.

22    Q.    All right.  Let's look at No. 3, which is

23    the next one.  Does that violate any EEO policy of

24    WGI?

168

1    A.    Yes.

2    Q.    What specifically, sir?  Would it be the

3  same policy, harassment, racial harassment policy?

4    A.    At least that.

5    Q.    Anything else?

6    A.    I think I could categorize that to

7  harassment as including sexually offensive material

8  as well as racially offensive, et cetera, and

9  defacing of company property.

10    Q.    Let's look at No. 4, sir.  That one says,

11  "Hi, Joe Louis, you brother-fucking nigger."  Does

12  that violate any EEO policy of WGI?

13    A.    Yes.

14    Q.    And those policies were in place at the

15  time -- well, okay.  We'll leave it at that.

16        We'll go to Bates No. 485 next.  There's a

17  lot of things in there, so I'll point you out to

18  specifically -- there are a lot of graffiti in this,

19  so we'll look at one that starts with "Hey, Godwin,

20  go back to where you came from, ratty cock-sucking

21  piece of shit.  We don't want you," right here on

22  the left-hand side.

23        Would that graffiti in that statement

24  violate any of the EEO policies of WGI?

169

1    A.    Yes.

2    Q.    Again, you would say again the

3  harassment -- which policy, sir?

4    A.    Yes, the harassment policy, and it's

5  just -- all of these are obnoxiously offensive and

6  easily perceived by any normally reacting individual

7  as offensive and against our policies.

8    Q.    Let's look at 486, sir.  Specifically

9  drawing -- because there are a lot of graffiti on

10  this -- one that says, "Godwin, fat rat," and it

11  above that it says, "This is his least favorite

12  color, white," do you see that as violating any of

13  WGI's EEO policy?

14    A.    Yes.

15    Q.    What specifically, sir?

16    A.    Anti-harassment and generally offensive.

17    Q.    And since there are two lines in there, is

18  it the "Godwin, fat rat" that violates, or is it the

19  one that says "his least favorite color, white," or

20  everything in it?

21    A.    Everything in it.

22    Q.    Next is 47, sir.  This is a subsequent

23  picture of what we just read, except there is some

24  additional graffiti in there, specifically the one

170

1    that says, "Go home, you nigger."

2            Does that graffiti violate the EEO policy

3    of WGI?

4        A.    Yes.

5        Q.    Would that be also racial harassment,

6    violating that specific provision of the WGI's

7    policy?

8        A.    It would include that, yes.

9        Q.    Thank you, sir.  If you can look at

10   number -- now, jump to 1964, not the year, but the

11   Bates number.

12           Specifically I'll point you to where it

13   says, "Kill all niggers."  Do you see that on that,

14   sir?

15       A.    Yes.

16       Q.    Does that violate WGI's EEO policy?

17       A.    Yes.

18       Q.    And that, again, would consist of the

19   provision regarding racial harassment and

20   discrimination?

21       A.    Yes.

22       Q.    The next one is Bates No. 1965.  That has a

23   lot of things, but among that it says -- if you

24   start from here, it's "Fat nigger," if you can read

171

1    that.   Would that type of graffiti violate the EEO

2    policy of WGI?

3         A.    Yes.

4         Q.    And that, again, would be racial harassment

5    and discrimination?

6         A.    At least, yes.

7         Q.    1966, sir.   There are a lot of things in

8    there.   If you can read that, this one says, "Go

9    home, you nigger."   Can you make that out?   Can you

10   read that, sir?

11        A.    (Reviewing document)   I think I can make

12   those words out on it.

13        Q.    Okay.   And as such, would that violate the

14   EEO policy of WGI?

15        A.    Yes.

16        Q.    Thank you, sir.   Let's look at 1967, just a

17   couple -- just a few more.   I've got four or five

18   more.   1967, a lot of things in there, but there's a

19   hand pointing to it, what is in black or at least

20   based upon the picture we have, it says, "Tell your

21   two kids watch out.   They will pay for your ratty

22   mouth, you dumb nigger," signed "KKK."

23             What is your opinion with respect to that

24   graffiti in connection with the WGI policy?

172

1       A.    Clearly in violation.

2       Q.    Is there a safety violation also?  When you

3   said "clearly in violation," again I'm thinking

4   racial harassment.  Is there a safety violation in

5   there, in that statement?

6       A.    It appears to be a threat.  Yes.

7       Q.    1968, sir.  At the very top, what we can

8   clearly see, it says, "Smells like nigger in," and

9   then the rest of it is not legible or clear.

10  "Smells like nigger," does that violate the EEO

11  policy of WGI?

12      A.    Yes.

13      Q.    And which policy would that be

14  specifically?

15      A.    EEO anti-harassment in several ways.

16      Q.    Okay.  Would racial harassment be one of

17  those?

18      A.    Yes.

19      Q.    1969, sir.  Looking at this specifically,

20  that word is written over or at least attempted to

21  be covered up, but I believe it does say, "Niggers

22  are apes."  Are you able to read that or make that

23  out?  If not, please let me know.

24      A.    I think I can see that word contained in

173

1   that.

2      Q.   And would that violate the EEO policy of

3   racial discrimination at WGI?

4      A.   Yes.

5      Q.   Two more, sir.  1971, a lot of things in

6   there, but I'll just point you out to one that says,

7   "Kill all Muslims."  Does that violate any EEO

8   policy of WGI?

9      A.   Yes.

10      Q.   Which policy is that, sir?

11      A.   The EEO policies, anti-harassment,

12   discrimination, religious discrimination obviously

13   in this case, and it does appear to be a threat.

14      Q.   1972, specifically where it says, "Godwin,

15   fat nigger," does that violate the EEO policy of

16   WGI, sir?

17      A.   Yes.

18      Q.   Which policies would that be?

19      A.   The EEO policies, the anti-harassment

20   policy, generally offensive.

21      Q.   Sir, if you had the opportunity -- if you

22   had the opportunity to see these pictures or to have

23   known about them before the EEOC sent them to you,

24   you said roughly in 2004, would that have changed

174

1   your decision and would you have come on site to

2   visit?

3           MR. PATERNITI:  Objection.  Go ahead.

4       A.   I would have -- I don't know that it would

5   have caused me to go on site.  I would certainly

6   have begun to question the efficiency of the process

7   that we had set into motion to solve this.

8           I don't know that we would have been

9   tremendously more successful, but I would have

10  perhaps tried to explore some other ways, and what

11  are those, I'm not sure, because we were constrained

12  to begin with by the element of most of these --

13  some of them apparently did occur at stairwells --

14  most of these were occurring inside the

15  port-a-johns, and it's difficult to arrest someone

16  in the act when doing that.

17          But it's reprehensible.  We would have done

18  everything reasonable that we could have done within

19  the constraints of reasonableness for us.

20      Q.   You said at least since 2002, August of

21  2002, you had conversations with Mr. Anderson, who

22  was the EEO officer on site.  Did he disclose the

23  specific nature and the content of the graffiti to

24  you as you've seen them here?

175

1      A.    In some of several conversations or other

2   kinds of communication with him, there were brief

3   descriptions of some of that.

4      Q.    Did he describe them -- how did he describe

5   them?  Did he describe them as people were being

6   referred to as niggers?

7      A.    I don't recall the exact detail.

8      Q.    Do you know whether -- okay.  If you don't

9   recall the exact details, what do you recall, if

10  anything at all?  Were there racial epithets?  Did

11  he describe anything as racial epithets, derogatory

12  racial offensive words being written about employees

13  of WGI?

14     A.    I don't believe there was any doubt in my

15  mind that it was offensive material.  And to its

16  exact content, I can't say specifically today,

17  although I do recall that in both Mr. Willis and Mr.

18  Enagbare, it was offensive personally to them, and I

19  do believe that my recollection of the facts that I

20  had say that it was racial in its nature.

21     Q.    Have you ever yourself been charged or been

22  accused of racial discrimination in the course of

23  your employment with WGI?

24     A.    None known.

176

1    Q.    None known to you.  Well, do you know of

2    any specifically?  You don't know; is that what

3    you're saying?

4    A.    That's right.

5    Q.    Any racial discrimination or any other type

6    of discrimination with your previous -- with Rust or

7    Raytheon?

8         MR. PATERNITI:  Objection.  I don't

9    understand the question.

10    Q.    Have you ever been charged with

11    discrimination of any kind while employed by Rust,

12    Raytheon -- you have already answered with respect

13    to WGI -- just with respect to those two companies?

14    A.    No.

15    Q.    Any discrimination charges against you with

16    respect to any -- in any form against you, whether

17    in your personal life?

18    A.    None.

19    Q.    Have you -- do you use the word "nigger"?

20    A.    No.

21         MR. DESSIN:  Thank you, sir.

22              REDIRECT EXAMINATION

23    BY MS. PALACIOS-BALDWIN:

24    Q.    Mr. McDaniel, I have two follow-up

177

1    questions to Jacques', and I promise there are two.

2           He asked you some questions about images,

3    specific in this case, and asked for your response

4    as to whether or not you believed they were

5    discriminatory.

6           My first question is whether you consider

7    the display -- whether the actual flag or in an

8    image as a drawing -- of the Confederate flag in the

9    workplace as a violation of the WGI's policies on

10   EEO.

11       A.    Yes.

12       Q.    And the second question I have is, do you

13   have an opinion as to whether or not the display of

14   drawings of nooses or an actual noose on site is a

15   violation of the EEO policy at WGI?

16       A.    Absolutely.

17           MR. PATERNITI:  Is everybody done?

18           MR. BENNETT:  Well, I had just one

19   follow-up question.

20                    RECROSS EXAMINATION

21       BY MR. BENNETT:

22       Q.    The follow-up is, if you had been made

23   aware that a Confederate flag was displayed on a WGI

24   employee -- for example, on his hard hat, for

178

1  example -- what, if any, type of corrective action,

2  in light of your opinion that it would be a

3  violation of the zero tolerance policy, in your

4  opinion should have been taken relative to that

5  display of the Confederate flag?

6      A.   To request the individual to cease and

7  desist in such acts, and failure to do so would

8  result in punitive action up to and including

9  termination.

10     Q.   Would you counsel the person on why the

11 Confederate flag would be inappropriate to display

12 at the work site?

13     A.   Yes.

14     Q.   What would you say?

15     A.   That it has a history associated with it

16 that is indicative of discriminatory practices, and

17 that it is inciteful at times for certain

18 individuals and accentuates a racial connotation to

19 it, and I would ask them to stop displaying it.

20     Q.   I assume you would -- is it fair to say you

21 would also tell the person that it is inappropriate

22 for display at the work site?

23     A.   Yes.

24         MR. BENNETT:  I don't have anything

182

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                    )

3      I, Carol H. Kusinitz, Registered Professional

4  Reporter and Notary Public in and for the

5  Commonwealth of Massachusetts, hereby certify that

6  there came before me on the 1st day of December,

7  2006, at 12:41 p.m., the person hereinbefore named,

8  who was by me duly sworn to testify to the truth and

9  nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 7th day of

21  December, 2006.

22              Carol H. Kusinitz

23              Notary Public

24      My commission expires  6/7/13