# EXHIBIT B (PART 1)

1

Volume I
Pages 1 to 186
Exhibits 1 to 16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
EQUAL EMPLOYMENT OPPORTUNITY     :
COMMISSION,                      :
        Plaintiff,               :
                                 :
JOHN BALDWIN, LEONARD BELL,      :
JOHANNES KAINDOH, WAYNE          :
HENDERSON, GODWIN ENAGBARE       :
and JOE L. WILLIS,               :
        Intervenor-Plaintiffs,   :
                                 :
        -against-                :   C.A. No
                                 :   04-12097-GAO
WASHINGTON GROUP                 :
INTERNATIONAL, INC., RON         :
BENNETT, MICHAEL FOGARTY and     :
DENNIS WOODRUFF,                 :
        Defendants.              :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF WARREN R. ANDERSON, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Equal Employment Opportunity
Commission, John F. Kennedy Federal Building,
Government Center, Boston, Massachusetts, on
Wednesday, April 12, 2006, commencing at 10:07 a.m.

PRESENT:

    Equal Employment Opportunity Commission
        (by R. Liliana Palacios, Esq.)
        John F. Kennedy Federal Building,
        Room 475, Government Center, Boston, MA
        02203-0506, for the Plaintiff.

45

1    think it assumes that all those things are within

2    the labor relations function.

3         MS. PALACIOS:  Fair enough.

4         Q.   If you understand the question, I would

5    like you to answer it.

6         A.   Yes, with a clarification.  If it was an

7    EEO issue, they would call the EEO officer of the

8    company.

9         Q.   Who is the EEO officer?

10        A.   Mike McDaniel.

11        Q.   Mr. McDaniel, does his position fall within

12   any particular department or organization within

13   WGI?

14        A.   I actually don't know the answer to that

15   question.

16        Q.   Is there a human resources department at

17   WGI?

18        A.   Yes.

19        Q.   Do you know who the head of that department

20   is?

21        A.   Karen Ogden I believe is her name.  She's

22   in Boise, Idaho.

23             I need to clarify that, too.  We also have

24   a benefits section, which kind of divides human

46

1    resources in two parts.  A Mr. Roger Allen runs that

2    side of it.

3           Karen is the primary person, though, for

4    human resources issues.

5    Q.    Do you happen to know if anybody reports to

6    Mr. McDaniel?

7    A.    I believe he has an assistant.  He does

8    have an assistant, Nancy, but I don't recall the

9    last name.

10   Q.    Do you happen to know who Mr. McDaniel

11   reports to, if anybody?

12   A.    I don't actually know.

13   Q.    Could you tell me a little bit about -- I

14   suspect you do a lot of things, and you can take as

15   much time as you want, but give me a snapshot of the

16   duties you have as labor relations director.

17   A.    The primary duties would be as follows.  We

18   obviously pursue a lot of new work around the United

19   States all the time with various clients.  When we

20   are in the pursuit of a project, I'm always involved

21   at the front end.

22          We have to make a labor relations

23   evaluation, how do we want to do this job, should

24   the job be done union for whatever variety of

48

1      Q.    Do you ever work on the drafting of

2    policies and procedures related to work at all?

3      A.    As a clarification, would you mean for a

4    field job, for instance, or a corporate?

5      Q.    Actually, good clarification point.  I

6    meant both.  Let's start with corporate policies.

7    Are there corporate policies related to work at WGI?

8      A.    Yes.

9      Q.    With respect to those policies, are you

10   ever involved in the drafting of those policies?

11     A.    The labor relations policies we have have

12   been really in place and unchanged for some time.

13           When I went to Boise in the '98, '99 time

14   period, I redid the administrative bulletin we have

15   for our department for labor relations for the

16   company just to make some changes that I thought

17   needed to be updated.

18           We have a labor relations manual.  We have

19   an industrial relations manual.  Those have stayed

20   the same for a number of years.

21           We do have a web page on our company page

22   for labor relations.  There's an individual in Boise

23   who actually does the physical activities, physical

24   work of making changes to it.  I update that

49

1   periodically.

2           We have new interpretations of the general

3   president's agreement and the national maintenance

4   agreement that come in periodically, and those have

5   to be updated.  We keep our website updated.  That

6   would be part of a policy I think or procedure, to

7   answer the question.

8       Q.    With respect to EEO situations, you

9   mentioned that Mr. McDaniel oversees that area.  Do

10  you ever have to handle EEO matters in your

11  position?

12      A.    Not normally.  What will typically happen

13  right now is I may get a call from a project

14  manager, for instance, and if he does have an EEO

15  situation, I may advise him, but what I will always

16  do is tell him to call Mike.  He's the EEO

17  professional in the company.  I'm not.

18      Q.    Do you happen to know who Mr. McDaniel's

19  predecessor was, if he had one?

20      A.    Well, I'm not sure.  Let me clarify the

21  answer for you.  Mike came from the Raytheon E&C

22  side.  During the '90s, I recall an individual by

23  the name of "Woody Burge" that handled EEO matters.

24  He had a couple of assistants, too, out of Boise.  I

50

1    don't recall their names now.

2              In the '80s, we had an individual named

3    "Tiny Gaines," who I had quite a bit of contact with

4    while I was on my field sites in the '80s.

5        Q.    With the exception of Mr. McDaniel, who

6    handled EEO matters, do each of the projects sites

7    have an EEO representative?

8        A.    No, they don't.

9        Q.    To the best of your knowledge, it would be

10   the project manager that would deal with the issue

11   either by contacting you, or Mr. McDaniel probably

12   more so?

13       A.    Yes.

14       Q.    Are you familiar with the WGI corporate

15   labor relations manual?

16       A.    Yes.

17       Q.    I will just represent to you that it was

18   produced to us in response to one of our document

19   requests.  I have it in front of me.

20             How have you become familiar with this

21   manual?

22       A.    Using it for reference material over the

23   years.

24       Q.    When was the last time you referred to it,

51

1   if you recall?

2       A.    I had a question come to me on a project we

3   were bidding towards the end of last year that was

4   going to involve dual gates, because we were going

5   to have union and nonunion contractors possibly on

6   the job.  We have a section on that on dual gates,

7   in that manual.

8            Actually, we have two manuals.  One is

9   industrial relations, and the other one is labor

10  relations.  That would have been the last time I

11  probably looked at one of those, in that time

12  period, but I have used them throughout the years.

13      Q.    Have you ever read it in total?

14      A.    I would have read it in total as a result

15  of using it over the years for very general

16  research.

17      Q.    Do you know who would be responsible for

18  maintaining that policy or making revisions to that

19  policy, if anyone?

20           MR. PATERNITI:  Objection.  You mean

21  manual?  You said, "policy."

22           MS. PALACIOS:  I meant manual.

23      A.    You mean the manual?

24      Q.    Yes.

52

1      A.    If it were going to be changed, I would

2    probably be assigned that task.

3      Q.    Have you ever made any changes to that

4    manual?

5      A.    I have not.

6      Q.    Or have you ever recommended any changes to

7    that manual?

8      A.    We made some minor changes to it when we

9    purchased Raytheon E&C.  We had to remove

10   Morrison-Knudsen.

11     Q.    Any substantive changes to the policies

12   that you can recall?

13     A.    Not that I recall, no.

14     Q.    Have you ever recommended any substantive

15   changes to the policies in the manual?

16     A.    No.

17     Q.    Is that because you think generally they

18   are acceptable?

19     A.    Yes.

20     Q.    Do you get evaluated?  Does your

21   performance get evaluated on any regular basis with

22   WGI?

23     A.    Every year.

24     Q.    Who does your review, if anyone?

53

1    A.    Is Cakrane.

2    Q.    Does anyone give input into your review?

3    A.    Is Cakrane.

4    Q.    Just him?

5    A.    Yes.

6    Q.    I have in your personnel file a lot of your

7    performance reviews from Morrison-Knudsen and not

8    that many from WGI.  I'm asking this question, which

9    is do your performance evaluations with WGI allow

10   you to give any feedback or input about your

11   performance?

12    A.    Yes.  There's a section in there that

13   allows for that.

14    Q.    Do you know where WGI keeps most of its

15   personnel files?

16    A.    I believe in Boise.

17         MS. PALACIOS:  Can we take a five-minute

18   break.

19         (Recess at 11:25 a.m.)

20    BY MS. PALACIOS:  (11:40 a.m.)

21    Q.    Mr. Anderson, you told me earlier about a

22   case in which you are involved right now having to

23   do with the Weymouth site and Ms. Sandra Williams?

24    A.    Yes.

56

1    what the salary range for that is, if you know.

2        A.    I would have to speculate.  I can't say

3    specifically what they are.

4        Q.    Agreeing to keep your salary confidential,

5    what is your salary currently at WGI?

6        A.    $121,000 a year.

7        Q.    Do you have any other compensation at WGI?

8        A.    No, I do not.

9        Q.    Do you know how many employees WGI

10   currently has?

11       A.    Approximately 25,000 worldwide.

12       Q.    Do you know approximately how many of those

13   are in the U.S.?

14       A.    Probably around 20,000.  That's going to be

15   all grades and classifications.  That will include

16   craft workers and projects, also.

17       Q.    So that includes any union employees?

18       A.    That's correct.

19       Q.    Is it fair to say that you are the sole

20   labor relations person with responsibility in the

21   United States for 20,000 people.

22       A.    Well, 20,000 people won't have a labor

23   relations problem.  It will probably be a few

24   hundred.

57

1    Q.    But you have that responsibility should

2    they have any?

3    A.    Absolutely.

4    Q.    This doesn't require a response, but you

5    have a tough job.

6    A.    Thank you.

7    Q.    You talked to me a little bit about EEO

8    training that you received.  I just want to break

9    that down a little further.  Have you ever received

10   any training in cultural diversity or diversity type

11   training?

12   A.    Not that I can recall.

13   Q.    What about training with respect to

14   anti-discrimination policies, whether state or

15   federal?

16   A.    Yes.  Part of that training I related to at

17   Oak Ridge covered those issues.

18   Q.    Was that the only training you ever

19   received on anti-discrimination policies?

20   A.    Any kind of formal training, yes.

21   Q.    I want to focus now on the Sithe Mystic

22   powerplant project.  I'm just going to call it

23   "Mystic."  That's what I mean when I say that.

24         I understand you were the labor relations

87

1      A.    I find in my experience it's fairly general

2   knowledge.

3      Q.    Have you participated in any training where

4   project managers or managers of different sites are

5   given the reduction in force policies and procedures

6   for WGI?

7      A.    I have done labor relations training in my

8   past for several sites.

9      Q.    Did you do that type of training focusing

10  on reductions in force issues at Mystic?

11     A.    No, I did not.

12     Q.    Do you know if anybody else did?

13     A.    Not to my knowledge.

14     Q.    While you were at Mystic, did you have the

15  authority to hire employees?

16     A.    Not in the sense that I believe you asked

17  the question.  When you are operating on a union job

18  with referral procedure with the local unions, it's

19  critical to have only one person that's designated

20  to call the local unions to order craft workers.    I

21  did that.

22          The field supervision would generate a

23  request form, say, "Electricians, five," and I would

24  call the hall.

88

1      Q.   Did anyone else perform that function while
2  you were at Mystic?
3      A.   No, to my knowledge.
4      Q.   Who in the field would decide that
5  additional staff was necessary?
6      A.   Supervisors, engineers, depending on the
7  flow of the work.
8      Q.   For example, within the project where there
9  were electricians working, my understanding is that
10  there were foremen that handled different parts of
11  the job.  Would a foreman at Mystic have the ability
12  to say, "I need more workers"?
13      A.   He or she could suggest it.
14      Q.   Who would he or she suggest that to?
15      A.   Generally it would be his -- he might go
16  through his general foreman for the suggestion, who
17  would then go to possibly the assistant
18  superintendent or the superintendent.
19      Q.   Who would you ultimately hear from in the
20  actual request form that you mentioned?
21      A.   The superintendent himself, he or she.
22      Q.   Did you have the authority at Mystic to
23  terminate employees yourself?  Like if you saw
24  something on the site that you thought was a

89

1   violation of any rule, did you have that authority?

2        A.    I did not have the authority to terminate

3   myself, no.

4        Q.    Did anyone at that site have the authority

5   to terminate employees?

6        A.    That would be the chain of command from the

7   general site manager on down.  Several of the

8   superintendents did.

9        Q.    Were decisions to terminate to your

10  knowledge made by individuals or by groups of

11  individuals normally at Mystic?

12            MR. PATERNITI:  Objection.

13       A.    I don't understand the question.

14       Q.    I'll clarify.  A superintendent would have

15  the authority to terminate an individual on their

16  own?

17       A.    Yes.

18       Q.    The reason I asked is because you seemed to

19  qualify your ability to terminate individuals as on

20  your own.  Were you able to terminate individuals or

21  employees with somebody else in the decision?

22       A.    No.  I'm...

23       Q.    You are lost?

24       A.    Yes.

90

1      Q.    I'll withdraw the question completely.

2    Let's forget that and move on.

3           With respect to discipline of employees,

4    were you aware of whether or not WGI had at the

5    Mystic site a disciplinary policy or procedure that

6    it followed?

7      A.    Yes.   We had job rules.

8                 (Document marked as Anderson

9                 Exhibit 2 for identification)

10     Q.    I'm showing you what was marked as Exhibit

11   No. 2 in your deposition.   You mentioned job rules.

12   Are these the job rules that you were referring to

13   that were used at Mystic?

14     A.    (Examines document)   Yes.

15     Q.    You can take time to look at it fully

16   before you answer.   At the bottom of the page marked

17   248, which is the second page of what you have in

18   front of you, there's a bottom section that says,

19   "WGI's disciplinary procedure consists of the

20   following steps"?

21     A.    Yes.

22     Q.    Is this what you understood to be the

23   disciplinary procedure that was used at Mystic while

24   you were there?

91

1    A.    Yes.

2    Q.    Do you know when employees received this,

3  if at all, at Mystic?

4    A.    When they are oriented in.  We also had it

5  posted.

6    Q.    Can you indicate on that map that you drew

7  maybe with this blue pen with a "P" where on the

8  site any postings like the job rules would have been

9  or were.

10    A.    (Witness complies)

11    Q.    You indicated the "P" right on the

12  powerplant site.  To the right there's a little "X."

13  What is that?

14    A.    That's the front gate, the main gate.

15    Q.    Were you authorized at Mystic to discipline

16  employees if necessary?

17    A.    Not by myself, no, not on my own.

18    Q.    Did you have occasion to discipline

19  employees while you were at Mystic?

20    A.    I would be asked by site management my

21  opinion.  I would give my opinion.  The site

22  management would then either agree with what I

23  thought or not.

24    Q.    Is it fair to say then that the site

92

1   management would make the decision to discipline?

2       A.   Yes.

3       Q.   So is the answer to the question as to

4   whether or not you had occasion to discipline while

5   at Mystic yes?  In other words, did you actually

6   have involvement in disciplining employees while you

7   were at Mystic?

8       A.   I would be asked my opinion on a certain

9   matter.  Then management would either take that

10  opinion and consider it or reject it.

11      Q.   Fair enough.  Do you know the policy, if

12  any, that WGI had at Mystic about whether to

13  document verbal warnings?

14      A.   They had a small form that the field

15  supervision had that was a triplicate, as I recall,

16  that was used for that purpose.

17      Q.   Verbal warnings were supposed to be in

18  writing?

19      A.   They were supposed to have been documented

20  in some manner.

21      Q.   Was that documentation to be kept in the

22  employee's personnel file?

23      A.   It was supposed to be sent to the personnel

24  file.

93

1    Q.    Is there any other place that those types

2    of warnings would have been kept?

3    A.    They may have been kept in the foreman's

4    logbooks or desk.

5                    (Document marked as Anderson

6                    Exhibit 3 for identification)

7    Q.    I'm showing you Exhibit 3 in your

8    deposition.  This is actually a copy of what looks

9    to be a Reprimand:  Safety Violation.  Does this

10   look like the type of slip that you were describing

11   that went with a warning at Mystic?

12   A.    (Examines document)  Yes.

13   Q.    Was there any other warning slip that you

14   recall that is not this one that's in front of you

15   right now?

16   A.    Not that I recall.

17   Q.    If you look at this form with me, would you

18   agree with me that there's no area here for the

19   employee's response to the warning?

20   MR. PATERNITI:  Objection.  Go ahead.

21   A.    That's correct.

22   Q.    Do you know why there isn't a space for the

23   employee to respond on this form?  You may not,

24   but...

94

1      A.    No, I don't know.

2      Q.    Do you happen to be familiar with what the

3    policy for rehire was at Sithe Mystic?

4      A.    Can you be more specific.

5      Q.    Sure.  From my review of the documents in

6    this case, I understand that there's a termination

7    form that is generated when someone is terminated.

8    I'm using termination with a broad meaning, RIF, for

9    cause, et cetera.  There's a little box on the form

10   that says either "Eligible for rehire" or not.  Are

11   you familiar with what I'm talking about?

12     A.    Yes.

13     Q.    Is there a policy to your knowledge that

14   was adhered to at Mystic with respect to the

15   decision whether to allow somebody to be rehirable

16   or not?

17     A.    There was not a written policy for that,

18   no.

19     Q.    Was there any procedure that was followed,

20   although perhaps not written, to decide whether or

21   not someone was eligible for rehire?

22     A.    No.

23     Q.    Is it fair to say it was based on the

24   discretion of the individual who made the decision

95

1    to terminate?

2        A.    It would have involved the foreman and the

3    superintendent, certainly.

4        Q.    You think it just might be discretionary?

5        A.    Certainly could be, yes.

6        Q.    I want to switch gears and actually spend a

7    couple of minutes talking to you about

8    subcontractors on the site.

9            Again, not being someone that has your

10   experience and knowing what happens on these

11   construction sites, can you try to explain to me

12   what the relationship is between WGI, focusing on

13   the Mystic site, and the subcontractors that were on

14   the site.

15       A.    The subcontractors would have a contract

16   for a particular construction activity with us

17   directly.

18       Q.    Who negotiated the contracts between WGI

19   and the subcontractors, if you know?

20       A.    I don't have any idea.

21       Q.    Did you have any responsibility for that at

22   all?

23       A.    No.

24       Q.    If a subcontractor had a crew on-site that

96

1    was doing something unsafe, would WGI have the

2    ability to stop that unsafe practice?

3        A.    Yes.

4        Q.    Would WGI have the ability to terminate

5    employees for violating safety policies that were

6    employees of the subcontractor?

7        A.    Not directly, no.

8        Q.    How would that work?

9        A.    There would be a conference between us and

10    the actual employer.

11        Q.    My understanding is that at Mystic, there

12    were about 100 or so subcontractors on-site at any

13    given time.  Is that true?

14        A.    Yes.  If you include some suppliers, it is

15    possible there were that many.  The actual

16    construction subcontractors were less than 100,

17    though.

18        Q.    How many do you think there were of actual

19    construction subcontractors?

20        A.    A dozen, two dozen, depending on the time

21    of the job.

22        Q.    Do you have an understanding as to whether

23    or not WGI had control over the site as general

24    contractor or prime contractor that exceeded that of

97

1    the subcontractors?

2           MR. PATERNITI:  Objection.

3      Q.   Do you understand the question?

4      A.   Would you ask it again.

5      Q.   Sure.  My question is this.  I'm trying to

6    see if I can say it more clearly.  Actually, let's

7    just stop there.  I will reformulate my question.

8    Let me go back.

9           With the construction subcontractors that

10   were on-site, the 12 or more that were on-site at

11   any given time, were there individuals that were

12   responsible for sort of being in contact with WGI on

13   a regular basis?

14     A.   Yes.

15     Q.   Who was that particular title or person?

16     A.   It generally would be the top field

17   individual that that subcontractor had assigned to

18   the job.

19     Q.   What kind of relationship was that person

20   required to have with WGI?  Was it like a daily

21   reporting responsibility?

22     A.   Yes, yes, yes.

23     Q.   Was that daily reporting related to more

24   than just job performance?

98

1      A.    It would be primarily job cost and schedule

2    performance.

3      Q.    Do you know of any occasion where any of

4    these subcontractors reported more than just job

5    cost and schedule performance?

6      A.    No.

7      Q.    These individuals wouldn't report to you

8    directly?

9      A.    No.

10           MS. PALACIOS:   I think this is a good time

11    to break for lunch.   Off the record.

12           (Discussion off the record)

13           (Recessed for lunch at 12:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

99

1              AFTERNOON SESSION   (1:35 p.m.)

2                  WARREN R. ANDERSON, Resumed

3        BY MS. PALACIOS:

4        Q.    We are back from the lunch break.  Before I

5    continue my questioning, Mr. Anderson, I wanted to

6    follow up on a couple of things.

7              First, I asked you previously whether you

8    ever requested hiring additional labor relations

9    staff, that line of questioning.  I just wanted to

10   ask you as to who, if you know, has the final

11   decision as to whether to hire additional labor

12   relations staff or professionals?

13       A.    At that particular project you mean?

14       Q.    In general at WGI.

15       A.    It would be Is Cakrane.

16       Q.    To the best of your ability, could you tell

17   me what the duties are of a project manager.

18       A.    Run the project, every aspect of it.  He or

19   she would have final authority and responsibility

20   for every aspect of the job, and the relationship of

21   the client.

22       Q.    So that includes actual performance of the

23   work on-site, whether or not the actual project is

24   produced?

100

1    A.    He or she would have a staff to carry out

2    those individual functions.

3    Q.    How many staff work with the project

4    manager on most sites?  I suspect it changes.

5    A.    I have seen projects with three individuals

6    up to 200, 300, depending on the magnitude of the

7    job.

8    Q.    Do you have any understanding as to why

9    you, Warren Anderson, were sent to Mystic?  Was

10   there a reason you were sent, or was it just part of

11   your duties?

12   A.    There was a reason.

13   Q.    What was the reason?

14   A.    After September 11th, just as a little

15   background, we had a lot of budget cuts in the

16   company, and the Cleveland office where I was

17   located at suffered that particularly hard.

18       The budget for labor relations was

19   eliminated.  I had an administrative aide that

20   worked with me, and I had to lay her off.

21       Proximate to that time, the labor relations

22   person here on these two jobs decided to resign.

23   Q.    Who was the labor relations person on these

24   two jobs here that decided to resign?

101

1    A.    Ken McDaniels, no relation to Mike.

2    Q.    Was Mr. McDaniels employed by WGI?

3    A.    Yes.  He came from the Raytheon E&C side.

4    Q.    Right before lunch, as a result of I think

5    low sugar, I was struggling with the question, which

6    I think I revised.

7         The question I was trying to get at was

8    what your understanding was with respect to the

9    Mystic site as to the scope of control that WGI had

10   over the work performed by the subcontractors.

11        MR. PATERNITI:  Objection.  Go ahead.

12   Q.    You can answer if you can, or if you don't

13   understand the question, I'll ask it differently.

14   A.    No.  I believe I understand your question.

15        As part of each subcontractor's contract

16   with us, they would have a defined scope of work.

17   That scope of work may change from time to time.  If

18   so, you would have change orders negotiated between

19   the parties.

20        Our field supervision, the superintendents

21   I had mentioned earlier, part of their

22   responsibility was to oversee the actual field

23   construction activities that the subcontractor was

24   producing.

102

1          We didn't run the subcontractor.  The

2     subcontractor is an independent employer that has a

3     contract with us to perform a certain activity

4     within a set period of time for a set amount of

5     dollars.

6          Q.    Same question, but this time with respect

7     to the conduct of their employees.  In other words,

8     what is your understanding, if any, about the

9     control that WGI had over the conduct of

10    subcontractor employees at Mystic?

11         A.    We would have no control over those

12    employees.  Those are employees of an employer.  We

13    were not dual employers.

14         If we had a problem with an employee, we

15    would have to engage the subcontractor in

16    discussions or conversations about how to possibly

17    solve the problem.  I mean that in a very general

18    sense.  They are expected to manage their own

19    people.

20         Q.    I'm just looking for a yes or no answer, if

21    you can do it, to the following question, which is

22    did you ever have occasion to deal with the

23    subcontractor on an issue related to an employee's

24    conduct at Mystic, a subcontractor's employee?

103

1      A.    If the question is their conduct, no.

2      Q.    Were you ever involved in a situation where

3   a subcontractor wasn't performing their work

4   requirement appropriately and there had to be some

5   discussion between WGI and the subcontractor?

6      A.    As to the performance of their contract do

7   you mean?

8      Q.    Correct.

9      A.    No.  I was not involved in those

10  discussions.

11                (Document marked as Anderson

12                Exhibit 4 for identification)

13     Q.    I'm showing you what was marked as Exhibit

14  No. 4 to your deposition.  Can you just tell me if

15  you have ever seen this document before.

16     A.    Yes, I have seen it before.

17     Q.    Have you ever used it through the

18  performance of your work duties at WGI?

19     A.    I have not.

20     Q.    Do you know anybody who has?

21     A.    Mike McDaniel probably, but that's

22  supposition.

23     Q.    Do you know how this document is used?

24     A.    In seeing what the document is here, it's

104

1     an audit form.  It would be used for a project audit

2     to verify EEO affirmative action policies that the

3     company has at the site.

4         Q.    I appreciate you are reading it and know

5     what it says, but since you have not used it, you

6     don't have any knowledge on how this is actually

7     used in the field; is that true?

8         A.    That's true.

9         Q.    Mr. Anderson, I want to focus your

10    attention now to the part of the EEO function that

11    you -- or your EEO function at Mystic at the time

12    that you were there.  I wanted to specifically know

13    whether you ever handled any complaints of

14    discrimination while you were there.

15        A.    I would have been the individual that would

16    have been the primary contact if someone had a

17    problem.

18        Q.    Did you actually handle any complaints?  In

19    other words, did anyone complain to you of

20    discrimination while you were at Mystic?

21        A.    Yes.

22        Q.    How many times?

23        A.    I would say approximately eight or nine

24    times.  Oh, wait a minute.  I'm sorry.  Let me

1    think.   Let's say four times.

2        Q.    Four times in total?

3        A.    Yes, I believe that's correct.

4        Q.    And definitely my question was about people

5    who complained to you directly.   Is that still four

6    times?

7        A.    Directly?

8        Q.    Yes.   In other words, if you were involved

9    in complaints of discrimination --

10        A.    That's not your question.

11        Q.    Right.   Just "I went to Warren Anderson,

12    and I complained about discrimination."

13        A.    Let me ask for a clarification.

14        Q.    Sure.

15        A.    Walking in the door unannounced, knowing no

16    information about them?

17        Q.    My question is geared more towards you

18    being the first person of contact.   In other words,

19    they had not spoken to anybody else that you know

20    of.

21        A.    Probably once.

22        Q.    Who was that person, if you can recall?

23        A.    Ozzie Weeks.

24        Q.    Have discrimination complaints come to your

106

1   attention through a process of referral from other

2   individuals on the site, such as a foreman, et

3   cetera?  If so, what is the number of those

4   instances?

5       A.   Clarify that a bit for me.

6       Q.   Sure.  You said Mr. Weeks came to you

7   directly as a first person of contact.  I assume --

8   and maybe I'm wrong -- that you had some involvement

9   in complaints of discrimination where you were not

10  the first person to be contacted.  I wanted to know

11  if that was true, and if so, how many times was that

12  the case?

13      A.   That's true, yes.

14      Q.   Then how many times were you otherwise

15  involved in getting complaints?

16      A.   Okay, I understand what you mean.  Three

17  times.

18      Q.   Do you recall the names of the individuals

19  who complained?

20      A.   Godwin Enagbare, Joe Willis.  I mentioned

21  Ozzie Weeks.  There was another individual who was

22  a -- and I don't recall the name -- who was a

23  subcontractor employee that had a complaint against

24  one of our superintendents.

107

1    Q.    Do you remember the name of the

2  superintendent?

3    A.    John Day.

4    Q.    Not counting these four times where you

5  were either approached directly or eventually by an

6  individual who was complaining of discrimination, do

7  you know of other instances where someone other than

8  you handled complaints of discrimination that arose

9  at Mystic?

10    A.    At the site directly?

11    Q.    Yes.

12    A.    There were instances where a union BA would

13  have been involved.  Site stewards certainly would

14  and could certainly be involved.

15    Q.    Did those instances involve people other

16  than Mr. Weeks, Mr. Enagbare, Mr. Willis and whoever

17  it was that brought a complaint about Mr. John Day?

18    A.    To my knowledge, those were the other

19  people.

20    Q.    Those were the individuals you were talking

21  about?

22    A.    Yes.

23    Q.    Is it fair to say while you were at Mystic,

24  the only complaints of discrimination that you ever

1    heard about directly at some point were these four

2    that you just talked about?

3        A.    Coming to me or in a slight roundabout way

4    coming to me, that would be correct.

5        Q.    Were there other complaints of

6    discrimination that never came to you that you

7    learned about while you were at Mystic?

8        A.    Yes.

9        Q.    What are those, if you recall?

10        A.    Wayne Henderson, Leonard Bell, Kaindoh, and

11    John Baldwin.

12        Q.    I just want to as a point of reference

13    understand generally what you do in a situation

14    where someone complains to you of discrimination.

15    Maybe you can, if you want, use an example or tell

16    me generally.

17            Someone comes to your office and tells you

18    they've been discriminated against.  Tell me

19    generally what procedure you would follow to handle

20    that situation.

21        A.    I would want to know the full details of

22    what happened, certainly the individual or

23    individuals involved.  Once you have that

24    information, it would be appropriate to talk to the

109

1   individuals involved, and were there witnesses to

2   the confrontation or the harassment or

3   discrimination.

4       Q.   Would you talk to those witnesses if there

5   were any?

6       A.   Yes.

7       Q.   When you talk about this procedure, are you

8   envisioning that you would handle that yourself, or

9   would you ask somebody to help you with it if you

10   were otherwise --

11       A.   I may handle it myself or I may have

12   received more information from, say, a

13   superintendent, that's very possible, yes.

14       Q.   Did you say more from the superintendent?

15   I didn't understand the response.

16       A.   Well, a superintendent could also be

17   involved, for instance, and have talked to a party.

18   I very well may not go back to that party.  I would

19   get that information from that superintendent.

20   That's an example.

21       Q.   Were there situations that you know about

22   at Mystic that a superintendent handled an EEO

23   complaint?

24       A.   Define "handled."

110

1    Q.    Do you know of any situations while you
2    were at Mystic where a superintendent received a
3    complaint of discrimination?
4    A.    Directly themselves?
5    Q.    Yes.
6    A.    Not anyone else?
7    Q.    Correct.
8    A.    No.
9    Q.    How about in any other way but communicated
10   to you by the superintendent, that they would have
11   learned through somebody else and it was
12   communicated to you by the superintendent?
13   A.    If information was gotten that was a matter
14   of nature, somebody would call me.  It may well be a
15   superintendent that heard about it.  That would be
16   knowledge they would just do.  They would follow up
17   on if they knew something.  That's what they are
18   supposed to do.
19   Q.    With respect to the orientation that's
20   given to employees when they are hired, and I
21   understand given the history of the Mystic site,
22   that probably a bunch of people were hired before
23   you even got on-site that were working, but to the
24   extent that other people were hired later where you

111

1    explained that people would be called from the union

2    to take certain positions that were available, I'm

3    curious about the orientation process, if any, for

4    those folks. Do you have any familiarity with that

5    process?

6        A.    I knew when new hires came in, they were

7    given a drug test. They would fill out their

8    payroll paperwork. They were given, my best

9    recollection is, about an hour of safety

10   orientation, and it may have been two hours, given a

11   package of materials, job rules and safety rules for

12   the job.

13       Q.    Do you know who was responsible for

14   conducting that orientation?

15       A.    The safety department.

16       Q.    Remind me again. That was Mr. --

17       A.    Junkins.

18       Q.    Do you know whether any of that orientation

19   included an orientation to WGI's EEO policies and

20   procedures?

21       A.    It did not.

22       Q.    During this orientation, were employees

23   given any like WGI handbook, other than the work

24   rules?

112

1      A.    Not that I recall right now.

2      Q.    If you know, how did employees learn about

3   WGI's EEO policies and procedures?

4      A.    At some point in the job, I realized we had

5   a bit of deficiency on orientation.  I put together

6   three postings which I also asked the safety

7   department to distribute in the future to any new

8   hires.

9      Q.    Do you know approximately when that was

10   that you included those three postings?

11      A.    My best recollection would be

12   August/September time frame of 2002.

13      Q.    How did you come to the conclusion that you

14   had a deficiency on the orientation, in that area?

15      A.    It was lacking.  I mean, I don't recall the

16   reason now, but I went and looked at the new hire

17   package that they passed out, and that was not in

18   there.

19            I also thought our postings were lacking at

20   the main gate.

21      Q.    When you say "lacking," do you mean

22   altogether not there or just not as clear or

23   complete as you would like?

24      A.    We had a five in one poster, but I thought

113

1    we needed to be more specific.

2        Q.    What is a five in one poster?

3        A.    It's a federal poster.  It has the five

4    various categories.

5                    (Documents marked as Anderson

6                    Exhibits 5-7 for identification)

7        Q.    I'm going to show you just at once, and I

8    will hold them up or put them in front of me,

9    Exhibit 5, Exhibit 6 and Exhibit 7.  When you

10   mentioned that you had put together three postings

11   on the EEO issue that we were just discussing, are

12   these the three postings that you were describing?

13       A.    (Examines documents)  Yes.

14       Q.    Did you actually personally draft these

15   postings?

16       A.    I used as a guide the examples of postings

17   that we had in the EEO manual for the company, and I

18   also didn't change much.  I changed a few words, but

19   I faxed them down to McDaniel to read them over and

20   make sure they passed his scrutiny.

21       Q.    And they did?

22       A.    Yes.

23       Q.    How did he communicate that to you?

24       A.    He called me back.

114

1     Q.   If you could look at the document entitled

2  "Complaint Procedure," which I believe is Exhibit

3  No. 5.  In this form, you are not only the labor

4  relations manager but also the EEO coordinator; is

5  that true?

6     A.   That's correct.

7     Q.   I'm just wondering, in the third paragraph

8  from the bottom, the second sentence that says, "The

9  involvement of each supervisor in the achievement of

10  our affirmative action objectives will be a factor

11  in measuring their performance," do you see that

12  line?

13     A.   No.  Oh, the fourth paragraph?

14     Q.   Yes, sorry.

15     A.   (Examines document)  Okay.

16     Q.   Did any of the employees at Sithe Mystic

17  get performance evaluations?

18     A.   Craft employees?

19     Q.   Any employees.

20     A.   Staff employees did, not craft.

21     Q.   Have you ever worked on a site with WGI

22  where they did performance evaluations with the

23  craft workers?

24     A.   No.

115

1      Q.    Is there any reason why that's not done, to

2    your knowledge?

3      A.    On a union project, we get referrals from

4    the hall.  These individuals are assumed to be

5    professional journeymen persons, apprentices.

6    Usually the labor agreement we work under allows you

7    to reject an employee who is referred if you feel

8    their performance is not going to be proper.

9      Q.    But that's, I assume, I guess from what you

10   are saying, if you know about it before they come on

11   the site?

12     A.    That's right.

13     Q.    What, if anything, is done to gauge the

14   performance of a craft worker on the site, if you

15   know?

16     A.    The foreman's evaluation, superintendent's

17   evaluation.

18     Q.    Is there any reason, from your perspective,

19   again, not having worked on one of these sites, that

20   would make it impossible or unfeasible to have a

21   performance evaluation be performed for craft

22   workers?

23     A.    You would probably get an objection from

24   the unions to do that.

116

1    Q.    But has that been explored, to your

2    knowledge?

3    A.    Not to my knowledge, no.

4    Q.    Back to the sentence I highlighted in

5    Exhibit 5, I'm just wondering how the involvement of

6    the supervisor in the achievement of the affirmative

7    action objectives would be measured in performance.

8    I assume that supervisors includes supervisors that

9    are not staff employees who were not getting

10   performance evaluations.  I'm just wondering if you

11   could explain that a little bit.

12   A.    The way this is written, it's really

13   directed to staff people.

14   Q.    Who are staff people?  What titles of

15   employees are encompassed in the staff?

16   A.    That would be anyone beyond the level of

17   general foremen.

18   Q.    Sorry, say that again.

19   A.    Anyone beyond the level of general foremen.

20   General foremen and foreman are craft employees.

21   Q.    Do you not consider foremen and general

22   foremen supervisors on sites?

23   A.    Yes.

24   Q.    Yes, they are, or yes, you do?