# EXHIBIT B (PART 2)

117

1     A.    Yes, they are supervisors.

2     Q.    But foremen and general foremen at the

3  Mystic site did not get performance evaluations?

4     A.    No, they did not.

5     Q.    That were written?

6     A.    That's correct.

7     Q.    To your knowledge, was their performance at

8  all discussed with them?

9     A.    To my knowledge, no.

10     Q.    Who are the vice presidents of the company.

11  I know you mentioned Mr. Cakrane.  Are there any

12  other vice presidents of the company?

13     A.    Yes.  I would have to get the company

14  directory.

15     Q.    Are there lots?  How many are we talking?

16     A.    Quite a few, dozens.

17     Q.    How are employees put on notice, if at all,

18  as to the identity of the vice presidents of the

19  company?

20     A.    Rephrase the question, please.

21     Q.    Are employees given any notice to your

22  knowledge as to who the vice presidents of the

23  company are?

24     A.    Well.  If they work in a certain

118

1    department, they will know that anyway.  That's

2    going to be common knowledge.

3        Q.    Like what kind of departments?

4        A.    Estimating, engineering, safety, human

5    resources.

6        Q.    What about the craft workers, are they told

7    in any way who the vice presidents of the company

8    are?

9        A.    No.

10        Q.    Do they have access to a company directory

11    to find that out in any way?

12        A.    I wouldn't have any idea.

13        Q.    Why don't you go ahead and put those three

14    policies aside.  I may question you later on those.

15                    (Document marked as Anderson

16                    Exhibit 8 for identification)

17        Q.    Take a look at what's been marked Exhibit

18    No. 8.  Let me know when you are through looking at

19    it.

20        A.    (Examines document)  Okay.

21        Q.    Have you seen this document before?

22        A.    Ones very much like it, if not this one

23    specifically.

24        Q.    Do you recall this letter being issued to

119

1    employees at the Mystic site on March 1, 2002?

2        A.    I don't recall that, no.

3        Q.    With respect to the three policies that I

4    previously had in front of you, Exhibits 5, 6 and 7,

5    was there any reason other than, as you described,

6    your feeling that the training on orientation on EEO

7    matters was deficient, was there any other reason

8    why these policies were put out?

9        A.    Well, we had two issues come up on graffiti

10   and discrimination issues, possible alleged

11   discrimination issues.

12       *Q.    Did you intend to with those policies put

13   out to employees an understanding as to what the

14   policy and procedure would be for dealing with

15   discrimination on-site?

16       A.    I prepared a toolbox training also, and I

17   did a check stuffer at some point, which I don't

18   remember the date exactly, which would be an

19   attachment to their check that spoke to these

20   issues, to all the craft.

21            MS. PALACIOS:   Could you read back the last

22   question.

23            *(Question read)

24       Q.    Was that a yes or no answer?

120

1     A.    Yes, yes, yes.

2     Q.    You mentioned there was a situation with

3  graffiti that you intended to address with these

4  policies.  Take a look at them yourself.  I didn't

5  see a mention about graffiti specifically in these

6  policies, but I wondered if there was a reason for

7  that or not.  That's my question.

8     A.    No, no reason that I can think of or

9  specifically tell you.

10          Can we step back for a moment.

11    Q.    Sure.

12    A.    Exhibit 6 here speaks to sexual harassment

13 specifically, inappropriate pictures, written

14 material, just to point that out.

15    Q.    Well, because you had some role in drafting

16 these, I'm trying to get your understanding, so

17 that's helpful.  Did you intend for that to cover

18 graffiti when you talk about written material?

19    A.    No, I did not.

20                (Documents marked as Anderson

21                Exhibits 9-10 for identification)

22    Q.    Take a look at what I had marked as

23 Exhibits 9 and 10.  Is this the toolbox meeting that

24 you put together that you described previously?

121

1       A.    (Examines documents)   Yes.

2       Q.    Is the exhibit marked as Exhibit 9 the

3    check stuffer that you talked about?

4       A.    Yes.

5       Q.    Again, you mentioned graffiti being part of

6    the reason why you put together these policies.   Was

7    there a reason why you didn't include graffiti in

8    the check stuffer description?

9       A.    I don't recall, no.

10      Q.    I noticed in Exhibit 10, you do mention

11    graffiti in Paragraph 2 and talk about graffiti and

12    threats being subject to a zero tolerance in the

13    company?

14      A.    Yes.

15      Q.    Could you describe to me what your

16    understanding that you intended to convey would be a

17    zero tolerance policy on these issues.

18      A.    If you use any threats or if you are caught

19    doing any graffiti that's of a harassing or

20    intimidating nature, you are going to be terminated

21    by the company.

22      Q.    Was there any training that you conducted

23    for anybody at Mystic when you rolled out these

24    policies and procedures?

122

1    A.    Formal training you are asking?

2    Q.    Yes.

3    A.    No.

4    Q.    Or any informal training?

5    A.    It was brought up at staff meetings on a

6    pretty regular basis by myself.

7    Q.    When you say "brought up," what do you mean

8    by that specifically?

9    A.    We had a staff meeting every morning of all

10   the superintendents.  It was a topic that I touched

11   upon fairly frequently, discrimination and graffiti.

12   Q.    Did you ever have occasion to meet with the

13   craft foremen or general foremen on these policies?

14   A.    No.

15   Q.    Do you know if anyone else did?

16   A.    Not to my knowledge.

17   Q.    Did you give anybody else authority to

18   train anybody else on the site on these policies?

19   A.    Would you rephrase that.

20   Q.    Sure.  Did you ask anybody else other than

21   yourself to give training or mention these policies

22   on the work site?

23   A.    No.  This Exhibit 10 was distributed by the

24   safety department to each crew and was to be

123

1    reviewed at their toolbox safety meeting, which, as

2    I recall, was Monday mornings.

3        Q.   Tell me a little bit about the toolbox

4    meetings.  Did you sit in on any of them at Mystic?

5        A.   I did not.

6        Q.   Have you ever sat in on them while you were

7    working for WGI?

8        A.   On other sites I have in the past.

9        Q.   How long do they usually take?

10       A.   10 to 15 minutes usually.

11       Q.   In your experience, are folks focused and

12   interested in what is being said usually?

13            MR. PATERNITI:   Objection.   Go ahead.

14       A.   Generally, yes.

15       Q.   At Mystic, do you know who conducted the

16   toolbox trainings?

17       A.   The foremen and the stewards in some

18   occasions in some crafts.

19       Q.   And the stewards you said?

20       A.   On some occasions, the stewards were there,

21   too.

22       Q.   Was the safety department ever involved in

23   doing the toolbox trainings, other than this one

24   time you described?

124

1      A.    The safety department did special training,
2  but they didn't do these.
3      Q.    The training as reflected in Exhibit 10 in
4  front of you where you have the toolbox meeting
5  discussion and you have the date, and I guess in
6  that one it says Mr. Paul Aiello was the supervisor,
7  I assume those are signatures of people that
8  attended.  Is that true?
9      A.    They would be on the crew he would be
10 supervising, yes.
11     Q.    Do you know Mr. Paul Aiello?
12     A.    No, I do not.
13     Q.    Do you know whether or not he's a foreman?
14     A.    No, I don't know.
15     Q.    Do you know whether or not he's someone who
16 is in the safety department?
17     A.    Not that I am aware of.
18     Q.    I guess what I'm trying to find out is you
19 mentioned the safety department did this, true?
20     A.    No.
21     Q.    That's not true?
22     A.    No.  The safety department would prepare a
23 toolbox training each week.  They would send that
24 out to all the superintendents, who would distribute

125

1    that down through all the foremen and down to all

2    the crews who would then conduct their own training.

3           We had lots of crews.  This was a way to

4    get some training to everybody at one time.

5           Q.   What specifically happened with respect to

6    this training?

7           A.   As they would do with any toolbox training

8    that was prepared, as I said, normally by the safety

9    department, the foreman would read what was done was

10   written.  They would have a discussion that would be

11   appropriate.  Everyone would sign it.  Then these

12   forms would come back to the safety department.

13          Q.   What happened with this particular

14   training?  You told me with safety toolbox

15   trainings, that the safety department, especially

16   the superintendent, would then go to the foremen.  I

17   know you put this together.  What did you do after

18   you put it together to make sure it got to the

19   crews?

20          A.   I gave a copy of it to the safety

21   department to do their normal distribution as they

22   would normally do with their regular toolbox safety

23   meeting.

24          Q.   Did you have any discussions about how you

126

1   wanted this training to be conducted with the safety

2   department?

3        A.   With the safety department?

4        Q.   Yes.

5        A.   No.

6        Q.   With anybody else?

7        A.   No.

8        Q.   Did you get any questions from any of the

9   craft workers about this toolbox training or any of

10  the policies that we've been discussing?

11       A.   I did not.

12       Q.   No questions from the foremen or general

13  foremen?

14       A.   Not that I recall.

15                    (Document marked as Anderson

16                    Exhibit 11 for identification)

17       Q.   Here's Exhibit 11, Mr. Anderson.  This is a

18  document that was given to us during the deposition

19  of John Baldwin, who, as you may or may not know,

20  worked on a separate WGI site that was not Mystic.

21            Have you seen this policy before?

22       A.   (Examines document)  No.

23       Q.   Do you have any idea of where this policy

24  came from?

127

1      A.    It would appear to be generated by my

2   company at a particular site, because it identified

3   P4, which is a site in Wisconsin.

4      Q.    Did you have any dealings with this site at

5   all in the performance of your duties?

6      A.    As to labor relations?

7      Q.    Yes.

8      A.    Yes.

9      Q.    You never actually worked with that policy,

10  though?  You were not aware of that policy at all at

11  that Wisconsin site?

12     A.    No.

13     Q.    Do you know who had duties for EEO matters

14  at that site?

15     A.    I do not.

16     Q.    Are you familiar with all of the policies

17  relating to work issues that the company puts out

18  for employees?  Well, let me put it this way.  Is

19  there any sort of central database or manual for

20  policies that had been given out to employees over

21  time at different sites?

22     A.    I wouldn't know the answer to that.

23     Q.    That's fine if you don't know.

24           My next questions have to do with at

128

1    Mystic, did you have any responsibility at all to

2    look at the EEO policies of the subcontractors

3    on-site to determine whether or not they were

4    acceptable or appropriate?

5         A.    Do you mean were there written policies,

6    for instance?

7         Q.    Yes.

8         A.    No.

9         Q.    Has there ever been a requirement to your

10   knowledge of a subcontract, with some of these

11   subcontractors?

12             MR. PATERNITI:   Objection.

13        A.    At that particular project?

14        Q.    In general, have you ever heard that where

15   WGI would say as part of their agreement with a

16   subcontractor, "We want to look at your policies

17   before we agree"?

18        A.    I have seen that on government projects.

19        Q.    Incidentally, was Mystic a federally funded

20   site?

21        A.    No.

22        Q.    How about Weymouth?

23        A.    No.

24        Q.    When the toolbox training was done, were

129

1    subcontractor employees involved in those toolbox

2    trainings to your knowledge?

3        A.    Not to my knowledge.

4        Q.    Do subcontractor employees sit in on

5    toolbox trainings that are performed by WGI?

6        A.    I don't remember a requirement for that.

7        Q.    I spent part of the afternoon yesterday

8    looking at the "With All Due Respect" video.  Have

9    you seen that before?  It was produced to me by WGI

10   in this case.

11           Have you ever seen that video, the training

12   video on EEO and I guess affirmative action?

13       A.    I may have.

14       Q.    You don't have a specific recollection

15   offhand?

16       A.    No.

17           MS. PALACIOS:  Off the record.

18           (Discussion off the record)

19       Q.    Do you know of any regular meetings that

20   were held with foremen and general foremen on the

21   Mystic site either with you or with superintendents?

22       A.    With myself, I don't recall any meeting

23   specifically with foremen.  The superintendents, I

24   wouldn't have any personal knowledge of that.

130

1     Q.   Do you know whether the safety department

2  ever held any meetings with just supervisors, like

3  for foremen and the general foremen of the craft

4  workers?

5     A.   I don't know the answer to that.

6         MS. PALACIOS:  Why don't we take a few

7  minutes.

8         (Recess at 2:30 p.m.)

9     BY MS. PALACIOS:  (2:45 p.m.)

10     Q.   With respect to Exhibits 5, 6 and 7, which

11  were the three policies that we talked about earlier

12  prior to the break, I just wanted to confirm, did

13  you instruct anybody to provide training on these

14  policies to any of the foremen at the Mystic site?

15     A.   I did not.

16         I have to change an answer I gave you

17  earlier before the break, though.

18     Q.   Okay.

19     A.   I believe you asked me if the safety

20  department had regular meetings with the foremen.

21  Was that the proper form of your question?

22     Q.   I don't remember.

23     A.   My answer was no, and that was based on the

24  fact, my answer being no, that I never attended any,

131

1  but they had regular meetings with the foremen.  I

2  was just never physically there for those.

3      Q.    But you know that those occurred, meetings

4  with foremen?

5      A.    Yes.

6      Q.    Do you know whether or not anyone else

7  directed the foremen at the Mystic site to be

8  trained on the policies on Exhibits 5, 6 and 7?

9      A.    Not to my knowledge, no.

10     Q.    Given that you were responsible for

11 drafting those policies, can you tell me who your

12 audience was.  Who were those directed to?

13     A.    The craft workers on the site.

14           MS. PALACIOS:  Why don't we mark the

15 diagram as Anderson Exhibit 12.

16                    (Document marked as Anderson

17                    Exhibit 12 for identification)

18     Q.    I'm just going to show you your drawing,

19 which is now marked as Exhibit 12.  You said you had

20 those policies posted?

21     A.    Yes.

22     Q.    Where were they posted?

23     A.    Right about in this area here next to the

24 clock alleys (indicating).

132

1    Q.    Maybe you could take this opportunity to

2    define that area where the "P" is on your drawing a

3    little bit more.  If you could put there I guess

4    circles to indicate where the punch clocks were, if

5    there were any.

6    A.    Would you like to make a new drawing or

7    keep it on this?

8    Q.    We can keep it on one, unless you wanted to

9    do like a highlight.

10    A.    Well, this is a little tiny one now.  It

11    will look like a bunch of...

12    Q.    Let's mark this as Exhibit 13, and we can

13    indicate the powerplant site.  Is that what you

14    wanted to do?

15    A.    It will be just a close-up of the front

16    gate.

17                    (Document marked as Anderson

18                    Exhibit 13 for identification)

19    Q.    Before you do that, can you define for me,

20    when you say craft workers -- and we've been

21    operating on craft workers as a monolith -- who does

22    that group include?

23    A.    The craft workers are going to include the

24    craft members of each construction union with which

133

1    we dealt, who they were members of the union, but

2    they would become our employees for a period of

3    time.

4         Q.    That would include supervisors?

5         A.    It would include the general foremen,

6    foremen, journey persons and apprentices.

7         Q.    Now you are going to draw on Exhibit 13,

8    which is going to be a close-up of the front gate.

9    As you do that, if could you put in the clock alley.

10        A.    Sure.  (Witness complies)

11        Q.    Were there any trailers in the front there?

12             MR. PATERNITI:  By the front gate you mean?

13             MS. PALACIOS:  Yes.

14        A.    There was a pipefitter trailer off here,

15   but in this particular drawing, it will be too much

16   of a close-up.  There were trailers all around the

17   perimeter for a variety of reasons (indicating).

18             MR. BENNETT:  For the record, you are

19   pointing to the perimeter of the powerplant site.

20             THE WITNESS:  Yes, the powerplant site

21   itself.

22        Q.    I'm writing on your drawing, Exhibit 12,

23   "Trailers around perimeter," but you can go ahead

24   and keep drawing on Exhibit 13.

134

1      A.    (Witness complies)

2      Q.    Okay, we're looking at Exhibit 13.

3      A.    This was the regular gate for the ingress

4    and egress of vehicles.

5      Q.    Let me come around and stand next to you so

6    I can see.

7      A.    Which had a mechanical arm.  I won't put

8    that in.  There was a smaller gate here that was for

9    personnel egress and ingress.

10          I recall we had three clock alleys.  As

11   craft workers, and myself -- I had a badge -- would

12   come in the site, there was a card swipe on these

13   clock alleys.  They look like small shacks.  As you

14   entered, you would swipe your card.

15          The bulletin board with the postings was

16   right here.  This was the blank side.  If you were

17   coming in, unless you turned, you wouldn't see it.

18   You would see the bulletin board, but you would have

19   to turn your head.  Going out in the evening, for

20   instance, then you are facing that before you go to

21   the clock alley (indicating).

22     Q.    What was the bulletin board actually on?

23   Was it on a partition?

24     A.    It was on, as I recall, legs.  It was

135

1    fairly large.  I'm going to say it was six by eight.

2    It had sliding plastic doors.  A lock was kept on

3    them so people wouldn't tear stuff out of there.

4         Q.    Was this outside the clock alley, again,

5    the bulletin board, or was it in a trailer?

6         A.    This was all outside.

7              MR. BENNETT:  Just for the record, can you

8    have him label where the bulletin board was with the

9    posting.

10             MS. PALACIOS:  He did.

11             THE WITNESS:  I did, right here.  It's just

12   kind of tiny (indicating).

13             MR. DESSIN:  You do mean six by eight feet,

14   right, not inches?

15             THE WITNESS:  Yes.  It was fairly large.

16   That's the best dimensions I can recall.

17        Q.    Without making any marks yet, if you could

18   just indicate to me where the permanent bathrooms

19   were on the site at Mystic.

20        A.    Here and here (indicating).

21        Q.    Could you draw two "B's" where the

22   permanent bathrooms were.

23        A.    Two "B's"?

24        Q.    Yes, a "B" for each bathroom.

147

1      Q.    And what about Joe?

2      A.    I don't recall.  I don't recall them being

3  specific about it to me.

4      Q.    I know you said you recall that Godwin's

5  complaint came in around September of 2002.  Do you

6  have a recollection as to when Joe's complaint came

7  in, whether it was before or after or within months,

8  or otherwise?

9      A.    Again, I would have to look at my journals.

10  I'm thinking it was in August sometime possibly,

11  maybe the first half of August.

12      Q.    After you got those two complaints in the

13  summer or fall of 2002, did you on your own decide

14  to go and walk the site to see if that graffiti was

15  present?

16      A.    No, I did not.

17      Q.    Did you instruct anyone other than the

18  superintendent and the steward in Godwin's situation

19  to do so?

20      A.    No.

21      Q.    Did you communicate at all with

22  Mr. McDaniel about the graffiti reports?

23      A.    Yes.

24      Q.    How many times, just on that issue?

148

1    A.    I don't recall it.  Specifically with that

2 issue, it would have been in conjunction with the

3 issue with Joe and Godwin as part of the issue.  I

4 would have had discussions with -- we established a

5 cleanup crew later on.  I talked with him about it

6 on that.

7    Q.    Whose idea was it to set up a cleanup crew?

8    A.    It was a recommendation that I made, not

9 specifically, but "We need to do something."  I told

10 that to Bill Rittershaus.  Then he decided that we

11 should have a cleanup crew.

12    Q.    Would you consider setting up a cleanup

13 crew to be a response to the graffiti?

14    A.    Certainly.

15    Q.    Any other steps or conduct that WGI, in

16 your mind, at the Mystic site undertook to address

17 graffiti that was complained of?

18    A.    We've discussed everything that I can

19 recall right now.

20    Q.    Can you tell me a little bit about -- I

21 understand you spoke to Rittershaus, and you

22 recommended doing a cleanup crew, and it sounds like

23 he went ahead with the idea.  Did you at any point

24 personally meet with any individual who was selected

149

1    to be part of the cleanup crew to discuss what was

2    happening and what the goals were of their work?

3        A.    I talked to Bob Blount at one point, who

4    ran the crew.  I didn't talk to the members of the

5    crew, no.

6        Q.    Remind me again.  Bob Blount was

7    superintendent of laborers?

8        A.    Yes.  He was a civil superintendent.  As I

9    recall, he reported to -- I can't remember the name

10   now.

11       Q.    But you didn't actually directly speak to

12   any members of the cleaning crew?

13       A.    I did not.

14       Q.    Did you give Mr. Blount any specific

15   directions on what he should say to the cleanup

16   crew?

17       A.    No.

18       Q.    My understanding was that the cleanup crew

19   was made up of laborers.

20       A.    That's correct.

21       Q.    Was there a decision on who would be

22   selected for the cleanup crew that was made up of

23   laborers?

24       A.    I wouldn't know the answer to that.

150

1      Q.    Do you know whether or not the cleanup crew
2  made any reports of what they found as they cleaned
3  up the graffiti?
4      A.    I don't know that.
5      *Q.   Do you know whether or not they found any
6  additional graffiti?
7      A.    No, not personally.
8      *Q.   When you say "not personally," did you
9  learn of it any other way?
10     A.    Why don't you reask the question again.
11           MS. PALACIOS:  Could you read it back.
12           *(Questions read)
13     A.    If I judge by when I took my tour with the
14 EEOC investigator, I would make an assumption that
15 they found.  I'm not supposed to assume, however,
16 so...
17     Q.    Right, don't assume.  That's fine.  Did any
18 of the members of the cleaning crew or Mr. Blount or
19 anybody else, for that matter, ever talk to you
20 about whether they found any additional graffiti?
21     A.    I don't remember having a specific
22 conversation in that regard, no.
23     Q.    Do you know what the instructions were to
24 the cleanup crew as to what they were supposed to do

151

1    with the graffiti if they found it?

2         A.    No.   I only know my discussions with Bob

3    Blount.   I don't know what he specifically said to

4    his crews.

5         Q.    Did you tell Bob Blount what you wanted to

6    be done with the graffiti?

7         A.    That we needed to get rid of the graffiti.

8         Q.    Anything more specific than "get rid of

9    it"?

10        A.    No, "get rid of it."

11        Q.    Do you have in your mind an idea of what

12   "get rid of it" meant?

13        A.    Sandpaper, paint.

14        Q.    I know that you participated in the EEOC

15   on-site, as you just told me.  I know you were

16   interviewed by the EEOC investigator, do you recall

17   that?

18        A.    Yes.

19        Q.    Could you tell me a little bit about what

20   your involvement was on the on-site, you know,

21   particularly with respect to your going around the

22   site with the EEOC and finding the graffiti.

23        A.    Well, I was the contact person for any EEO

24   issues, so it was just natural.

152

1    Q.    On that day, did the EEOC investigator meet

2    with you at the beginning of the day and you

3    remained with her throughout the day?  How did it

4    work?

5    A.    I seem to recall these were afternoon

6    sessions, as best as I recall.

7    Q.    Was the tour of the facility where you said

8    you saw additional graffiti, was that as part of

9    your interview?  Like did you get interviewed and

10   then that happened, or right before?  How did it

11   work?

12   A.    I remember the interview as a separate

13   event.

14   Q.    On a separate day you mean?

15   A.    I would have to look at my logbooks.

16   Q.    After seeing graffiti when you looked

17   around with the EEOC investigator, did you have any

18   additional conversations with Bob Blount or anybody

19   else on the cleaning crew about removing that

20   graffiti found?

21   A.    I don't remember talking to Bob, no.

22   Q.    Do you know whether the racial graffiti

23   which Mr. Enagbare and Mr. Willis complained of was

24   ever removed from the site?

153

1    A.    I don't personally know that, no.

2    Q.    Did anyone ever tell you that it was

3    removed?

4    A.    I can't recall that.

5    Q.    Do you know whether or not the cleanup crew

6    ever took photographs of any of the graffiti that

7    they found?

8    A.    The cleanup crew?

9    Q.    Yes.

10    A.    I don't know.

11    Q.    You didn't instruct anybody to have them

12    take pictures?

13    A.    No.

14    Q.    What about writing down any of the content

15    of what they found, do you know whether they did

16    that?

17    A.    I don't recall.

18    Q.    And you didn't instruct anybody to do so?

19    A.    No.

20    Q.    Do you have any understanding on the

21    frequency and severity of the graffiti that was

22    found, based on the cleaning crew's activities?

23    A.    No, not personally.

24    Q.    Or through anybody else?

154

1      A.    No.

2      Q.    Did you or anybody else that you know of

3   undertake to try to figure out whose handwriting was

4   in the graffiti of which Mr. Enagbare and Mr. Willis

5   complained?

6      A.    No.

7      Q.    Was there any discussion at all with

8   respect to the graffiti situation at Mystic as to

9   additional surveillance methods at the site, for

10  example, having cameras installed outside of the

11  bathroom areas to monitor and review or anything

12  like that?

13     A.    I had a discussion with ideas similar to

14  that with Bill Rittershaus.

15     Q.    Could you tell me a little bit about those

16  discussions.

17     A.    The ideas were rejected.  The thought of

18  putting cameras out there would create a big problem

19  with the unions.  There's the privacy issues they

20  would bring up.  It just wouldn't work.

21     Q.    That was Bill that thought it wouldn't

22  work?

23     A.    Well, we both agreed.

24     Q.    Was there ever any discussion with the

155

1    union about the possibility of putting cameras up to

2    deal with the graffiti situation?

3        A.    I had mentioned it to a few stewards during

4    a stewards meeting once and got the reaction that I

5    anticipated.

6        Q.    Which was negative?

7        A.    Oh, yes.

8        Q.    Do you remember any of the stewards you

9    spoke to, their names?

10       A.    Let's see, the pipefitters' steward, but I

11   don't recall the name at the moment.  He was one of

12   them.  There was the boilermakers' steward and the

13   ironworkers' steward.

14           There were three names.  I don't remember

15   them at the moment.

16       Q.    Did you have any discussion with

17   Rittershaus or anybody else about alternatives to

18   dealing with the graffiti situation, other than just

19   the cleanup crew, that you have not told me about?

20       A.    We talked about having guards at every

21   port-o-john, and the idea was just not practical.

22   Whenever someone used the port-o-john, the guard

23   would have to run in immediately.  It was very

24   impractical for an idea.

156

1    Q.    Any other ideas?

2    A.    That's all I remember.

3    Q.    Did you ever get any of the supervisors of

4    the craft workers together to discuss ideas that

5    could work for dealing with graffiti on the site?

6    A.    Not specifically ideas.  We talked about

7    graffiti at staff meetings.  You know, we tried to

8    catch somebody doing it.

9    Q.    Did you contact police or any other law

10    enforcement or instruct anybody to do so to deal

11    with the graffiti?

12    A.    No.

13    Q.    Do you know if anybody was questioned from

14    the different craft worker groups that worked near

15    some of the port-o-johns or bathrooms or anywhere

16    else that graffiti was found to find out if they

17    knew who did it?

18    A.    Could you please rephrase that again.  I'm

19    not sure I know what you mean.

20    Q.    Sure.  Do you know if anyone questioned the

21    craft workers who worked near places where graffiti

22    was found to determine if anybody knew who did it?

23    A.    No.  It was too fluid of an environment.

24    Q.    What do you mean by that?

157

1    A.    Craft workers that were here today would be
2    over here tomorrow and then here the next day
3    (indicating).   It was very fluid.
4    Q.    I assume there was a company that actually
5    provided the port-o-johns to the Mystic site.   Is
6    that true?
7    A.    Yes.
8    Q.    Do you remember what the name of that
9    company was?
10    A.    I think it was Handy John.   That may not be
11    exactly right, though.
12    Q.    Did you have any conversations with anybody
13    at that company about the situation that was
14    occurring?
15    A.    Not myself, no.
16    Q.    Did anybody else that you know of?
17    A.    Bob Blount would have.   He got cleaning
18    supplies from them and worked with them to replace
19    some of the worst port-o-johns.   That company would
20    take one and replace it.   He worked with them on
21    that I know.
22    Q.    Do you know if that company had any
23    complaints about the vandalism of their property
24    that was voiced to you or anybody else at that site?

158

1      A.    Not that I'm aware of, no.

2      Q.    Was there ever an effort to identify the

3   cost associated with cleaning up the bathrooms and

4   allocating staff to the cleanup crew or materials

5   that were used to clean up the bathrooms at that

6   site?

7      A.    Not that I'm aware of, no.

8      Q.    With respect to the cleanup crew, your

9   instructions to Bob Blount, did they include any

10  requirement that the cleanup crew go into every

11  bathroom, or were they just going into bathrooms

12  that had been identified to include graffiti?  Do

13  you know how that was handled?

14     A.    I would have to clarify.  I would not

15  instruct Bob Blount.  He didn't work for me.  I

16  would discuss the issue with Bob.

17          What schedule he used or how he handled the

18  cleanup of the port-o-johns, I do not know that

19  specifically.

20     Q.    Did you discuss with Bob how many people

21  you thought were necessary to be part of the cleanup

22  crew?

23     A.    No.  The company made that decision.  It

24  probably would have been Bob Blount.  Steve Cantrell

159

1    may have been involved as his reporting, who he

2    reported to; or Bill Rittershaus.

3        Q.    Going back to what you said about meetings

4    with supervisors that occurred, could you tell me,

5    how often were there meetings with supervisors that

6    you participated in while you were at Mystic?

7        A.    We had a staff meeting every morning.

8        Q.    Every morning?

9        A.    Every single morning.

10       Q.    Who was present at the staff meetings?

11       A.    All the superintendents, myself, Bill

12   Rittershaus, the site managers.  Alan Corder, the

13   business manager, was there.  The warehouse manager

14   was there.  It was generally the heads of the

15   various departments or craft, disciplines that were

16   attending that meeting.

17       Q.    Did foremen and general foremen participate

18   in those staff meetings?

19       A.    No.

20       Q.    Was there a similar daily meeting for the

21   general foremen and foremen of the craft workers?

22       A.    The superintendents would hold a briefing.

23   They had a different term for it.  It was to discuss

24   the day's work.  They may even discuss a safety

165

1    Q.   Was there any discussion between the two of

2    you about how that would have happened?

3    A.   He would have called Bob Blount.

4    Q.   Did you personally take any steps to

5    determine whether there was additional graffiti

6    after you walked the site with the EEOC?

7    A.   I did not.

8    Q.   Did you instruct anybody else, other than

9    in this conversation with Bill Rittershaus, to do

10   that?

11   A.   I remember having a conversation or

12   bringing it up at one of the staff meetings

13   afterwards, after the EEOC tours or audits and, you

14   know, "Folks, pay attention.  If you see it, tell

15   Bob."

16   Q.   Did anyone at that meeting say that they

17   had seen anything?

18   A.   I don't recall specifically anyone saying

19   that.

20   Q.   Was it just one time that you addressed it

21   at a staff meeting?

22   A.   No.

23   Q.   How many times?

24   A.   It would be several times over a period of

166

1    months.

2        Q.    At any time, did anyone who participated in

3    a staff meeting say that they had seen anything or

4    not seen anything?

5        A.    I don't remember anybody at a staff meeting

6    bringing up, "Here's a specific example."  There

7    were discussions about graffiti in general on

8    construction sites, that it's a difficult problem to

9    manage.

10       Q.    Did anyone during these staff meetings

11   raise ideas on how to deal with the graffiti?

12       A.    Sandpaper, paint, cleaners.

13       Q.    Again, just to clarify, the folks that were

14   part of the cleanup crew were WGI employees?

15       A.    Correct, yes.

16       Q.    The supervisor of those folks was Bob

17   Blount?

18       A.    Correct.

19       Q.    Who, if anybody, supervises Bob Blount?

20       A.    I recall that Bob reported to Steve

21   Cantrell, but Steve left at some point, and I don't

22   recall who -- he might have had a direct report at

23   some point to Bill, but...

24       Q.    Who was Steve Cantrell?

167

1      A.   He ran the civil end of the project for a

2   period of time.  He went to the Weymouth job at one

3   point, and I don't remember the dates of that.

4      Q.   With respect to the bulletin board that we

5   talked about where postings were posted, was there

6   lighting on that bulletin board for the night crew

7   to see the postings, if you know?

8      A.   I don't recall specifically.  We had quite

9   a bit of light in that area.  There were overhead

10  power poles.

11         It was quite bright at night in there, but

12  I don't remember specifically that there was light

13  in the bulletin board case itself.

14     Q.   Do you know who had keys to open the

15  bulletin board, if anyone?

16     A.   Bill Junkins.

17     Q.   Can I have you pull out Exhibit No. 5,

18  please.  Exhibit No. 5 talks about the affirmative

19  action objectives which I pointed out to you before

20  in the fourth paragraph I believe, if I'm not

21  mistaken; is that right?

22     A.   I have No. 5 here.  Is this it?

23         MS. PALACIOS:  Let's go off the record for

24  just a second.

168

1          (Discussion off the record)

2      Q.    Exhibit No. 5, is that the complaint

3   procedure?

4      A.    Yes.

5      Q.    If you look at the fourth paragraph, second

6   sentence -- and I know I had you look at this

7   before -- the involvement of each supervisor?

8      A.    Yes.

9      Q.    Can you tell me where the affirmative

10  action objectives are listed, if anywhere.

11     A.    I cannot.

12     Q.    If you look at the exhibits where the

13  toolbox training and check stuffer are, I believe

14  there's a date of September 16th on both documents.

15  One is actually printed on it in Exhibit 9, and

16  Exhibit 10 actually has the date entered by the

17  person that did the training.

18     A.    Right.

19     Q.    They both have the same date, correct?

20     A.    Yes.

21     Q.    I'm just curious, given that date, are you

22  able to tell me with any clarity as to when the

23  other policies that related to the toolbox training

24  and the check stuffer were actually sent out to

169

1    folks?

2        A.    You mean the postings?

3        Q.    Yes, the three postings, Exhibits 5, 6 and

4    7.

5        A.    This all occurred in a proximate time.

6        Q.    Like within a week or so?

7        A.    Within a week or so.

8        Q.    Did you ever have any conversations with

9    Mr. Cakrane about the graffiti situation at Mystic?

10       A.    A few times.

11       Q.    What did he have say to you about it?

12   Actually, what did you talk to him about?

13       A.    That it was driving me crazy.

14       Q.    What did he say?

15       A.    "Hang in there."

16       Q.    Did he give you any ideas on how to --

17       A.    He mentioned, "Have you brought it up to

18   Mike McDaniel?"  I said, "Certainly."

19       Q.    Did Mike McDaniel have any other ideas,

20   other than cleaning, that he shared with you on how

21   to handle the graffiti problem?

22       A.    Well, the cleaning, trying to get word out

23   to people that it was a violation.

24            The toolbox training, I discussed that with

170

1    him.  We were a little confounded on what to do

2    about it, in reality.

3        Q.   Did you seek assistance outside the company

4    on how to deal with the graffiti problem?

5        A.   No, I did not.

6        Q.   Do you know if anybody else did?

7        A.   Not to my knowledge.

8        Q.   Very quickly, I just want to have this

9    these two documents marked as exhibits.  I have some

10   quick questions.

11                  (Documents marked as Anderson

12                  Exhibits 14-15 for identification)

13       Q.   I'm showing you what was marked as Exhibit

14   No. 14.  You will see that says September 11th as

15   the date?

16       A.   (Examines document)  Yes.

17       Q.   Can you tell me who Larry Myers is.

18       A.   He's a personnel executive in Boise, and

19   may be the individual that Mike reports to.

20       Q.   Can you tell me what this is, what the

21   document is?

22       A.   It looks like it is a memo from Larry Myers

23   to the Office of the Chairman.  That's those four

24   individuals.

171

1     Q.    Are you familiar with this human resources

2  report that goes out it looks like weekly?

3     A.    No, I'm not.

4     Q.    Do you know whether that actually happens?

5     A.    No, I don't.

6     Q.    Have you ever seen this document before?

7     A.    I seem to recall it, yes, at some point.

8     Q.    Do you remember what the context was for

9  your reviewing this document?

10     A.    No, I don't.

11     Q.    You can put that aside.  I'm showing you

12  now what was marked as Exhibit No. 15.  This looks

13  like it's a memo from you.  Is that true?

14     A.    (Examines document)  Yes.

15     Q.    Do you recall drafting this memo?

16     A.    Let me look it over here real quick.

17  (Witness reviews document)  Yes, okay.

18     Q.    Can you tell me why you put this memo

19  together.

20     A.    For the record, for Mike to have in his

21  files.

22     Q.    Do you have monthly safety meetings, or you

23  had monthly safety meetings back then?

24     A.    It would be maybe four weeks, or six weeks.

172

1   It would depend a lot on schedules.  It was fairly

2   regular, but it was not always fixed every month

3   with the union agents.

4       Q.    Who else from WGI participated in this

5   meeting?

6       A.    Bill Junkins normally came with me, because

7   it had a safety component primarily.

8       Q.    It looks like you gave them a little

9   briefing on what was happening with the graffiti.

10  Did the craft unions or the trade unions have any

11  input on how to handle that situation at all?

12      A.    No.

13      Q.    Did you ask them if they had any input?

14      A.    Yes.

15      Q.    You mentioned earlier on in your deposition

16  that you had two friendships that you maintained

17  while you were at Mystic with Mr. Higgins and

18  Mr. Junkins?

19      A.    Yes.

20      Q.    Did you ever talk to them off work hours or

21  even during work hours about this graffiti problem

22  that was "driving you crazy"?

23      A.    Yes.

24      Q.    Did they have any thoughts that you found

173

1  helpful?

2      A.    No more new thoughts than the rest of us

3  had addressed it.

4      Q.    Did you have any conversations with

5  Mr. Junkins about whether some of the graffiti posed

6  any safety problems?

7      A.    No.  I don't remember that being a concern.

8      Q.    Did he have any concerns that there might

9  be safety problems relevant to some of the graffiti

10  that was found?

11          MR. PATERNITI:  Objection.  Only if you

12  know.

13      A.    I don't recall.

14      Q.    Part of what happened during the

15  investigation of this case at the administrative

16  level here at the EEOC, which you may or may not

17  recall, was that the EEOC investigator spoke to a

18  number of employees at WGI.

19      A.    Yes.

20      Q.    One of those employees was Jim Fay.

21      A.    Okay.

22      Q.    In the interview that Jim Fay gave with the

23  EEOC investigator, he mentioned that, as I will

24  represent to you, he mentioned that he told

174

1    "management" about graffiti in the bathrooms or

2    graffiti's on the site rather 10 to 12 times.  Were

3    you part of that management that he mentioned it to?

4    In other words, did he come to you with complaints

5    of graffiti at any time?

6         A.   He did not.

7         Q.   Did you participate in any of those

8    interviews, other than your own obviously, that were

9    done with anyone else who worked at WGI?

10        A.   Only my own.

11        Q.   I think the last question I really have for

12   today is related to a document I want to now have

13   marked.

14                  (Document marked as Anderson

15                   Exhibit 16 for identification)

16        Q.   It's not so long of a document, but it is

17   eight pages.  It is marked as Exhibit 16.  This is

18   actually notes that were typed of the interview,

19   your interview during the EEOC on-site.

20             I would just like you to review it.  Take

21   your time to look at it and review it.  Using my

22   blue pen, if there's anything that you think is

23   inaccurate, feel free to correct it.  If a question

24   is wholly inaccurate, cross it out, but I really

177

1    not sure what they means here.

2              "I do have book on operational guidance for

3    the policy and staff," well, that's going to be the

4    manual.

5    Q.    That we discussed earlier?

6    A.    Right.  "Have you read it?"  I have used

7    it.  The context here is I read through the whole

8    thing.  I don't like the context.  I didn't say that

9    to her.

10             "Have you been trained on the policy?"

11   "Yes," three years ago by EEOC professionals.

12   Training was for one day."  What I'm saying here in

13   the context of this policy are two separate

14   discussions.  I talked about the fact that we had

15   training in Cleveland, employee training, but she's

16   got it as something I was doing, which I don't

17   remember taking that training.  I talked about the

18   fact we had training.

19             By the way, I found her incredibly

20   intimidating.  I did not care for her at all.  I

21   have to tell you that.  I'm very upset seeing this.

22             "Tell me about the policy and complaint

23   procedure."  "We have it, but I base my

24   investigations on my experience.  I used to be a

181

1   training that Mr. Myers says was going to be done to

2   raise awareness?  Do you know whether that happened

3   at Mystic?

4        A.    Not that I'm aware of.

5        Q.    You didn't participate in any --

6        A.    I did not.

7        Q.    Is it accurate that you established a

8   two-man crew to continually walk the site and clean

9   up graffiti as it occurred?

10        A.    I didn't establish the crew.  The company

11   did.  There was actually four persons involved.

12   There was an individual assigned to each of the

13   permanent, semi-permanent bathrooms, and then there

14   was a two-person crew that walked the site and

15   cleaned up graffiti as it occurred, like they say

16   here.

17        Q.    When you say the company was responsible

18   for establishing the crew, can you give me the names

19   of people that encompasses "the company."

20        A.    Bill Rittershaus, Bob Blount.  It would

21   have flowed through that chain of command.

22        Q.    I'm not sure if I asked you this already,

23   so indulge me if I have.  Do you know whether

24   Washington Group provided any training on how to

182

1    handle discrimination complaints to general foremen

2    and foremen at the Mystic site?

3        A.    I'm not aware of any.

4        Q.    Based on any understanding that you have of

5    this field, do you know how a general foreman or a

6    foreman at the Mystic site would have dealt with a

7    complaint of discrimination?

8        A.    He probably would have told his next

9    superior, whoever that individual reported to.

10       Q.    I understand the foremen report to the

11   general foremen.  Who is the next line of report for

12   a general foreman?

13       A.    It would either be the assistant

14   superintendent if there was such an individual

15   assigned to that, or the superintendent.

16       Q.    If you look at the last line of Exhibit 14,

17   "Several people have been terminated for racist

18   conduct," that line.

19       A.    Right.

20       Q.    Do you know anything about people who have

21   been terminated for racist conduct at the Mystic

22   site?

23       A.    Let's see, September 11th, three people.

24       Q.    Do you remember who those people were?

183

1     A.    It was the individual that had the run-in

2  with Ozzie Weeks.  He was an electrician.  I'm

3  drawing a blank on the name.  He was terminated.  He

4  used the "N" word in an argument with Ozzie.  Ozzie

5  worked for another contract, not for us.

6          Wait a minute, let's see if I have it

7  right.  (Examines document)  Yes, Ozzie worked for

8  Bond Brothers.  The harasser worked for us.  He was

9  terminated.

10          We had a superintendent that was terminated

11  for making racist comments to subcontractor

12  employees.

13     Q.    Do you know who that was?

14     A.    John Day.  Of course, we have Alan Griffis

15  with Encompass.

16          I think the word "several" here is

17  generally capturing what is going on.  That was used

18  in this memo.  Those are the ones that I recall,

19  though.

20     Q.    Anybody else?

21     A.    Not that I can recall.  By the time of this

22  memo, I'm trying to put it into that time frame.

23  That's all that's coming to mind at the moment.

24     Q.    Do you remember if the person who was

184

1    terminated regarding the incident with Ozzie Weeks

2    was Dick O'Hare?

3        A.    That's it, yes.

4        Q.    Finally, just to clarify, the document that

5    we were reviewing that were the notes of the EEOC

6    investigator from the onsite, this was actually

7    included in the discovery responses or production to

8    WGI at some point.  I asked you earlier in the day

9    whether you looked at any discovery.  You said,

10   "Yes."  I'm just curious, had you ever seen this

11   before today?

12       A.    No, I had not.

13            MS. PALACIOS:  That's all for today.  Off

14   the record.

15            (Discussion off the record)

16                 (Whereupon the deposition

17                 was suspended at 4:30 p.m.)

18

19

20

21

22

23

24

186

1    COMMONWEALTH OF MASSACHUSETTS)

2    SUFFOLK, SS.                    )

3        I, Ken A. DiFraia, Registered Professional

4    Reporter and Notary Public in and for the

5    Commonwealth of Massachusetts, do hereby certify

6    that there came before me on the 12th day of April,

7    2006, at 10:07 a.m., the person hereinbefore named,

8    who was by me duly sworn to testify to the truth and

9    nothing but the truth of his knowledge touching and

10   concerning the matters in controversy in this cause;

11   that he was thereupon examined upon his oath, and

12   his examination reduced to typewriting under my

13   direction; and that the deposition is a true record

14   of the testimony given by the witness.

15       I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 26th day of April,

21   2006.

22                    Ken A. DiFraia

23                        Notary Public

24                My commission expires 4/3/09