# EXHIBIT B (PART 3)

2-1

Volume II
Pages 2-1 to 2-212
Exhibits 17 to 27

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                              :

EQUAL EMPLOYMENT OPPORTUNITY    :
COMMISSION,
       Plaintiff,              :

JOHN BALDWIN, LEONARD BELL,    :
JOHANNES KAINDOH, WAYNE       :
HENDERSON, GODWIN ENAGBARE   :
and JOE L. WILLIS,
       Intervenor-Plaintiffs, :

      -against-         :  C.A. No.
                      :  04-12097-GAO

WASHINGTON GROUP          :
INTERNATIONAL, INC., RON    :
BENNETT, MICHAEL FOGARTY and :
DENNIS WOODRUFF,
       Defendants.        :

- - - - - - - - - - - - - - -x

      CONTINUED DEPOSITION OF WARREN R. ANDERSON,
a witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Ken A. DiFraia, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Equal Employment Opportunity Commission, John F.
Kennedy Federal Building, Government Center, Boston,
Massachusetts, on Thursday, April 13, 2006,
commencing at 10:11 a.m.

PRESENT:

   Equal Employment Opportunity Commission
      (by R. Liliana Palacios, Esq.)
      John F. Kennedy Federal Building, Room 475,
      Government Center, Boston, MA 02203-0506,
      for the Plaintiff.

2-4

1              P R O C E E D I N G S

2              WARREN R. ANDERSON, Resumed

3    a witness called for examination by counsel for the

4    Plaintiff, being previously duly identified and

5    sworn, was examined and testified as follows:

6              DIRECT EXAMINATION, Continued

7       BY MS. PALACIOS:

8       Q.   Good morning.

9       A.   Morning.

10      Q.   I'm going to just remind you that you are

11   still under oath.  This is the continuation of your

12   deposition on the second day.  You understand that?

13      A.   Yes.

14      Q.   I wanted to just do a little bit of cleanup

15   on some of the things I asked you about yesterday

16   before I go into another area.

17              I just had a question, to the extent that

18   you know, I understand Mr. McDaniel is the corporate

19   EEO coordinator at WGI.  Does he ever get assigned

20   to the field like you are, if you know?

21      A.   Not that I know.

22      Q.   Does every site that WGI has always have an

23   EEO contact to your knowledge?

24      A.   Well, Mike is the EEO contact for every

2-5

1   site.

2       Q.   Do you know if Mike has a 1 800 number for

3   folks to contact him if necessary?

4       A.   I believe he does, but I can't say for

5   sure.

6       Q.   Do you know why you were designated the EEO

7   contact at Mystic as opposed to Mr. McDaniel?

8       A.   Well, he's not there.

9           MR. PATERNITI:   I would just insert an

10  objection.  Go ahead.

11      A.   Now, I know I believe in some of the

12  postings, we did put his name on there if someone

13  wanted to go beyond the site.  Again, someone has to

14  be designated as a contact person for EEO for the

15  site.

16      Q.   Oh, actually on the site?

17      A.   Yes, and if a labor relations person isn't

18  on the site, it's going to be the project manager

19  that will have that designation.

20      Q.   I wanted you to look at the second page of

21  Exhibit 8, which was the letter from Stephen Hanks

22  referring to the sexual harassment policy.

23          You will notice towards the end of the

24  letter, there's a reference to the company having a

2-6

1    procedure in place for resolving harassment and

2    discrimination complaints.  Do you see that?

3        A.    (Examines document)  Yes.

4        Q.    Can you tell me, if you know, where I could

5    find that procedure.

6        A.    To my knowledge, the procedure would be

7    contained in the EEO manual.

8        Q.    What is the EEO manual?

9        A.    It's all the company policies, as I recall,

10   on EEO and affirmative action.  There are sample

11   letters to the union, sample postings, a general

12   reference manual.

13       Q.    Is that different than the labor relations

14   manual we discussed yesterday?

15       A.    Yes.

16       Q.    Thank you.  You can put that aside.

17              I'm not actually going to ask you a lot of

18   questions about Exhibit 16, which we discussed

19   yesterday, the notes of the investigator on your

20   interview.  I understand that you objected to the

21   interview in the way you did yesterday, but I did

22   want to ask you a couple of questions based on what

23   the notes say.

24              If you could look at Page 7 of Exhibit 16.

2-106

1    Q.    Have a safe trip home.

2                   CROSS EXAMINATION

3    BY MR. BENNETT:

4    Q.    Good afternoon, Mr. Anderson.

5    A.    Afternoon.

6    Q.    This is my opportunity to ask you some

7    questions.  I will try to be as quick as possible so

8    we can get you out of here and back to Denver.

9             Are all the WGI employment policies and

10   procedures supposed to be applied uniformly to all

11   employees?

12   A.    Site job rules would be, but obviously

13   there would be variations to that for staff

14   employees.

15            We have ethics issues that a craft worker

16   wouldn't, but generally your site rules on a site

17   would apply to everyone, yes.

18   Q.    So, for example, if it says that workers

19   are not supposed to do X, Y or Z at the site, that

20   type of policy would apply to all workers uniformly?

21   A.    If two superintendents were in a fist

22   fight, they would both be fired, for instance.

23   Q.    Were EEO policies given to the foremen?

24   Were there ever written policies given to the

2-107

1    foremen?

2        A.    Not specifically, no.

3        Q.    I'm talking about at the Mystic site, of

4    course.

5        A.    If a foreman were to come on after I

6    supplied those documents which we talked about

7    yesterday for the safety department to hand out,

8    then they would have, but prior to that, no, not

9    that I'm aware of.  I'm not aware of it.

10       Q.    Are you talking about the September 16,

11   2002 documents that are part of the check stuffer

12   type thing?  Which document is it?

13             MR. PATERNITI:  Why don't you take a look

14   at the exhibits.

15             MS. PALACIOS:  I believe it's Exhibits 5, 6

16   and 7.

17             MR. PATERNITI:  Yes, 5, 6 and 7.  Take a

18   look at those.  Here's No. 5.

19       A.    These postings were also then handed out in

20   orientation as part of a package.  A foreman coming

21   on board at that time period or later would have

22   received this.

23       Q.    You are referring to Exhibits 5 through 7?

24       A.    That's correct.

1  Q.    Is it fair to say that these postings came

2  about on or about, as I think the position statement

3  refers to the date of, September 16, 2002?

4  A.    It would have been in that time period,

5  correct.

6  Q.    Is it fair to say that prior to

7  September 16, 2002, there were no EEO policies or

8  any type of affirmative action type policies

9  provided by WGI to any foremen; is that correct?

10  A.    Not to my knowledge, no.

11  Q.    That same question goes to employees.

12  Would there have been any type of EEO policies,

13  affirmative action policies, cultural diversity

14  policies handed out by WGI to employees prior to

15  September 16, 2002?

16  A.    Not to my knowledge.

17  Q.    The same question goes as far as general

18  foremen, assistant superintendents, superintendents

19  and everyone up from there, would it be fair to say

20  that no EEO policies, cultural diversity policies,

21  affirmative action policies were provided to anyone

22  above the level of a foreman by WGI either; is that

23  correct?

24  A.    No, no.  Staff people, whether it was

2-109

1  through an E-mail or a mailing, generally once a

2  year, as I can best recall, were reminded of the

3  policies of the company when it came to EEO and

4  affirmative action.

5      Q.   What do you mean by "staff personnel"?

6      A.   That would be anyone who is a salaried

7  individual that works for Washington Group, not an

8  hourly craft worker.

9      Q.   Is a general foreman considered to be a

10 craft worker or a staff person?

11     A.   Craft worker.

12     Q.   How about the assistant superintendent?

13     A.   That would be a staff person, a salaried

14 staff person.

15     Q.   Would you agree with me that from the

16 general foreman, the next step up would be assistant

17 superintendent, or is there something I'm missing?

18     A.   Well, you may not have an assistant

19 superintendent in a structure.  A general foreman

20 may report directly to a superintendent.

21          Because of the extreme size of this

22 project, we had assistant superintendents.  In a

23 fairly normal sized job, you wouldn't have so many

24 layers.

2-110

1    Q.    Would it be fair to say the next step up

2    from general foreman would be either assistant

3    superintendent or superintendent?

4    A.    Yes.

5    Q.    The distinction between a craft worker and

6    a staff employee came from the ascension from

7    general foreman to either assistant superintendent

8    or superintendent?

9    A.    Yes, because that ascension is really

10   reflected in the labor agreement.  The general

11   foremen on down are all craft employees referred by

12   the union.  They are considered temporary employees,

13   compared to a permanent staff employee.

14   Q.    You said EEO policies were given by WGI to

15   staff employees?

16   A.    Yes, on a regular basis every year.  In

17   fact, just a couple of months ago, I received an

18   E-mail from Steve Hanks similar to Exhibit No. 8.

19   Q.    Is there any documentation of when staff

20   employees at Mystic would have received any EEO

21   policies by WGI?

22   A.    I would have no idea.

23   Q.    When did you say you came onto the Mystic

24   job site?

1    A.    The 5th or 6th of December in 2001.

2    Q.    When you got there, did you have any

3  knowledge whether any EEO policies were distributed

4  to any of the staff employees?

5    A.    No, and I may not ever know that because

6  they are usually E-mailed or mailed to staff

7  employees that work for Washington Group.

8    Q.    Who mails the policies out?

9    A.    Oh, they come out of corporate.  I don't

10  know.  I don't know that.

11    Q.    Is there any particular time of the year

12  that the EEO policies get mailed or E-mailed to

13  staff employees?

14    A.    Usually around the first of the year, to

15  the best of my knowledge.

16    Q.    What would you say the protocol would be if

17  a foreman was notified by an employee of racially

18  offensive graffiti on the site or if that foreman

19  saw racially offensive graffiti?  The foreman, what

20  is he supposed to do about that?

21    A.    Well, if he's going to do something about

22  it, that's what we would have to assume, that he's

23  actually going to do something.

24    Q.    Let me stop you.  Is he supposed to do

2-112

1    something?

2         A.    Of course.  It's offensive, and it is not

3    proper on a job site to have any graffiti.

4         Q.    What is he or she supposed to do then?

5         A.    If he or she, for instance, was a member of

6    the laborers union, they could assign a laborer to

7    clean it up right now.

8              If this individual was a member of some

9    other craft, let's say a pipefitter, it would

10   generally go to the proper foreman or supervisor

11   that could get someone to do that.

12             One member of a craft can't direct someone

13   else to do any kind of work, only in a safety

14   violation.  That's the one time the rule doesn't

15   apply.  All crafts are very tight about their work,

16   though.

17             A pipefitter foreman cleaning a port-o-john

18   or cleaning a wall would actually get some reaction

19   from the laborers, "That's our job," if I'm making

20   sense.

21        Q.    What if a boilermaker foreman saw or heard

22   about racially offensive graffiti at the job site,

23   what should he have done?

24        A.    He could tell a superintendent, who'd go

2-113

1    and take care of it, contact the proper people.  It

2    would not be a difficult process.  It would be a

3    very easy process.  If there were laborers in the

4    area working, "Clean it off from there, will you."

5         I don't mean do make it sound so

6    structured.  It's not like that.  If there's cleanup

7    to be done, though, normally the laborers handle

8    that on a construction job.

9         Q.    If there was a report about racially

10   offensive graffiti to a foreman, would you be made

11   aware of that?

12        A.    Not necessarily at all, no.

13        Q.    Would there be any documentation of the

14   report of racially offensive graffiti to a foreman?

15        A.    If someone documented it specifically,

16   there would be, but if they didn't, then there

17   wouldn't be.

18        Q.    Same question relative to a general

19   foreman.  If the general foreman received a

20   complaint about racially offensive graffiti, what

21   should he or she do?

22        A.    The same answer I just gave you.

23        Q.    What about if a foreman received a report

24   from an employee about a racially offensive comment

2-114

1    or racially offensive behavior, what is the

2    appropriate action for that foreman to do?

3        A.    Notify the steward, notify his superior,

4    but ultimately something like that, you certainly

5    get it up the line to management.  That's an issue

6    management needs to be aware of.

7        Q.    Was there any instruction to the foreman on

8    what to do in the event of a report by an employee

9    of racially offensive conduct or a racially

10   offensive comment?

11       A.    No, not that I recall.  Most would know

12   that if they have a problem, being professional

13   supervisors, for the most part, most of them, that

14   an issue like that needs to be handled, needs to go

15   to a superintendent, needs action.

16       Q.    You said most of them would know.  Why do

17   you say that?

18       A.    Well, because there's no group of people

19   where everyone performs perfectly.  That's why I say

20   that.

21       Q.    Is it your position that Washington Group

22   efficiently and effectively investigated the

23   racially offensive graffiti at the Mystic site?

24            MR. PATERNITI:  Objection.  Go ahead.

2-121

1    two employees that were alleged to have been in the

2    fight were?

3         A.    I may have, but I don't recall now.

4         Q.    At the time, did you talk to the two

5    employees who were alleged to have been in the

6    fight?

7         A.    At the time of the fight?

8         Q.    Or shortly thereafter.

9         A.    Oh, I didn't know anything about the fight

10   for quite a long time.  That came out in some of the

11   filings by the plaintiffs.

12        Q.    Was there an EEO coordinator on the site

13   for the night shift?

14        A.    No, there was not.

15        Q.    I forget, did you say your title was also

16   the EEO coordinator?

17        A.    I was designated by Washington Group to be

18   the EEO coordinator and the primary contact for any

19   issues that came up.

20        Q.    I think you said you usually got there

21   between five and 5:30 or around there in the morning

22   and stayed until 5:00 p.m.?

23        A.    That's correct.

24        Q.    Is it fair to say that there was no one

2-122

1    that did what your duty was during the day, no one

2    to do that during the night shift as far as the EEO

3    was concerned?

4        A.    That's right.

5        Q.    If someone on the night shift wanted to

6    come to you, they would obviously wait until the

7    next day that you were there?

8        A.    That's correct.

9        Q.    Or they would leave a message, correct?

10       A.    That's correct.

11       Q.    I think you answered this earlier, but I

12   will ask it again because I just don't remember.   Is

13   it fair to say you never spoke to Victor Ussow?

14       A.    That's correct.

15       Q.    Why is that?

16       A.    The information that I got from Charley

17   Belangia was this incident had occurred I believe a

18   couple of months before, not in my discussion with

19   Charley, I didn't know about the Victor Ussow

20   incident when it occurred, but after a couple of

21   months passed and there were the filings, I talked

22   to Charley Belangia, and he related to me that Mike

23   Fogarty had the individuals, the break room people

24   that had originally been involved in it, had Victor

2-160

1   already been at work.  As I recall, it was dark

2   outside.

3          I asked him, "Did you tell a joke involving

4   the word nagger?"  He said, "Yes, I did."  I said,

5   "Would you relay the joke to me."

6          He said, "Two guys are walking down the

7   street.  One says to the other one, 'Is your wife a

8   nagger?'  The other one says 'No, she's just a

9   little old white lady.'"  He readily admitted the

10  joke.

11      Q.   Was that similar to the joke that

12  Mr. Baldwin had complained about in the paperwork?

13      A.   Yes.  He misquoted it, however, I believe.

14  I remember the joke very well because I was asking

15  the party to relay it exactly to me as he told it.

16      Q.   When was this conversation with Mr. Finch?

17      A.   My best memory is maybe October/early

18  November.  I would have to go back to the notes.

19      Q.   What, if anything, did you say to Mr. Finch

20  about that?

21      A.   I said it was not funny.  I said, "It's

22  stuff like that that gets companies in trouble."  I

23  said, "Did you ever consider you could be sued as an

24  individual for behavior that could be alleged as

2-161

1   racist conduct?"  "Well, I really didn't think about
2   it."
3           I said, "Well, your supervisor here, in
4   front of your steward, we're putting you on notice
5   that if your name ever comes up in any fashion with
6   any racial context, the company will take action
7   against you.  Do you understand?"  He said, "Yes."
8       Q.   Why wasn't Mr. Finch terminated at that
9   point?
10      A.   This was long after the incident.
11      Q.   Do you know if Mr. Finch still works for
12  WGI?
13      A.   I would doubt it.  I don't know
14  specifically, but he would have been laid off, I
15  would imagine.
16      Q.   As perhaps a reduction in force?
17      A.   Yes.
18      Q.   Was anything in writing placed in
19  Mr. Finch's personnel file?
20      A.   No, not that I'm aware of.
21      Q.   Why not?
22      A.   He was given a verbal warning.  It doesn't
23  necessarily have to be documented.  His steward
24  heard it.

2-170

1       A.    Let me think for a second.  I can't recall
2   whether he was aware of the charge or not, but I
3   just wanted to make sure he was.
4           The conversation was very short.  The first
5   time I called I talked to his wife.  He didn't call
6   back.  I called again.
7           It was only right that he be notified.  He
8   was a party to this.  It was not a long
9   conversation.
10      Q.    You didn't have an in-depth conversation
11  about --
12      A.    No.
13      Q.    I have to finish the question.  Is it fair
14  to say you didn't have an in-depth conversation with
15  him regarding any substance of the allegations
16  regarding any of these complaints?
17      A.    That's correct.
18          MR. BENNETT:  Off the record.
19          (Discussion off the record)
20          (Recess at 4:45 p.m.)
21          MR. BENNETT:  (4:53 p.m.)  I will stop now
22  and let Jacques do cross.
23
24

2-175

1    A.    The journal I have now?

2    Q.    All the journals, basically the compilation

3  of your journals.

4    A.    I keep all my journals over the years.

5  Yes.

6    Q.    Were you ever trained by WGI or any of its

7  employees or contractors to conduct investigations

8  based upon allegations of discrimination of any

9  nature?

10    A.    Specifically trained would be your question

11  to do this kind of activity?

12    Q.    To train you to train others in terms of

13  how to deal with discrimination.

14    A.    Oh, I'm sorry.  Have I ever been trained to

15  train others?

16    Q.    That's correct.

17    A.    No.

18    Q.    Have you ever witnessed any acts of racial

19  discrimination in your lifetime?

20    A.    Personally?  On the police department I

21  did.

22    Q.    Can you describe those incidents to me.

23    A.    Other officers being racist, yes.

24    Q.    Around what year?  When was that, if you

2-176

1    can briefly tell me that?

2        A.    Maybe '71, '72, '73, somewhere in there.

3        Q.    Have you ever witnessed racial

4    discrimination at work?

5        A.    Where I was a witness to the

6    discrimination, not that I can recall, no.

7        Q.    And that includes WGI or Morrison-Knudsen

8    or any of the predecessors.

9        A.    Stone and Webster.   No.

10       Q.    Let me ask you, do you think the word

11   "nigger" is a racially offensive word?

12       A.    Absolutely.

13       Q.    You testified WGI's projects, including

14   those at the Mystic and the Weymouth sites, do not

15   have equal employment opportunity officers.

16   However, you serve as an equal opportunity officer

17   or coordinator; is that correct?

18            MR. PATERNITI:   Objection.

19       Q.    It does not have an equal opportunity

20   officer, but you serve as an equal opportunity

21   coordinator, correct?

22       A.    Yes.   I'm the contact person for those

23   issues.

24       Q.    What is the difference between an equal

2-177

1   opportunity officer versus an equal employment

2   coordinator?

3       A.    I'm not an EEO professional.  The EEO

4   officer for the company is an EEO professional.  I'm

5   not and don't purport to be.

6       Q.    What does it entail in terms of being an

7   EEO professional, as you put it?

8       A.    Whatever training that individual has had

9   over his or her life to prepare them to be an EEO

10  officer for the corporation.  I don't know

11  specifically what that is.

12      Q.    What does it entail to be an EEO

13  coordinator then?

14      A.    Someone on a job site, because we can't

15  have all types of people in all jobs.  You can have

16  a massive staff.  You just can't practically do it.

17  You have to identify one individual that's

18  responsible as a starting point for issues.

19          If the project is small, the project

20  manager has that.  He's required to handle an EEO

21  problem if it comes up, a labor relations problem.

22  Then that individual is going to reach out to the

23  professionals in the corporation to actually get

24  involved and give them guidance, try to get the

2-178

1    matter resolved or whatever.

2        Q.    You said you can't have all positions at

3    all the sites, but how would one determine exactly

4    when to have it, such as an EEO officer?

5        A.    I can't think of a specific project where

6    we had a designated EEO officer professional come

7    and be at the job site.  That's a corporate support

8    function normally.

9        Q.    Does WGI have an in-house staff of

10    attorneys?

11        A.    Yes.

12        Q.    Can you identify those individuals for me.

13        A.    Bob Berlin...

14        Q.    For each name, give me the title, please.

15        A.    Bob Berlin, he's a staff attorney.  I don't

16    know his specific title.  There's other attorneys.

17    I believe he works for Rich Perry, which would be

18    probably the corporate attorney.

19            We have others, but I don't know their

20    names.  My communication is done with Bob Berlin.

21        Q.    In any event, you certainly can get that

22    information?

23        A.    Absolutely.

24        Q.    If we were to ask you for that, you could

2-179

1    provide that?

2        A.    You bet.

3        Q.    Have you ever worked or communicated with,

4    for example, Bob Berlin or any of the other

5    attornies regarding the racial discrimination and

6    training and things you dealt with at the Mystic

7    site?

8        A.    When these issues came up and there were

9    filings, Bob Berlin was involved in that, as well as

10   Erin Higgins, Mike McDaniel.  There would have been

11   discussions with them.  I can't specifically

12   remember now.

13       Q.    Without telling me exactly the nature of

14   your conversation with Bob Berlin or the other

15   in-house attorneys, what exactly did you -- what was

16   your involvement with them?

17       A.    They have to be kept informed, usually Mike

18   McDaniel in this particular case.  I talk to Bob

19   Berlin about labor relations issues on a fairly

20   regular basis.

21            For these particular cases, Mike McDaniel

22   would have had most of the communication with Bob

23   Berlin.

24       Q.    Is it fair to assume that you being the

2-180

1    coordinator on the site, then Mike McDaniel would

2    also touch base with you regarding some of his

3    conversations, if not all of them, with Berlin?

4        A.    Sure, part of normal conversations.

5        Q.    You stated both to Attorney Bennett and to

6    Attorney Palacios that you assisted your lawyers,

7    including WGI's in-house attorneys, in preparing the

8    discovery responses to the various discovery

9    requests that we all made; is that correct?

10            MR. PATERNITI:   Objection.

11       A.    Yes.

12       Q.    Could you briefly describe exactly what you

13   mean by assisting.  What exactly did you do by

14   assisting?

15       A.    Provided information, parts of information,

16   pieces of information, things that I knew.

17            Specifically I may say, "Listen, you may

18   need to contact these people because they know

19   details, also."  They would do that.  Coordination,

20   provide what I knew, but other people have to

21   provide what they knew, too.

22       Q.    You stated yesterday that you had postings,

23   and the postings would be posted, for example, in

24   the toolbox meetings, would be posted on the

2-181

1  bulletin board; is that correct?  There was a

2  bulletin board where you had postings that you

3  posted there?

4      A.    Yes.

5      Q.    To clarify, were any other items posted on

6  that bulletin board?

7      A.    There was some safety information up there

8  that I recall.

9      Q.    Were you the only one that posted documents

10  there?

11      A.    The safety department did, also.

12      Q.    Is it fair to say only safety and perhaps

13  policies that were posted, or were there other

14  things?

15      A.    That's all I can recall.  I mean...

16      Q.    Mr. Anderson, you testified yesterday that

17  as a police officer, it was important to write

18  coherent reports; is that correct?

19      A.    Yes.

20      Q.    You further stated that the report writing

21  was fairly critical?

22      A.    Yes.

23      Q.    In your capacity as an equal employment

24  coordinator and as a director of labor relations,

2-182

1  you didn't draft any reports regarding your

2  investigation in connection with the complaints; is

3  that correct?

4      A.   Some of them.  You have to be more

5  specific.

6      Q.   Which reports did you draft for which

7  incidents basically with respect to the allegations

8  that are in contention here?

9      A.   There were a couple of meetings with Joe

10 Willis that rather than just the notes in my log, I

11 made separate notes.

12     Q.   You say you made separate notes.  Were they

13 notes or reports?  I'm trying to understand.

14     A.   They were notes to help me in guiding me in

15 discussing the matter with McDaniel to try to keep

16 the incidents clear in my mind.

17     Q.   You or WGI didn't have a protocol of

18 actually keeping a report for each incident that

19 occurred, correct?

20          MR. PATERNITI:  Objection.

21     A.   No, not necessarily a formal report for

22 everything that occurred.  No.

23     Q.   Did you or WGI have a protocol in place for

24 investigating complaints?

2-183

1          MR. PATERNITI:  Objection.

2      A.    Define "protocol."

3      Q.    If you had a policy that states that -- for

4  example, in our case just say Joe Smith comes to you

5  and he has a racial discrimination complaint, and he

6  tells you exactly, "Here is what you need to do as

7  an EEO coordinator in terms of investigating this."

8  There are certain steps to take in terms of

9  contacting people, writing documents, tracking it,

10 putting it in a file.  Was there a policy in place

11 as to exactly how to do that?

12     A.    No.

13     Q.    Was there a policy in place for tracking

14 each complaint?

15     A.    No.

16     Q.    Did you document, investigate and track

17 every separate incident when an employee complained

18 about racial discrimination or being in a racially

19 hostile environment?

20     A.    Be a little more specific.

21     Q.    I'm asking you whether when there was a

22 racial complaint or a complaint regarding racial

23 discrimination or a racially hostile environment,

24 whether you or a member of WGI really actually

2-184

1    investigated that, tracked that and documented each

2    complaint, if there was a system to do just that?

3            MR. PATERNITI:  Objection.  Go ahead.

4        A.   Not a formal system, but there would be

5    notes taken.  There might be a typed report done.

6    What would come out of that would be kept somewhere,

7    in a file, for instance, but there was not a

8    specific guidance document that would tell you how

9    to do this each and every time.

10           The idea was to get the pertinent

11   information and retain that and fix the problem if

12   possible.  That would be the goal, not necessarily a

13   lot of structure on how the paper would flow or be

14   kept.

15           That's a general answer to your question.

16       Q.   If I can get back to specifically

17   Mr. Enagbare and Mr. Willis for a moment.  Do you

18   know how many times Mr. Enagbare complained to his

19   foreman?

20       A.   I don't.

21       Q.   Do you know how many times he complained to

22   his general foreman?

23       A.   I do not.

24       Q.   Do you know how many times he complained to

2-185

1    his steward?

2        A.    I do not.

3        Q.    There's no way, no system in place, no

4    policy in place for tracking those complaints?

5            MR. PATERNITI:  I would object to that

6    whole series regarding just "complaints."

7        Q.    For racial discrimination complaints.

8        A.    No, no system in place.

9        Q.    Do you know how many times Mr. Willis made

10   any complaints with respect to racial discrimination

11   or a racially hostile environment to his foreman?

12       A.    I do not.

13       Q.    Do you know how many times Mr. Willis made

14   any such complaints with respect to racial

15   discrimination or a hostile environment to his

16   general foreman?

17       A.    I do not.

18       Q.    Do you know how many times he made the same

19   type of complaints to his steward?

20       A.    I do not know.

21       Q.    You testified that you had an opportunity

22   to actually at one point review the complaints or

23   charges that were filed by Mr. Willis and

24   Mr. Enagbare to the EEOC, correct?

2-186

1      A.    Yes, at some time in the past.

2      Q.    How did it come about in terms of you

3   reviewing those complaints?

4      A.    The company received the complaint.  I

5   don't remember whether it was in Birmingham with

6   Mike McDaniel or myself.  That would have been

7   shared with me to look it over.

8      Q.    When it was mailed out, the company would

9   get it, and you are thinking maybe Mike McDaniel got

10  it and he actually contacted you as the coordinator

11  on-site?

12     A.    Yes.  If it wouldn't have been me, he would

13  have used the project manager or someone at the

14  site, of course.

15     Q.    Do you recall what, if anything, you did

16  upon being contacted or upon learning of the charges

17  that were filed by either Mr. Enagbare or

18  Mr. Willis?

19     A.    If you are saying what did I specifically

20  do upon seeing the charge or reviewing the charge, I

21  would have begun a process of talking to Mike,

22  gathering any information that needed to be

23  gathered, was there going to be a position statement

24  done.  There would be a series of events taking

1    place.   I believe that's my best answer to you.

2         Q.    After learning of the complaint, did you

3    contact either Mr. Enagbare or Mr. Willis with

4    respect to the complaints that were filed?

5         A.    I would have to see the dates that we got

6    the complaints.   Then I would have to look at my

7    logbook maybe.

8         Q.    If you have your logbook at any given point

9    while you are here, feel free to pull it out to

10   refresh your memory.

11            Here's the notice that was sent out.   I'm

12   actually not going to introduce that into evidence

13   as an exhibit to the deposition.

14        A.    (Witness reviews document)  Okay.

15        Q.    I think it was mailed either on the 28th or

16   29th.   It's safe to say you didn't get it on those

17   dates, right?

18        A.    Right.   I recall that at the meeting that I

19   had, the first meeting with Godwin on the 5th of

20   September, that the knowledge of him making this

21   filing was there.

22        Q.    So at least by the 5th of September of

23   2002, you had knowledge of the fact that

24   Mr. Enagbare had at least filed his complaint?

2-188

1    A.    Yes, because I have a notation in my log to

2  that effect, that he said he had went to the EEOC

3  and filed a charge.

4    Q.    Are you finished?

5    A.    I'm done.

6    Q.    Do you recall whether by September 5, 2002,

7  Mr. Willis had filed a complaint?

8    A.    No, I don't recall that right at the

9  moment.

10    Q.    In terms of your investigation of the

11  matters in the complaint, what, if anything, did you

12  learn, if anything, about Mr. Enagbare?

13    A.    You have to be more specific.

14    Q.    You conducted an investigation?

15    A.    Yes.  I spoke with him a few times, yes.

16    Q.    Let me be specific with respect to

17  allegations that Mr. Enagbare himself may have used

18  the word "nigger."  Were you aware of that?

19    A.    Yes, I became aware of that at some point.

20    Q.    At what point did you become aware of that?

21    A.    I believe it might have been in a grievance

22  hearing dated the 20th, or sometime in the latter

23  part of September.

24    Q.    You never observed yourself, though, or

2-199

1    Q.    In light of what you have seen and in light

2    of your own testimony that these pictures are

3    racially offensive, if you had the opportunity,

4    would you have done anything differently in terms of

5    dealing with the racially offensive graffiti at

6    Mystic?

7    A.    Would I have done anything differently?

8    Q.    Yes, you, or would you have suggested

9    anything to be done differently to WGI?

10   A.    We established a crew to take care of it.

11   The graffiti comes and goes.  You can erase it.  It

12   will be right back up there in a second.  It's an

13   ongoing task that has to take place.  I think the

14   crew did a good job over time.

15   Q.    So you would not have done anything

16   differently; is that the answer?

17   A.    What was done was done.  It is what it is.

18   Q.    I'll leave it at that.  That's fine.

19         Would it have been reasonable for you to

20   visit the site, the specific location where, for

21   example, Mr. Enagbare, Mr. Willis and the other

22   Intervenor-Plaintiffs stated where they saw racially

23   offensive graffiti?

24         MR. PATERNITI:  Objection.

2-200

1    Q.    Would that have been reasonable?

2    A.    Not really.  I was an incredibly busy

3  person.  We had individuals that worked in the field

4  all the time that could address those matters.

5    Q.    Would it have been reasonable to have those

6  individuals address that matter?

7    A.    I believe they did, the superintendents and

8  the foremen, stewards.

9    Q.    You testified yesterday that you actually

10  didn't get a chance to see WGI's With all Due

11  Respect Training tape, correct?

12    A.    That's correct, I have not seen it.

13    Q.    Would it have been reasonable for you as

14  the EEO coordinator and director of labor relations

15  to have viewed that tape?

16         MR. PATERNITI:  Objection.

17    A.    I don't even know if we had that tape back

18  then.  I don't remember.  I don't know.

19    Q.    If you were aware of it, would it have been

20  reasonable for you to have viewed it as the EEO

21  coordinator?

22    A.    It would be a tape that anyone in

23  management could view.  It would be reasonable that

24  anybody in management could see it, yes.

2-201

1    Q.    Would it have been reasonable for you as

2    the EEO coordinator and the director of labor

3    relations to have placed some of the policies as a

4    check stuffer to all the employees?

5         MR. PATERNITI:  Objection.

6    A.    Are you asking if I did a check stuffer on

7    policies?

8    Q.    Yes.

9    A.    Yes.  I did two of them.

10    Q.    You testified that orientation of employees

11   did not include EEO policies; is that fair?

12    A.    Until I added some, yes, that's correct, to

13   the best of my knowledge.

14    Q.    When did you add some, by the way?

15    A.    This would have been around the beginning

16   of September.

17    Q.    What year?

18    A.    2002.

19    Q.    Since you never visited the port-o-johns

20   and the other locations where they had racially

21   offensive graffiti, I mean, it's hard for you to

22   gauge how bad the problem really was, correct, since

23   you never visited those sites?

24    A.    No, I couldn't gauge the full extent or

2-202

1    less extent of the problem.

2        Q.    While working at other sites for WGI, did

3    you visit specific areas where they had graffiti,

4    whether they were offensive or not?

5        A.    Over my lifetime, I have seen graffiti.  I

6    cannot be any more specific than that.

7        Q.    I'm asking specifically if any complaints

8    were made at any site?  Were there any complaints

9    made regarding racially offensive graffiti at other

10   sites when you worked there at WGI?

11       A.    I don't know of any.  There may have been.

12   Other individuals may be able to tell you that.

13       Q.    Sir, you've been very helpful.  Thank you

14   very much.

15           MR. BENNETT:  Off the record.

16           (Discussion off the record)

17                    RECROSS EXAMINATION

18   BY MR. BENNETT:

19       Q.    Mr. Anderson, is it fair to say that

20   Mr. McDaniel never came to the Mystic site, as far

21   as you know?

22       A.    To my knowledge, he never did.

23       Q.    Did he ever tell you he was traveling to

24   the Mystic site to look at the racially offensive --

2-212

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                    )

3      I, Ken A. DiFraia, Registered Professional

4  Reporter and Notary Public in and for the

5  Commonwealth of Massachusetts, do hereby certify

6  that there came before me on the 13th day of April,

7  2006, at 10:11 a.m., the person hereinbefore named,

8  who was by me duly sworn to testify to the truth and

9  nothing but the truth of his knowledge touching and

10 concerning the matters in controversy in this cause;

11 that he was thereupon examined upon his oath, and

12 his examination reduced to typewriting under my

13 direction; and that the deposition is a true record

14 of the testimony given by the witness.

15     I further certify that I am neither attorney or

16 counsel for, nor related to or employed by, any

17 attorney or counsel employed by the parties hereto

18 or financially interested in the action.

19     In witness whereof, I have hereunto set my hand

20 and affixed my notarial seal this 27th day of April,

21 2006.

22                _Ken A. DiFraia_____

23                        Notary Public

24            My commission expires 4/3/09